IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

BLAYDE GRAYSON                                                    PETITIONER

v.                                        CIVIL ACTION NO. 1:04-CV-708-CWR

LYNN FITCH, Attorney General, State
of Mississippi, *et al.*                                         RESPONDENTS

### MEMORANDUM OPINION AND ORDER

This is a capital habeas case. The Petitioner, Blayde Grayson, was convicted of

capital murder and sentenced to death in the Circuit Court of George County,

Mississippi. He wants this federal court to issue a Writ of Habeas Corpus that vacates

his state-court conviction and sentence. In habeas cases, the standard of review is

highly deferential, constraining, and even suffocating. It is a difficult standard to

meet. As the Court will explain in more detail below, when reviewing the state court's

rulings, it does not matter whether the federal court believes the state court's

determinations might have been incorrect. Instead, the federal court determines

whether the state court's determinations were unreasonable. For the following

reasons, the Court denies Grayson's petition and dismisses this case with prejudice.

### I. BACKGROUND

It was not unusual for Ray Pierce to begin his day early. The morning of May

5, 1996, was just another day. Around 5:00 a.m., Pierce took a walk around his George

County property. Trial Record Vol. 7 [153-12], at 22. His mother-in-law, Minnie

Smith, lived in a house nearby. *Id.* at 20. During the walk, Pierce noticed that one of

Smith's windows was open, and the screen was missing. *Id.* at 22. Otherwise, nothing appeared to be out of order. *Id.* at 23. He checked her front door, to see if there was any indication that she was awake, but he concluded that she was still asleep and returned home. *Id.* at 22-23. It was early.

Pierce then stuck to his routine on this Sunday morning. He left home to pick up a newspaper and some breakfast. *Id.* at 23. When he returned to Smith's home, his typical day turned into a nightmare. There was still no indication that Smith was awake. *Id.* at 23. Pierce went to Smith's bedroom window and called for her, but she did not answer. *Id.* at 23-24. He walked around to the back of the house and noticed that the door onto a small back porch – which Smith typically kept latched – was open. *Id.* at 24. Pierce also noticed that the door which led from the porch into Smith's kitchen was open. *Id.* That was unusual, as she typically locked that door with a deadbolt. *Id.*

Pierce entered the house to investigate, and he found Minnie Smith's lifeless body lying on her bed with a bloody quilt over her head. He pulled back the quilt and found that her head was black from an apparent beating, and she had a gash on her neck. *Id.* at 24-26. She was dead. He and his wife called the authorities.

Elaine Pierce – Smith's daughter – had seen her 78-year-old mother the night before, and she was in generally good health for her age. Trial Record Vol 6 [153-11], at 133-34. On the morning Pierce and her husband discovered that Smith had been murdered, a wheelbarrow had been pushed under the open window on Smith's home,

2

and there were tire tracks leading to the back porch. *Id.* at 137, 142. They could not find the missing screen. *Id.* at 138. Elaine Pierce also testified that Smith's purse, a pocket watch that had belonged to her father, a shotgun, a flashlight, a lantern, and a kitchen knife were missing from the house. *Id.* at 143. A couple of days earlier, Pierce had taken her mother to the bank to cash a social security check, and there was over $200.00 in Smith's purse at the time of the murder. *Id.* at 150-51.

Paramedics arrived and confirmed that Smith was dead. According to the autopsy report,[1] Smith suffered thirty stab wounds, six slashing wounds, and blunt force trauma to the head. Trial Record Vol. 8 [153-13], at 123, 138, 140; PCR Record Vol. 1 [154-1], at 58, 66. The medical examiner, Dr. Stephen Hayne, testified that the stab wounds were made by a blade about two inches long, and he confirmed that the kitchen knife which was stolen from Smith's house fit the criteria. Trial Record Vol. 8 [153-13], at 143-44. Hayne testified that Smith's first injury was the blunt force trauma to the head, which caused significant bleeding over the surface of the brain and could have caused her death over time. *Id.* at 142, 147. Most of the stabbing and slashing wounds were likely inflicted after the head injury, and they were primarily on her face and neck, although there were some defensive wounds to her hands and arms. *Id.* at 128-131, 135, 147. Hayne testified that two stab wounds to Smith's chest killed her. *Id.* at 136-37. One cut through her trachea and carotid artery; another cut through her lung and struck her heart. *Id.* Hayne estimated that the total time of the

---

[1] *See* PCR Record Vol. 1 [154-1], at 57-67.

3

attack was less than twenty minutes, and that Smith would have been conscious for at least part of that time, given the defensive wounds on her hands and arms. *Id.* at 131, 136, 147, 149. He said that while she was conscious, she suffered "considerable pain." *Id.* at 146, 148.

Local law enforcement officers, assisted by the State Crime Lab, began their investigation. Trial Record Vol. 7 [153-12], at 53. They took blood samples from several locations in the house, including the bathroom. *Id.* at 114-23. They also took fingerprints, as well as photographs of tire tracks and shoe impressions from outside the house. *Id.* at 123-29. After interviewing several people in the area, officers settled on the Petitioner, Blayde Grayson, as a suspect. *Id.* at 65-66, 95.

Grayson grew up about a quarter of a mile from Minnie Smith, where he lived with his mother and stepfather. Trial Record Vol. 10 [153-15], at 52, 57. The Smith and Grayson families were well-acquainted and friendly with each other. *Id.* at 58; Exhibit 9 to Petition [8-2], at 27, 33-34. Grayson began having disciplinary problems as a teenager. Trial Record Vol. 10 [153-15], at 54. He started using marijuana when he was thirteen or fourteen, and by the time he was seventeen he graduated to using crystal meth and cocaine. *Id.* at 54; Trial Record Vol. 9 [153-14], at 30, 33-34; Exhibit 35 to Petition [8-2], at 137; Exhibit 37 to Petition [8-2], at 147; Exhibit 51 to Petition [8-2], at 189-90. The drugs made him a different person according to some, Exhibit 35 to Petition [8-2], at 137, and Grayson began breaking into homes while under the influence. Trial Record Vol. 9 [153-14], at 31, 34; Exhibit 36 to Petition [8-2], at 142.

4

In August 1995 – approximately nine months before the murder – he pleaded guilty to grand larceny and knowingly receiving stolen property and was sentenced to the Pascagoula Restitution Center. Trial Record Vol 9 [153-14], at 31; Exhibit 12 to Petition [8-2], at 66-67.

In January 1996 – before he completed his sentence – he left the Restitution Center and traveled to Florida. A warrant was issued for his arrest. Successive PCR Record Vol. 2 [69-2], at 107; Exhibit 2 to Petition [8-2], at 5-6; Exhibit 37 to Petition [8-2], at 148. While in Florida, Grayson met Jason Kilpatrick and moved in with him near Pensacola. Exhibit 55 to Petition [8-2], at 201-02; Trial Record Vol. 8 [155-13], at 9. From January 1996 to May 1996, Grayson and Kilpatrick were active drug users, and they committed at least three armed robberies together. Exhibit 55 to Petition [8-2], at 201-02; Trial Record Vol. 9 [153-14], at 44; Trial Record Vol. 4 [153-9], at 46. On May 4, 1996 – the night of the murder – Grayson and Kilpatrick traveled to George County, Mississippi, ostensibly to visit Grayson's grandparents. Exhibit 10 to Petition [8-2], at 37, 41.

After their initial investigation led to Grayson as a suspect, law enforcement officers learned that he had been living in Escambia County, Florida. Trial Record Vol. 7 [153-12], at 65-55. They notified law enforcement in that area that they were looking for Grayson in connection with a murder. *Id.*; Trial Record Vol. 4 [153-9], at 46. On May 17, 1996, Escambia County authorities took Grayson and Kilpatrick into custody after a SWAT team stand-off at Grayson's girlfriend's trailer, and they

5

contacted George County that they had Grayson in custody. Trial Record Vol. 9 [153-14], at 40; Trial Record Vol. 4 [153-9], at 60. After the Florida officers questioned Grayson about the series of armed robberies he and Kilpatrick had committed, he expressed a desire to talk about "other crimes going on." Trial Record Vol. 4 [153-9], at 54. Accordingly, George County Sheriff George Miller traveled to Florida with Al Hillman, a Sheriff's Department investigator, and Houston Dorr, a Mississippi Highway Patrol ("MHP") investigator. Trial Record Vol. 7 [153-12], at 66; Trial Record Vol. 8 [153-13], at 31.

While the Mississippi officers were in Florida, they recovered a twelve-gauge shotgun, a small knife, a flashlight, and a lantern from Grayson's girlfriend's trailer. These four items were later identified by the Pierces as having been taken from Minnie Smith's house. Trial Record Vol. 8 [153-13], at 31; Trial Record Vol. 7 [153-12], at 66-72, 84-85; Trial Record Vol. 6 [153-11], at 145-49. The officers also retrieved the vehicle that Grayson had driven to Mississippi. Trial Record Vol. 7 [153-12], at 72-74. A crime lab technician took impressions of the tire tracks and footprints left at the murder scene, but the State's forensic scientist was unable to make a definitive identification. *Id.* at 127, 131, 138-143. The technician also took fingerprints from the crime scene, but they did not match Grayson's or Kilpatrick's. Trial Record Vol. 8 [153-13], at 106-07.

When the Mississippi officers arrived in Florida, they attempted to interview Grayson because the Florida officers had said he wanted to talk. Trial Record Vol. 4

6

[153-9], at 26, 50, 54. The Mississippi officers gave Grayson a *Miranda* warning, and he signed a waiver of rights. *Id.* at 27, 32. However, after they asked a few questions, Grayson said he did not want to talk to them until he talked to his lawyer. *Id.* at 27; Trial Record Vol. 8 [153-13], at 97; Trial Record Vol. 9 [153-14], at 47, 52. Sheriff Miller responded that the Florida officers had said that he wanted to talk, and Grayson answered, "I was going to deal with you all when I got down there and got my lawyer." Trial Record Vol. 4 [153-9], at 28. Miller then asked another question about Grayson's location at the time Minnie Smith was murdered, and Grayson answered, "I'm not willing to discuss nothing until I talk to my lawyer. I didn't mean to bring you fellows all the way down here for nothing, . . . but I need to talk to my lawyer about this. This is a situation." *Id.* at 28-29; Trial Record Vol. 9 [153-14], at 52-53. Miller pressed on. He asked Grayson questions about traveling to Mississippi, and Grayson finally answered: "I want to talk to my lawyer, and I'm through discussing this. I don't mean to drag you fellows all the way down here, and I didn't know you were coming. They ain't nobody told me nobody was coming from George [County]. I told [them] I would take care of that next week when I got [to] George [County]." Trial Record Vol. 4 [153-9], at 29-31. Sheriff Miller terminated the interrogation.

Grayson waived an extradition hearing, and officers transported him to the George County Jail. *Id.* at 58-59. On May 20, a court order permitted officers to take biological samples from him. Exhibit 4 to Petition [8-2], at 15. For several days after

he arrived in George County, Grayson was on suicide watch, and an officer checked on him every fifteen minutes. Exhibit 3 to Petition [8-2], at 8-13; Trial Record Vol. 4 [153-9], at 59-60. While incarcerated in George County, Grayson never asked for use of a telephone to contact his attorney until after he was charged with murder. Trial Record Vol. 4 [153-9], at 64.

The next day, on May 21, James Tanner, the jailer, told Sheriff Miller that Grayson had asked to speak with him about "getting something off his chest." Exhibit 5 to Petition [8-2], at 17; Trial Record Vol. 4 [153-9], at 65-66. Officers gave Grayson another *Miranda* warning. Exhibit 8 to Petition [8-2], at 24; Trial Record Vol. 4 [153-9], at 66. Grayson then wrote out a statement in which he admitted coming to Mississippi to see his grandparents. Exhibit 7 to Petition [8-2], at 22; Trial Record Vol. 7 [153-12], at 98-99. However, Grayson said that Kilpatrick had killed Minnie Smith while he was at his grandparents' house. Exhibit 7 to Petition [8-2], at 22; Trial Record Vol. 7 [153-12], at 100. Grayson admitted that he entered Smith's home after the killing, but he said he just checked on her and covered up her body. Exhibit 7 to Petition [8-2], at 22; Trial Record Vol. 7 [153-12], at 101. He agreed to show the officers where Smith's checkbook was located, and they all returned to Florida on May 22. Trial Record Vol. 7 [153-12], at 102. Officers recovered Smith's checkbook hidden under a scarf on a shelf in Kilpatrick's trailer. *Id.* at 102-03. Officers never recovered Smith's purse or the missing screen from her window. *Id.* at 108.

On May 23, on his own initiation and after executing a waiver of rights,

8

Grayson gave another statement to Sheriff Miller and Houston Dorr. Exhibit 9 to

Petition [8-2], at 26-35; Trial Record Vol. 8 [153-13], at 34-39, 98; Trial Record Vol. 4

[153-9], at 39-40. In this second, much more detailed statement, Grayson said that he

came to George County on the night of May 4 with Kilpatrick so that he could visit

his grandparents. Exhibit 9 to Petition [8-2], at 26. He said that he told Kilpatrick to

park by Smith's house so that he could walk to his grandparents' house and see if

they were awake. *Id.* When he discovered no one was awake at his grandparents'

home, Grayson returned to the car. He stated:

> When I got back to the car, he had a gun. It was lying in the back seat
> of the car, and I said, "Shit, man." I knew he had killed someone, and
> then he told me, and I run up to the house, and I went through the
> window, and I looked to see where she was in her room, and she was
> laying on the bed. She was just laying there. I didn't check her out. I
> didn't see if her eyes were opened, how she was laying, or what have
> you. I mean, I wasn't paying no attention [to] all that bull, so I threw the
> blanket over her and throwed a pillow over her and I left, and that was
> it.

*Id.* Grayson denied taking anything from the house, and he denied entering the

bathroom. *Id.* at 27. He said that Kilpatrick threw the knife away when they got back

to Florida. *Id.* at 27, 30. After Grayson finished his statement, Investigator Dorr

asked if he would be willing to take a lie detector test. Trial Record Vol. 8 [153-13], at

40-41; Trial Record Vol. 4 [153-9], at 40. Grayson agreed to do so. Trial Record Vol. 8

[153-13], at 40-41.

The next day, officers transported Grayson to Jackson for a polygraph

examination. *Id.* at 41. During the examination, Grayson admitted to murdering

Minnie Smith, telling the examiner, "I didn't mean to kill her. I just freaked out. That's Miss Minnie." *Id.* at 102. The examiner told Investigator Dorr, who was in the next room, that Grayson wanted to talk to him. Dorr gave Grayson another *Miranda* warning and started interviewing him again. *Id.* at 41-44. This time, the statement was videotaped. *Id.* at 45.

Grayson stated that he and Kilpatrick came to Mississippi for money and drugs on the night of May 4, 1996. Exhibit 10 to Petition [8-2], at 37, 41. They went to his grandparents' house, but no one was awake. *Id.* at 42, 51. Grayson then walked to Minnie Smith's house. *Id.* at 40, 42, 52. Kilpatrick drove the car there and parked by the side of the house. *Id.* at 43. Grayson entered Smith's home through the window and picked up her shotgun, which he claimed was the only item he intended to take from the house. *Id.* at 37, 42, 45, 52. Kilpatrick followed Grayson into the house, and Smith woke up. *Id.* at 39, 43. She asked who was there and sat up in her bed. *Id.* at 40, 43. Grayson then got a knife from the kitchen, went to Smith's bedroom, and stabbed Smith to death as she begged him, "Please, don't." *Id.* at 39-40, 47, 53. Grayson admitted that the knife retrieved from the trailer in Florida was the murder weapon. *Id.* at 47.

After he had murdered Smith, Grayson went to the bathroom to wash her blood off his hands and face. *Id.* at 41. Grayson exited the house by climbing back out the window. *Id.* at 44. Kilpatrick stayed in the house after Grayson exited and took Smith's purse before exiting via the back door. *Id.* at 44-45. The two men took

approximately $200.00 and Smith's checkbook from the purse before throwing it out the car window on their way back to Florida, along with the window screen. *Id.* at 45-46, 56. Upon returning to Florida, they bought some cocaine and sold Smith's shotgun. *Id.* at 57-58.

After this confession, Grayson was formally charged with capital murder on August 16, 1996. Trial Record Vol. 1 [153-6], at 15. His trial attorney filed several pre-trial motions, including a motion for an investigator and a motion for a psychiatric examination, both of which the trial court granted. Exhibits 13, 14, 15, 19, 21 to Petition [8-2], at 69-70, 73-74, 78, 91, 95; Trial Record Vol. 3 [153-8], at 88-91, 110-12. However, the trial court denied Grayson's motion for a change of venue after a hearing in which a sample of the county's jury pool testified. Trial Record Vol. 3 [153-8], at 2-75. On August 1, 1997, the trial court held a hearing on Grayson's motion to suppress his videotaped confession of May 24, 1996, and heard testimony from several witnesses, including Sheriff Miller and Investigator Houston Dorr. Exhibit 11 to Petition [8-2], at 61-63; Trial Record Vol. 4 [153-9], at 24-151; Trial Record Vol. 5 [153-10], at 1-66. The Court ultimately denied the motion. Trial Record Vol. 5 [153-10], at 68-78.

Grayson's trial began on August 4, 1997. After the State rested, Grayson's attorneys notified the trial court that Grayson had instructed them to not contest the death penalty if he were convicted. Trial Record Vol. 9 [153-14], at 6-7. They asked the trial court to appoint a third attorney to meet with Grayson and discuss his

11

options. *Id.* at 7. The court questioned Grayson briefly, learning that he had several family members in attendance, including his mother and grandmother. *Id.* at 10-12. Grayson's mother and grandmother told the court that they understood his decision and agreed with it. *Id.* at 12-14. However, after Grayson discussed the issue with a third attorney, he changed his mind. *Id.* at 99.

The jury returned a guilty verdict. Trial Record Vol. 10 [153-15], at 18. Grayson allowed his attorneys to call his mother and grandmother to testify during the sentencing phase of trial. *Id.* at 25, 50-66. Their testimony was the only mitigation evidence Grayson presented. *Id.* at 50-66. The jury found that Grayson had actually killed Minnie Smith, that he had attempted to kill her, and that he had intended the killing take place, rendering him eligible for the death penalty.[2] Trial Record Vol. 9 [153-14], at 93-94. As aggravating circumstances, the jury found that Grayson murdered Smith for pecuniary gain during the course of a burglary, that it was an especially atrocious and cruel crime, that it was committed by a person under a sentence of imprisonment, and that it was committed to avoid arrest. *Id.* at 94. Finally, the jury found that there were insufficient mitigating circumstances to outweigh the aggravating circumstances, and they returned a verdict that Grayson should be sentenced to death. *Id.*

Grayson appealed his conviction and sentence, and on November 8, 2001, the Mississippi Supreme Court affirmed both. *Grayson v. State ("Grayson I")*, 806 So. 2d

---

[2] *See* MISS. CODE ANN. §§ 97-3-19, 99-19-101.

241 (Miss. 2002). He filed a Petition for a Writ of Certiorari with the United States Supreme Court, but the Supreme Court denied the petition. *Grayson v. Mississippi*, 537 U.S. 973, 123 S. Ct. 466, 154 L. Ed. 2d 329 (2002). Grayson then filed a petition seeking post-conviction relief, and the Mississippi Supreme Court denied it on June 24, 2004. *Grayson v. State ("Grayson II")*, 879 So. 2d 1008 (Miss. 2004). He filed another Petition for a Writ of Certiorari with the United States Supreme Court. It was denied. *Grayson v. Mississippi*, 543 U.S. 1155, 125 S. Ct. 1301, 161 L. Ed. 2d 122 (2005).

In September 2004, Grayson sought appointment of counsel [1] in this Court to represent him in a federal habeas case. The Court appointed counsel, and Grayson filed his initial Petition for Writ of Habeas Corpus [8] on April 25, 2005. On January 11, 2012, Grayson filed a Motion to Stay [32] the case while he exhausted certain claims by pursuing a successive post-conviction petition in state court. The Court granted [35] the motion on May 11, 2012, and stayed the case pending a final adjudication of Grayson's successive petition for post-conviction relief.

Grayson filed a motion in the Mississippi Supreme Court seeking leave to file a successive petition for post-conviction relief. He also sought leave for certain experts to access him in the Mississippi State Penitentiary for the purpose of evaluating him, testing him, and any other purpose deemed reasonably necessary by counsel in litigating his post-conviction claims. The Mississippi Supreme Court denied his motion for leave to file a successive petition, but it granted his experts leave to access

13

him in the State Penitentiary subject to the rules and regulations of the Mississippi Department of Corrections ("MDOC"). *Grayson v. State ("Grayson III")*, 118 So. 3d 118 (Miss. 2013).

This Court lifted the stay on the habeas case and set a new pleading and briefing schedule. On December 16, 2013, Grayson filed his Amended Petition for Writ of Habeas Corpus [41]. He eventually filed a Second Amended Petition [104] on November 14, 2017, raising numerous issues for this Court's review.

## II. DISCUSSION

Petitions for writs of habeas corpus by prisoners challenging state-court convictions because of alleged constitutional deprivations are governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). AEDPA permits this Court to "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). Moreover, AEDPA only permits this Court to grant habeas relief on claims adjudicated in state court in two circumstances:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Before the Court conducts the § 2254(d) analysis, a habeas petitioner must clear several procedural hurdles. "The point of AEDPA, . . . is to require prisoners first to exhaust state court remedies before seeking federal relief . . . ." *Broadnax v. Lumpkin*, 987 F.3d 400, 406 (5th Cir. 2021). Therefore, a federal habeas petitioner "must exhaust all claims in state court prior to requesting federal collateral relief." *Smith v. Quarterman*, 515 F.3d 392, 400 (5th Cir. 2008); *see also* 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest [state] court." *Smith v. Quarterman*, 515 F.3d 392, 400 (5th Cir. 2008) (alteration original). The exhaustion requirement "refers only to remedies still available at the time of the federal petition, [and] it is satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law." *Gray v. Netherland*, 518 U.S. 152, 161-62, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996) (punctuation and internal citations omitted). Generally, federal courts dismiss unexhausted habeas claims without prejudice, *Smith*, 515 F.3d at 400, but they may also deny unexhausted claims and dismiss them with prejudice. *Buntion v. Lumpkin*, 31 F.4th 952, 964 n. 4 (5th Cir. 2022); 28 U.S.C. § 2254(b)(2).

15

Additionally, a federal habeas court "will not take up a question of federal law presented in a case if the decision of the state court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment." *Lee v. Kemna*, 534 U.S. 362, 375, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002). "The rule applies with equal force whether the state-law ground is substantive or procedural," *id.*, and this rule is jurisdictional in nature. *Ford v. Davis*, 910 F.3d 232, 237 (5th Cir. 2018). The Court must "honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law" in the alternative. *Buntion*, 982 F.3d at 949.

A federal habeas claim is procedurally barred where "the last state court to review the petitioner's claims unambiguously based its denial on a state procedural bar." *Mullis v. Lumpkin*, 47 F.4th 380, 387-88 (5th Cir. 2022). This is a corollary to the exhaustion requirement, in that "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address the merits of those claims in the first instance." *Davila v. Davis*, 582 U.S. 521, 527, 137 S. Ct. 2058, 198 L. Ed. 2d 603 (2017) (punctuation omitted).

"Where a state court asserts a procedural bar, [the Court] presume[s] that obstacle is 'adequate and independent,'" *Paredes v. Quarterman*, 574 F.3d 281, 289 (5th Cir. 2009), and the petitioner has the burden of proving it is not. *Mullis*, 47 F.4th at 388. "If the State has firmly established and regularly followed the rule by the time

of the relevant state court decision, then the rule is adequate. If the state court decision clearly and expressly relies on the state rule to deny relief, or if the decision does not fairly appear to rest primarily on or be interwoven with federal law, then the state rule is independent." *Buntion*, 31 F.4th at 962 (punctuation and citations omitted). A state procedural rule can be "firmly established and regularly followed . . . even if there is an occasional aberrant state court decision. The question is whether the rule is applied strictly or regularly to the vast majority of *similar* claims." *Mullis*, 47 F.4th at 388 (citations omitted).

"Federal review of the merits of a procedurally-barred claim is permitted, however, where the petitioner is able to demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Garza v. Stephens*, 738 F.3d 669, 675 (5th Cir. 2013). "To establish 'cause' . . . the [Petitioner] must show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 582 U.S. at 528. "A factor is external to the defense if it cannot fairly be attributed to the movant." *Id.* "The Supreme Court has not provided an exhaustive catalog of such objective impediments to compliance with a procedural rule, but a showing that the factual or legal basis for a claim was not reasonably available to counsel or that some interference by officials made compliance impracticable would constitute cause." *United States v. Vargas-Soto*, 35 F.4th 979, 993 (5th Cir. 2022) (punctuation omitted). However, "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when

17

acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Coleman v. Thompson*, 501 U.S. 772, 753, 111 S. Ct. 2546, 115 L. Ed. 640 (1991); *see also Prible v. Lumpkin*, 43 F.4th 501, 518 (5th Cir. 2022).[3]

Once a habeas petitioner has cleared these procedural hurdles, "AEDPA restricts a federal court's ability to grant habeas relief after an adjudication on the merits in state court to only two grounds." *Chamberlin v. Fisher*, 885 F.3d 832, 837 (5th Cir. 2018). First, questions of law are addressed under § 2254(d)(1), which permits relitigation of claims adjudicated on the merits in state court when the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." 28 U.S.C. § 2254(d)(1). "Clearly established federal law" is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Poree v. Collins*, 866 F.3d 235, 246 (5th Cir. 2017).

"A state prisoner can only satisfy the 'contrary to' standard if he shows the state court decision arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if it resolves a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. Aug. 23, 2023). To satisfy the "unreasonable application" prong, "the

---

[3] A habeas petitioner can also overcome procedural default if they "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Harper v. Lumpkin*, 19 F.4th 771, 781 n. 1 (5th Cir. 2021). This exception "is limited to cases where the petitioner can make a persuasive showing that he is actually innocent of the charges against him." *McGowen v. Thaler*, 675 F.3d 482, 499 (5th Cir. 2012). Grayson does not argue that he is actually innocent, and the Court need not further address this exception.

petitioner must show the state court was so wrong that the error was well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* Stated another way, "the state court's decision [must] be 'so lacking in justification' that the error is 'beyond any possibility for fairminded disagreement.'" *Russell v. Denmark*, 68 F.4th 252, 262 (5th Cir. 2023), *cert. denied*, ___ S.Ct.___, 2024 WL 72074 (Jan. 8, 2024) (citation omitted). This standard is difficult to meet. *Id.*

Accordingly, § 2254(d)(1) "establishes a highly deferential standard for evaluating state-court rulings that requires federal courts to give those rulings the benefit of the doubt." *Engle v. Lumpkin*, 33 F.4th 783, 790 (5th Cir. 2022). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Chamberlin*, 885 F.3d at 837. The habeas court must determine "whether fairminded jurists could disagree as to how the Supreme Court's caselaw applies to the circumstances that the state court confronted; if so, then [this Court] cannot set aside the state court's conclusion." *Engle*, 33 F.4th at 790.

Second, questions of fact are addressed under § 2254(d)(2) and (e)(1). *Neal*, 78 F.4th at 783. Section 2254(e)(1) provides that "a determination of a factual issue by a state court shall be presumed to be correct," and the "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Then, § 2254(d)(2) permits relitigation of claims adjudicated on

19

the merits in state court when the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(2). In other words, the Court first applies § 2254(e)(1)'s "clear and convincing" standard to specific factual issues, and then applies § 2254(d)(2)'s "reasonableness" standard to the state court's decision as a whole. *Lucio v. Davis*, 751 F. App'x 484, 488 (5th Cir. 2018); *Neal*, 78 F.4th at 783.

"The deference to state-court factfinding required by these provisions precludes a federal court from setting aside reasonable state-court determinations of fact in favor of its own debatable interpretation of the record. Ultimately, to clear the required threshold, the petitioner must show a reasonable factfinder must conclude the state court's determination of the facts was unreasonable." *Neal*, 78 F.4th at 783. An "unreasonable determination of the facts" is one "outside the bounds of reasonable debate." *Seals v. Vannoy*, 1 F.4th 362, 370 (5th Cir. 2021). In this context, "[t]he term 'unreasonable' refers not to ordinary error or even to circumstances where the petitioner offers a strong case for relief, but rather to extreme malfunction in the state criminal justice system." *Mays v. Hines*, 592 U.S. 385, 391, 141 S. Ct. 1145, 209 L. Ed. 2d 265 (2021) (punctuation omitted).

"Claims presenting mixed questions of law and fact are reviewed under a combination of these provisions; a state court's ultimate legal conclusion is reviewed under Section 2254(d)(1), while the underlying factual findings supporting that

conclusion are reviewed under Sections 2254(d)(1) and (e)(1)." *Neal*, 2023 WL 5425588 at *4.

There are yet other hurdles petitioners must clear to receive relief. When conducting a § 2254(d) analysis, the Court may generally only consider "the record that was before the state court that adjudicated the claim on the merits." *Lucio v. Lumpkin*, 987 F.3d 451, 472 (5th Cir. 2021); *see also Cullen v. Pinholster*, 563 U.S. 170, 180-81, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011). And even if a petitioner clears AEDPA's general bar on relitigation, the Court may not grant habeas relief "if the trial error was harmless." *Burgess v. Dretke*, 350 F.3d 461, 466 (5th Cir. 2003). That is, "a federal court may grant habeas relief only if it determines that the constitutional error had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 466-67. Finally, the petitioner must "persuade a federal habeas court that 'law and justice require' relief. And whatever else those inquiries involve, they continue to require federal habeas courts to apply the Court's precedents governing the appropriate exercise of equitable discretion." *Neal*, 78 F.4th at 783 (quoting *Brown v. Davenport*, --- U.S. ---, 142 S. Ct. 1510, 1524, 212 L. Ed. 2d 463 (2022)).

AEDPA was designed to "curb the abuse of the statutory writ of habeas corpus, and to address the acute problems of unnecessary delay and abuse in capital cases." *Graham v. Johnson*, 168 F.3d 762, 764 (5th Cir. 1999). The restrictions on the Court's authority to grant habeas relief recited above "further the principles of comity,

finality, and federalism." *Williams v. Taylor*, 529 U.S. 420, 436, 120 S. Ct. 1479, 146 L. Ed. 2d 435 (2000). The Court must give challenged state-court decisions the benefit of the doubt. *Charles v. Stephens*, 736 F.3d 380, 387 (5th Cir. 2013). "This deferential standard stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings and requires the state prisoner to show that the state court's ruling was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility." *Id.* (punctuation omitted).

## A.    *Suppression of Statements*

Petitioner argues that the state trial court erred by failing to suppress statements he made to law enforcement officers after he had invoked his right to counsel, violating rights secured by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Specifically, Petitioner contends that the trial court erred by admitting evidence of statements he provided to law enforcement agents on May 21, 23, and 24, 1996. He argues that the initial statement on May 21 was unconstitutionally taken after he had requested counsel, and that he never waived his previously-invoked right to counsel prior to the two subsequent statements. Accordingly, Petitioner asserts that the three statements and any evidence obtained because of them, such as Minnie Smith's checkbook, should have been excluded from trial. He also argues that his third statement – in which he confessed to the murder – should have been excluded because it was coerced.

"Following the commencement of adversary proceedings in a criminal case, the Sixth Amendment entitles a defendant to counsel at 'critical stages' of the criminal proceedings." *Lucio*, 751 F. App'x at 488 (quoting *Rothgery v. Gillespie*, 554 U.S. 191, 212-13, 128 S. Ct. 2578, 171 L. Ed. 2d 366 (2008)). The Supreme Court defined "critical stages" as "proceedings between an individual and agents of the State (whether formal or informal, in court or out) that amount to trial-like confrontations, at which counsel would help the accused in coping with legal problems or meeting his adversary." *Id.* at 488-89 (quoting *Rothgery*, 554 U.S. at 212 n. 16). Similarly, the Supreme Court has "declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation." *Quintanilla v. Thaler*, 443 F. App'x 919, 922 (5th Cir. 2011) (quoting *Edwards v. Arizona*, 451 U.S. 477, 481, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)).[4] "The Court defined 'custodial interrogation' as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Quintanilla*, 443 F. App'x at 922 (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). If a defendant's confession was obtained in violation of the Fifth or Sixth Amendment right to counsel, then it is not admissible against him at trial. *Miranda*, 384 U.S. at 474, 479; *Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).

---

[4] "[T]he right to have counsel present during custodial interrogation" is a prophylactic measure "to insure that the [Fifth Amendment] right against compulsory self-incrimination is protected." *Goodwin v. Johnson*, 132 F.3d 162, 178 n. 12 (5th Cir. 1997).

The Court will address Petitioner's arguments as to each of the statements individually, but it must first address threshold issues applicable to each one.

### 1. *Procedural Bar*

Respondents argue that this claim is procedurally barred because the Mississippi Supreme Court found that an adequate and independent state procedural law barred its consideration of those claims. As noted above, "[f]ederal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar." *Gonzalez v. Davis*, 924 F.3d 236, 241 (5th Cir. 2019). "Where a state court asserts a procedural bar, [the Court] presume[s] that obstacle is 'adequate and independent,'" *Paredes*, 574 F.3d at 281, and the petitioner has the burden of proving it is not. *Mullis*, 47 F.4th at 388.

In *Grayson II*, the Mississippi Supreme Court found that Petitioner's claims related to the admission of statements provided before he had counsel were "barred by the doctrine of res judicata and . . . procedurally barred from relitigation by Miss. Code Ann. § 99-39-21(3)" because they had been addressed in the trial court's suppression hearing and on direct appeal. *Grayson II*, 879 So. 2d at 1012-13. The relevant statute provides: "The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal." MISS. CODE ANN. § 99-39-21(3).

In *Grayson III*, the Mississippi Supreme Court found that Petitioner's initial

post-conviction counsel had provided ineffective assistance, which required it to address the merits of the claims asserted in *Grayson II* to determine whether the ineffective assistance prejudiced him. *Grayson III*, 118 So. 3d at 128-29. In doing so, the Mississippi Supreme Court found that despite Petitioner's attempt to "recast" his arguments concerning the trial court's admission of his inculpatory statements "under a different legal theory," they were procedurally barred by Miss. Code Ann. § 99-39-21(2). *Id.* at 135. That subsection provides:

> The litigation of a factual issue at trial and on direct appeal of a specific state or federal legal theory or theories shall constitute a waiver of all other state or federal legal theories which could have been raised under said factual issue; and any relief sought under this article upon said facts but upon different state or federal legal theories shall be procedurally barred absent a showing of cause and actual prejudice.

MISS. CODE ANN. § 99-39-21(2). Alternatively, the Mississippi Supreme Court held that the claim was meritless.

Neither *Grayson II* nor *Grayson III* prevent this Court from considering the habeas claims asserted in Ground A of the Second Amended Petition. "[R]es judicata does not prevent federal review of a habeas claim." *Jordan v. Mississippi*, 654 F. App'x 196, 197 (5th Cir. 2016) (citing *Cone v. Bell*, 556 U.S. 449, 129 S. Ct. 1769, 1781, 173 L. Ed. 2d 701 (2009)). Likewise, a statutory bar that "has the same effect as res judicata and prevents the re-litigation of claims" does not prevent federal review of a habeas claim, "as long as the claim was not procedurally barred for some other reason." *Jackson v. Epps*, 447 F. App'x 535, 544 (5th Cir. 2011) (addressing MISS. CODE ANN. § 99-39-21(2)). Applying these principles, the Fifth Circuit has found that

federal review of a claim denied by a state court pursuant to Miss. Code Ann. §§ 99-39-21(2) or 99-39-39-21(3) is not procedurally barred. *See Foster v. Johnson*, 293 F.3d 766, 787 n. 12 (5th Cir. 2002); *Jordan*, 654 F. App'x at 197; *Jackson*, 447 F. App'x at 544; *see also Willie v. Bradley*, 2008 WL 1990775, at *7-*8 (N.D. Miss. Feb. 12, 2008). Therefore, the claims asserted in Ground A of the Second Amended Petition are not procedurally barred.

### 2. Sixth Amendment Claims

Respondents also argue that any Sixth Amendment right-to-counsel claim arising from Petitioner's statements is meritless because his Sixth Amendment rights had not attached at the time each statement was given. In reply, Petitioner contends that he would not have been held by local investigators but for the fact that he was a suspect in a murder. He argues that he was clearly being held because of the murder, rather than the parole violation.

"An accused in custody, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless he validly waives his earlier request for the assistance of counsel." *United States v. Cruz*, 22 F.3d 96, 97 (5th Cir. 1994). "[I]f the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984).

However, "[a] defendant's right to counsel under the Sixth Amendment attaches when adversary judicial proceedings have been initiated against him." *McFarland v. Lumpkin*, 26 F.4th 314, 322 (5th Cir. 2022). An adversary judiciary proceeding may commence "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Texas v. Cobb*, 532 U.S. 162, 167-68, 121 S. Ct. 1335, 149 L. Ed. 2d 321 (2001). Moreover, the Sixth Amendment right to counsel is "offense specific," and it "cannot be invoked once for all future prosecutions." *Id.* at 167. In other words, "[e]ven though an accused has a Sixth Amendment right to counsel for one offense – because formal charges have been brought – the right does not automatically attach to other offenses with which he has not been charged," *United States v. Alvarado*, 440 F.3d 191, 196 (4th Cir. 2006), even if they are "closely related to" or "inextricably intertwined with" the charged offense. *Cobb*, 532 U.S. at 173; *cf. United States v. Avants*, 278 F.3d 510, 518 (5th Cir. 2002) (6th Amendment right to counsel had not attached with respect to federal murder charge where defendant had been charged with murder in state court).[5]

Therefore, Petitioner's Sixth Amendment right to counsel with respect to the

---

[5] The Supreme Court has carved out a limited exception to this rule for "offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* test." *Cobb*, 532 U.S. at 173 (citing *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)). That exception is not applicable here. *Blockburger* provides that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." *Cobb*, 532 U.S. at 173. Petitioner was arrested on a warrant for a probation violation after leaving a restitution center work detail. *See* Exhibit 2 to Petition [8-2], at 5-6. The statements at issue were admitted at a trial on charges of capital murder. These charges plainly require proof of different facts. *Compare* MISS. CODE ANN. § 47-7-37, *with* MISS. CODE ANN. §§ 97-3-19, 99-19-101.

capital murder charge attached when he was formally charged with capital murder. *See Cobb*, 532 U.S. at 168; *Crawford v. Epps*, 531 F. App'x 511, 517 (5th Cir. 2013) (petitioner's right to counsel attached when he was formally charged with capital murder by issuance of a general affidavit and warrant); *Quintanilla*, 443 F. App'x at 924. Grayson was formally charged with capital murder on August 16, 1996 – almost three months after he gave the disputed statements. Successive PCR Record Vol. 2 [69-2], at 107. Accordingly, at the time of the May 21, 23, and 24, 1996, statements, Grayson's Sixth Amendment right to counsel had not attached with respect to the capital murder charge.

Petitioner argues that the Mississippi Supreme Court unreasonably determined that he was not entitled to a hearing or appointment of counsel upon his detention because he was only being held on an arrest warrant arising from a probation violation. Petitioner contends that, despite the arrest warrant for his probation violation, he was being held "incommunicado" and "under subterfuge" on a murder charge without a warrant, initial appearance, or appointment of counsel in violation of his Sixth Amendment right to counsel.

The Supreme Court has considered the possibility that officers would engage in tactics like those alleged by Petitioner, but it expressly declined to abrogate the general rule that the Sixth Amendment right to counsel attaches with respect to a specific crime upon the formal initiation of charges for that crime. *Cobb*, 532 U.S. at 167-72. The Court concluded that *Miranda* and the Fifth Amendment's protection

against compulsory self-incrimination provided sufficient protection of a suspect's rights in such situations. *Cobb*, 532 U.S. at 171-72. It also acknowledged that the "Constitution does not negate society's interest in the ability of police to talk to witnesses and suspects, even those who have been charged with other offenses." *Id.*

Therefore, the Court finds that Petitioner's Sixth Amendment claims arising from the admission of his May 21, 23, and 24, 1996, statements are meritless, and the Mississippi Supreme Court's judgment that his Sixth Amendment right to counsel had not attached when he provided the statements was not contrary to or an unreasonable application of clearly established federal law.

### 3. *Exhaustion of "Limited Waiver" Argument*

Respondents argue that Petitioner failed to exhaust his claim that he only provided a "limited waiver" of his right to counsel. As noted above, a federal habeas petitioner "must exhaust all claims in state court prior to requesting federal collateral relief." *Smith*, 515 F.3d at 400. AEDPA's "exhaustion requirement is satisfied when the substance of the federal claim is fairly presented to the highest state court on direct appeal or in post-conviction proceedings, even if the state court fails to address the federal claim." *Johnson v. Cain*, 712 F.3d 227, 231 (5th Cir. 2013). A federal claim "is fairly presented when the petitioner asserts the claim in terms so particular as to call to mind a specific right protected by the Constitution or alleges a pattern of facts that is well within the mainstream of constitutional litigation." *Id.* "It is not enough that all the facts necessary to support the federal claim were before the state courts,

or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982) (internal citation omitted). Rather, "the state court system must have been presented with the same facts and legal theory upon which the petitioner bases his current assertions." *Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006).

Moreover, new facts which "supplement," rather than "fundamentally alter," a claim presented to the state courts are not sufficient to render a habeas claim a new, unexhausted claim. *Anderson v. Johnson*, 338 F.3d 382, 386-87 (5th Cir. 2003). Likewise, "merely putting a claim in a stronger evidentiary posture is not enough" to make it a new, unexhausted claim. *Nelson v. Davis*, 952 F.3d 651, 671 (5th Cir. 2020); *see also Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005). Rather, "new evidence that fundamentally alters the legal claim or places the claim in a significantly different legal posture can render it a new claim that was not adjudicated on the merits by the state court." *Id.* at 671-72.

On direct appeal, Petitioner argued that his statements were coerced, rather than voluntary. Appeal Record [153-2], at 11-17. He also argued that the State violated his right to counsel, and that his waiver of rights was not made knowingly or intelligently. *Id.*; *see also Grayson I*, 806 So. 2d at 247-49. He did not argue that the State violated his right to counsel because he only intended to give a limited waiver of rights.

Likewise, in Petitioner's first post-conviction proceeding, he argued that the

30

State intentionally delayed filing formal charges against him so that it could coerce a confession from him before his Sixth Amendment right to counsel attached. PCR Record Vol. 1 [154-1], at 189-98; *see also Grayson II*, 879 So. 2d at 1012-13. He also argued that his alleged waiver of rights was ineffective due to the State's misconduct in holding him without charges. PCR Record Vol. 1 [154-1], at 199-200. He did not assert a claim that the State violated his right to counsel because he only intended to give a limited waiver of rights.

In Petitioner's successive post-conviction proceeding, he argued that his trial counsel provided ineffective assistance by failing to adequately investigate and present evidence in support of his motion to suppress his statements to law enforcement officers. Successive PCR Record Vol. 3 [69-5], at 42-43; *see also Grayson III*, 118 So. 3d at 135. Among other things, Petitioner argued that his attorney "failed to assert that, even assuming Grayson reinitiated discussions with police after invoking his right to counsel, he made only a limited waiver to [write a voluntary statement], which was ignored by officers, who repeatedly interrogated Grayson and obtained confessions in violation" of his rights. Successive PCR Record Vol. 3 [69-5], at 43, 46. However, despite claiming that his counsel provided ineffective assistance by failing to argue that the waiver of rights was limited, Grayson did not assert a post-conviction claim that the State violated his right to counsel by taking his statements despite the limited scope of his waiver.

As noted above, to exhaust a claim a petitioner must present the state court

system "with the same facts and legal theory upon which the petitioner bases his current assertions." *Ruiz*, 460 F.3d at 643. Grayson first presented his "limited waiver" argument to the state courts in his successive post-conviction proceeding, under a legal theory of ineffective assistance of counsel. In this habeas case, he presented the "limited waiver" argument under a different legal theory, asserting it as a standalone claim that the State violated his Fifth and Sixth Amendment right to counsel. Therefore, the Court finds that Petitioner failed to exhaust the claim that the State violated his Fifth and Sixth Amendment right to counsel by taking the statements despite his execution of a "limited waiver."

"Though courts are free to dismiss unexhausted claims *without* prejudice, they are also free to *deny* such claims and dismiss *with* prejudice." *Buntion*, 31 F.4th at 964. Petitioner's claim that the State violated his right to counsel by ignoring the "limited" nature of his waiver of rights lacks merit. Accordingly, the Court will not dismiss the unexhausted claim without prejudice, opting rather to deny it for the reasons provided below.

### 4. May 21, 1996

With respect to the first statement, taken on May 21, 1996, Petitioner argues that the Mississippi Supreme Court unreasonably determined that he had waived his right to counsel. He contends that his re-initiation of contact on May 21 was "limited in nature." That is, he contends that he only agreed to write out a statement concerning what had happened with Minnie Smith, and that he did not agree to

submit to questioning from Sheriff Miller. Thus, Petitioner argues that the Mississippi Supreme Court 1) unreasonably assumed that his waiver of rights was complete, or unlimited in nature; 2) unreasonably determined that his waiver of rights was knowing and voluntary; and 3) unreasonably applied applicable federal law by holding that his signature on a waiver form automatically constitutes a knowing and intelligent waiver of rights.

In response, the State argues that Petitioner's claims are procedurally barred, that his "limited waiver" argument is barred because he failed to present it to the Mississippi Supreme Court, and that his Sixth Amendment right to counsel had not attached when he gave the statements. The Court has already addressed those issues. The State also broadly argues that Mississippi Supreme Court's determination of the facts was reasonable, and that its decision was not contrary to or an unreasonable application of federal law.

On direct appeal, the Mississippi Supreme Court addressed whether the trial court should "have suppressed Grayson's incriminating statements to the police." *Grayson I*, 806 So. 2d at 247. The court held that Petitioner's "claim fails because he clearly waived any right to an attorney he might theoretically have had at the time he confessed." *Id.* at 248. It also discussed the evidence from trial and held that the "record does not support Grayson's" argument that the "factors surrounding his confinement . . . render[ed] his confession involuntary." *Id.* Finally, it noted that the first statement "lasted less than four minutes and elicited no information that was

offered at trial." *Id.*

Petitioner addressed these issues again on post-conviction relief, albeit from a different direction. There, he argued that the "State delayed the filing of formal charges against him for the purpose of extracting a confession from him, in violation of his constitutional rights." *Grayson II*, 879 So. 2d at 1012. In other words, he argued that the officers intentionally delayed charging him with a crime so that they would not have to appoint counsel. The Mississippi Supreme Court rejected the argument, holding that it was a restatement of Petitioner's arguments in the trial court's suppression hearing and on direct appeal and, therefore, barred by *res judicata. Id.*

### a. Limited Waiver

Petitioner argues that the Mississippi Supreme Court unreasonably assumed that his waiver of rights was complete, or unlimited in nature. Respondents broadly contend that the state court's factual determinations were not unreasonable considering the evidence presented at trial.

Although Petitioner did not assert this issue as an independent claim in state court, the Mississippi Supreme Court addressed it as an element of an ineffective assistance claim. In his successive post-conviction proceeding, Petitioner argued that his trial counsel provided ineffective assistance by failing "to assert that . . . he made only a limited waiver to [write a voluntary statement], which was ignored by officers, who repeatedly interrogated Grayson and obtained confessions in violation" of his rights. Successive PCR Record Vol. 3 [69-5], at 43, 46; *see also Grayson III*, 118 So. 3d

at 135. The Mississippi Supreme Court held that Petitioner failed "to offer sufficient evidence in support of his" assertion that he only intended to provide a limited waiver. *Grayson III*, 118 So. 3d at 135. It noted that his own affidavit offered in support of the successive petition did not mention any facts on this point, and that a "thorough review" of the records from direct appeal and both post-conviction proceedings revealed no evidence to support his late claim that he only intended to provide a limited waiver. *Id.*

"The Fifth Amendment, which applies to the states by virtue of the Fourteenth Amendment, provides that no person shall be compelled in any criminal case to be a witness against himself." *Quintanilla*, 443 F. App'x at 922 (citations and punctuation omitted). Therefore, "an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation." *Id.* (quoting *Edwards*, 451 U.S. at 481). If a suspect in custody "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Gribble v. Johnson*, 196 F.3d 1258, 1999 WL 800203, at *6 (5th Cir. 1999). "If the interrogation continues without the presence of an attorney and a statement is taken," the state has the burden "to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel," *Butler*, 441 U.S. at 373, by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

A waiver of Fifth Amendment rights can be explicit or implicit. *Berghuis v.*

*Thompkins*, 560 U.S. 370, 383-84, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010). An explicit, written waiver "is usually strong proof" of its validity, but it "is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373, (1979). Rather, "waivers can be established even absent formal or express statements . . . ." *Berghuis*, 560 U.S. at 383. "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* at 385. Likewise, the totality of the circumstances may render an express waiver involuntary or unknowing. *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005). The Court's "determination is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation." *Id.*

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence . . . . Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478. Accordingly, if "the accused himself initiates further communication, exchanges, or conversations with the police" after invoking his right to counsel, he waives *Miranda*'s bar on further interrogation, and any statements he makes thereafter are admissible at trial. *Edwards*, 451 U.S. at 484-85. However, "[i]f the police do subsequently initiate an encounter in the absence of counsel . . . , the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where

the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *Johnson v. Stephens*, 617 F. App'x 293, 300 (5th Cir. 2015). In this context, police-initiated "questioning" or "interrogation" includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Gribble*, 1999 WL 800203 at *8.

On May 21, 1996, Grayson called for the jailer, James Tanner, to "come to his cell." Exhibit 5 to Petition [8-2], at 17. Grayson said he wanted to talk to Sheriff Miller and "get[ ] something off his chest." *Id.*; Trial Record Vol. 4 [153-9], at 65-66. Grayson does not dispute that he initiated the interaction with Miller on May 21, 1996. Rather, Grayson contends that he only provided a *partial* waiver of his Fifth Amendment rights. Specifically, he contends that he only agreed to write out a statement concerning what occurred with Minnie Smith.

Petitioner cites a single piece of evidence in support of this argument. One of the officers – either Sheriff Miller or James Tanner – took handwritten notes while Miller interviewed Petitioner. The first several lines of the notes read as follows:

> Rights were given – wants to make to
> George Miller & James Tanner statement
> Willing to write vol [sic] statement –
> concerning Mrs. Ms. [sic] Minnie.

Exhibit 6 to Petition [8-2], at 19. The rest of the notes summarize the interview, in which Petitioner claimed that Kilpatrick had killed Minnie Smith while he was at his grandparents' house. Exhibit 7 to Petition [8-2], at 22; Trial Record Vol. 7 [153-12],

at 100. Grayson admitted that he entered Smith's home, but he said he just checked on her and covered up her body. Exhibit 7 to Petition [8-2], at 22; Trial Record Vol. 7 [153-12], at 101.

> After the interview, Petitioner provided the following handwritten statement:

> I, Blayde Grayson, & Jason Kilpatrick came to Miss. to see my grandparents and while I was gone through the woods Jason broke in Mrs. Minnie's house, stole her gun & money (appr. $200.00) and stabbed her. When he told me this, I ran up to the house to see if she was dead, in hopes that she wasn't and I could call someone to help her. So, when I saw she was dead, she was, so I covered her up and we left and came back to Florida. The clothes are on the west side of Pensacola. He threw the knife at his mom's house and the gun was sold to Chris Miller.

Exhibit 7 to Petition [8-2], at 22. Petitioner also agreed to show the officers where Smith's checkbook was located, and they all returned to Florida on May 22, where the officers recovered Smith's checkbook hidden under a scarf on a shelf in Kilpatrick's trailer. Trial Record Vol. 7 [153-12], at 102-03.

Petitioner contends that the notes from the interview demonstrate that he only intended to waive his Fifth Amendment rights to provide a written statement, rather than to be interviewed by Sheriff Miller. Accordingly, he contends that testimony regarding the interview and the checkbook which the officers retrieved as fruit of the interview should have been excluded from his trial. The Court disagrees, for the following reasons.

First, the notes from the interview do not unambiguously state that Petitioner *only* intended to "write [a] vol[untary] statement." Exhibit 6 to Petition [8-2], at 19. Given the context – notes written by hand while conducting an interview of a party

of interest in a murder investigation – it is reasonable to assume that "willing to write vol statement" does not mean that Petitioner was *only* willing to provide a written statement. Indeed, it could reasonably be interpreted as his agreement to provide a written statement *in addition to* the interview from which the notes were taken. At best, the notes are ambiguous on this point, and it is important to note that the Mississippi Supreme Court concluded that Grayson never made this factual claim in the suppression hearing at trial, on direct appeal, or in his first post-conviction proceeding.

The affidavit that Petitioner presented in support of his successive post-conviction petition does not include any mention of the alleged "limited" waiver. Successive PCR Record [69-4], at 33-34. Additionally, the notes from the interview indicate that Petitioner was advised of his rights prior to the interview. Exhibit 6 to Petition [8-2], at 19. Likewise, Sheriff Miller testified that Officer Tanner advised Petitioner of his rights prior to the interview. Trial Record Vol. 4 [153-9], at 215. Therefore, despite knowing that he had the right to remain silent, Petitioner willingly participated in the interview, suggesting that he did not intend to limit his waiver to a written statement. *Cf. United States v. Hearn*, 563 F.3d 95, 104 (5th Cir. 2009) ("[The petitioner] was fully apprised of her *Miranda* rights and chose to waive those rights by answering the officers' questions."). Accordingly, the Court finds that the Mississippi Supreme Court's determination that Petitioner waived his Fifth Amendment right to counsel with respect to the May 21 statement was not

39

unreasonable.

Even if the Mississippi Supreme Court's determination of this factual issue had been unreasonable, the trial court's admission of evidence arising from the May 21 interview was harmless. First, Sheriff Miller's testimony regarding the interview was not materially different than Petitioner's written statement. Second, "[t]he Supreme Court . . . has never held – much less 'clearly established' – that physical evidence derived as a result of a Fifth Amendment violation must be suppressed." *Burgess*, 350 F.3d at 468. Therefore, even if the May 21 statement had been suppressed, it does not necessarily follow that the checkbook would have been suppressed as fruit of the statement.

Even if the statement and checkbook had not been admitted into evidence, there was still ample evidence to support Petitioner's conviction. Law enforcement officers retrieved other physical evidence from Kilpatrick's trailer that was not a fruit of the May 21 statement: the shotgun, the flashlight, and the murder weapon. Petitioner later confessed to the murder, and although he contends that the confession was inadmissible for other reasons, he does not argue that it was fruit of the May 21 statement. Therefore, even if the Mississippi Supreme Court unreasonably determined that Petitioner did not provide a limited waiver, he has not demonstrated that the "error had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 466-67.

### b. Knowing and Voluntary

Next, Petitioner argues that the Mississippi Supreme Court unreasonably determined that his waiver of rights with respect to the May 21, 1996, statement was knowing and voluntary. In response, the State broadly contends that the Mississippi Supreme Court's factual determination on this point was not unreasonable in light of the evidence before it.

On direct appeal, Petitioner argued that several factors combined to "overcome his free will and render his confession involuntary," such as his confinement under suicide watch and prior questioning by officers. *Grayson I*, 806 So. 2d at 248. Grayson did not offer specific arguments regarding each statement. Rather, he focused only on the confession statement of May 24, 1996.

The Mississippi Supreme Court held that the "trial record does not support Grayson's interpretation of the facts or their legal significance." *Id.* It noted that Sheriff Miller's initial questioning of Petitioner in Florida "lasted less than four minutes and elicited no information that was offered at trial." *Id.* Petitioner offered no evidence that being under observation for a potential suicide attempt "had any coercive effect, nor any evidence that he suffered sleep deprivation as a result of being" under observation." *Id.* at 249. It also held that he offered no evidence that officers "used coercive tactics to induce him to take the polygraph test," and that he had no evidence that officers had induced him to confess by telling him that "it would be better for him to admit the charges." *Id.* Therefore, the Mississippi Supreme Court

concluded that there was no evidence to support Petitioner's argument that his confession was coerced. *Id.*

In his second post-conviction proceeding, Grayson argued that his trial counsel had provided ineffective assistance by failing to adequately investigate and support his motion to suppress. *Grayson III*, 118 So. 3d at 135. The Mississippi Supreme Court held that this was merely a restatement of the argument he presented on direct appeal and, therefore, procedurally barred. *Id.* It also held that, regardless of the procedural bar, he had failed to offer sufficient evidence to demonstrate that he only intended to provide a limited waiver of his rights. *Id.*

"There are two inquiries to determine whether an accused has voluntarily and knowingly waived his" right to counsel. *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003). "First, the waiver of the right must be voluntary in that it was not the product of intimidation, coercion, or deception." *Id.* "In order for a defendant to establish that his confession was involuntary, he must demonstrate that it resulted from coercive police conduct, and it is essential that there be a link between the coercive conduct of the police and the confession of the defendant." *Id.* at 584. Evidence of police trickery can "show that the defendant did not voluntarily waive his privilege." *Id.* (quoting *Miranda*, 384 U.S. at 476). But "[t]rickery or deceit is only prohibited to the extent it deprives the suspect of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *United States v. Alvarado-Palacio*, 951 F.3d 337, 341 (5th Cir. 2020). "The

voluntariness determination is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation." *Id.*

Second, the waiver must be knowing, in that it "must be made with a full awareness of the nature of the right being waived." *Hopkins*, 325 F.3d at 583. Once again, the Court examines the totality of the circumstances surrounding the interrogation. *Id.* (citing *Spano v. New York*, 360 U.S. 315, 321-23, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959)). The question is whether the officers' actions "deprive[d] the defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them," whether by trickery, deceit, or the conditions of his confinement. *Id.*

Petitioner claims that officers coerced him into giving a statement on May 21, 1996. However, despite asserting this claim in his Second Amended Petition [104], he made no serious attempt to brief it, focusing instead on the "limited waiver" argument. Regardless, the record contains ample evidence to support the Mississippi Supreme Court's determination that Grayson knowingly and voluntarily waived his Fifth Amendment rights with respect to the May 21 statement.

Grayson admitted that Florida officers advised him of his right to counsel on May 17, 1996, and he admitted that he understood his right to counsel. Trial Record Vol. 9 [153-14], at 52. Likewise, Sheriff Miller testified that he advised Petitioner of his rights before taking the statement on May 21. Trial Record Vol. 4 [153-9], at 66. After he provided the statement, Petitioner signed a waiver form in which he affirmed

that he knew and understood his rights. Exhibit 8 to Petition [8-2], at 24. Petitioner also testified that when he provided the May 21 statement, he knew he had a right to remain silent and a right to an attorney, but he wanted to tell Sheriff Miller his version of events surrounding the murder. Trial Record Vol. 9 [153-14], at 56.

Sheriff Miller testified that Petitioner appeared to understand what he was doing, and that he did not appear to be under the influence of drugs or alcohol at the time he provided the May 21 statement. Trial Record Vol. 4 [153-9], at 66-67. Miller also testified that no one threatened, pressured, or coerced Grayson. *Id.* at 67. Indeed, Petitioner admitted to the trial court that he was not physically abused in any fashion. Trial Record Vol. 9 [153-14], at 64.

Tanner, the jailer, testified that Grayson initiated contact on May 21, 1996. Trial Record Vol. 4 [153-9], at 125. Grayson "called for" Tanner and then said he "need[ed] to talk to [Tanner] and the Sheriff." *Id.* "He said he wanted to get something off of his chest." *Id.* Tanner's testimony on this point was corroborated by contemporaneous notes. Exhibit 5 to Petition [8-2], at 17. Tanner also testified that he did not witness anyone threaten or coerce Petitioner while he was in custody. Trial Record Vol. 4 [153-9], at 127. Likewise, he did not witness anyone question Petitioner about any criminal conduct until he met with the Sheriff on May 21. Trial Record Vol. 4 [153-9], at 126. Tanner testified that Petitioner was given access to a phone, *id.* at 127, and the jail watch log corroborates Tanner's testimony on this point. Exhibit 3 to Petition [8-2], at 8-10.

44

With respect to the suicide watch procedures, Tanner testified that officers checked in on prisoners to "make sure they don't do harm to themselves" at least once an hour, sometimes up to four times an hour. Trial Record Vol. 4 [153-9], at 136-37. He said: "We look in on them. If they're moving around, we know they're all right. We leave them alone. If they're asleep, we might wake them up, especially in the daytime we make sure they're there." *Id.* at 137. However, Tanner testified that Grayson never made any complaints about sleep deprivation, or otherwise complained that the suicide watch bothered him. *Id.* at 138. Grayson did not produce any evidence that the suicide watch procedures deprived him of sleep.

In summary, Grayson knew he had a right to counsel, as evidenced by his invocation of it back in Florida. He also admitted to the trial court that he knew and understood his right to counsel at the time he provided the statement to Sheriff Miller. "The law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Lucio*, 751 F. App'x at 492. Moreover, after he gave the statement, Grayson signed a waiver form acknowledging that he understood and waived his rights, and "[a] signed waiver form, though not conclusive, is usually strong proof of a knowing and voluntary waiver." *Alvarado-Palacio*, 951 F.3d at 341.

Additionally, Grayson has not directed the Court to any evidence that the conditions of his confinement were coercive. Miller and Tanner both testified that no

45

one threatened or coerced Petitioner, and Petitioner admitted that he was not physically abused. The record contains no evidence that Petitioner suffered sleep deprivation from the suicide watch, or that it otherwise influenced his decision to waive his rights and provide a statement on May 21, 1996.

Therefore, accounting for all the circumstances surrounding the May 21 statement, the Court concludes that the Mississippi Supreme Court reasonably determined that Grayson knowingly and voluntarily waived his Fifth Amendment right to counsel.

### c. Application of Federal Law

Petitioner argues that the Mississippi Supreme Court's determination that he provided a knowing and voluntary waiver of rights was contrary to or an unreasonable application of clearly established federal law. Petitioner contends that the Mississippi Supreme Court held that his signature on a waiver form automatically constitutes a knowing and intelligent waiver of rights. This, however, is a mischaracterization of the Mississippi Supreme Court's decision.

On appeal, the Mississippi Supreme Court provided a thorough survey of the Fifth Amendment right to counsel. *Grayson I*, 806 So. 2d at 247-48. It noted that "[w]hen a suspect invokes his right to counsel, all interrogation must cease until the lawyer is present, unless the suspect himself reinitiates communication with the police." *Id.* at 247 (quoting *Edwards*, 451 U.S. at 484). It held that the authorities ceased questioning Petitioner when he invoked his right to counsel, but that he then

waived his right to counsel by reinitiating communication with them. *Id.* at 248. He also signed a waiver of his rights. *Id.* The Mississippi Supreme Court then considered the circumstances surrounding Petitioner's confession statement, including many of the facts discussed herein, but it ultimately disagreed with Petitioner's "interpretation of the facts or their legal significance." *Id.* at 248-49. Ultimately, the Mississippi Supreme Court concluded that Petitioner had not offered any evidence of coercion. *Id.* at 249.

Therefore, the Court finds that this claim has no merit. This Court's reading of the Mississippi Supreme Court's decision does not align with Grayson's interpretation argued here. The Mississippi Supreme Court did not hold that a suspect's signature on a waiver form automatically constitutes a knowing and intelligent waiver of rights. Rather, it conducted the proper analysis under the applicable law, examining the totality of the circumstances to determine whether Petitioner's waiver was, in fact, knowing and voluntary.[6]

Petitioner also contends that the Mississippi Supreme Court's decision was directly contrary to three specific Supreme Court opinions, but this argument is likewise meritless. "A state prisoner can only satisfy the 'contrary to' standard if he shows the state court decision arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if it resolves a case differently than the

---

[6] Even if the Mississippi Supreme Court had held that Petitioner's signature on a waiver form automatically constituted a knowing and intelligent waiver of rights, the error would be harmless because, for all the reasons discussed above, the record contains ample evidence to support the same outcome under the proper analysis.

Supreme Court has on a set of materially indistinguishable facts." *Neal*, 78 F.4th at 783.

In *Edwards v. Arizona*, the Supreme Court held that "waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case . . . ." 451 U.S. at 482. The Supreme Court also held that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused initiates further communication . . . with the police." *Id.* at 484-85.

Here, Petitioner has never argued that his waiver was not knowing and intelligent. Indeed, he could not credibly claim as much because of his own testimony to the contrary in the trial court. *See* Trial Record Vol. 9 [153-14], at 52, 56. Therefore, that aspect of *Edwards* is inapplicable here. Even if the Mississippi Supreme Court erred by not expressly finding that Petitioner's waiver was knowing and intelligent, the error was harmless in light of Petitioner's undisputed testimony that he understood his rights.

Petitioner also argues that the Mississippi Supreme Court's decision was contrary to the Supreme Court's decision in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983). In that case, the Supreme Court held:

> [E]ven if a conversation taking place after the accused has expressed his
> desire to deal with the police only through counsel is initiated by the
> accused, where reinterrogation follows, the burden remains upon the
> prosecution to show that subsequent events indicated a waiver of the
> Fifth Amendment right to have counsel present during an interrogation.

*Id.* at 1044. Thus, there are two separate inquiries: whether the accused reinitiated

communication, and whether he waived the previously asserted right. *Id.* at 1045.

"[I]nquiries or statements, by either an accused or a police officer, relating to routine

incidents of the custodial relationship, will not generally" waive a previously asserted

right to counsel. *Id.*

On appeal, the Mississippi Supreme Court expressly found that Petitioner

reinitiated contact with the police, and then, considering the totality of the

circumstances, it expressly found that Petitioner voluntarily waived his right to

counsel. *Grayson I*, 806 So. 2d at 248-49. It repeated these findings in Petitioner's

successive post-conviction proceeding. *Grayson III*, 118 So. 3d at 135. Therefore, the

Mississippi Supreme Court conducted the analysis prescribed by *Bradshaw*. Recall,

the question is not whether this Court believes the state court's determination was

incorrect, but whether that determination was unreasonable. *Chamberlain*, 885 F.3d

at 837.

Additionally, Petitioner did not initiate a conversation with Tanner and Miller

about "routine incidents of the custodial relationship." *Bradshaw*, 462 U.S. at 1045.

According to the record – including Petitioner's own testimony – he wanted to talk to

Miller about Smith's murder. Trial Record Vol. 4 [153-9], at 125; Trial Record Vol. 9

49

[153-14], at 56; Exhibit 5 to Petition [8-2], at 17. The Mississippi Supreme Court considered Petitioner's late assertion that he only intended to provide a limited waiver of his rights, but it did not believe him because the evidence says otherwise. That determination was reasonable, for all the reasons provided above.

Finally, Petitioner argues that the Mississippi Supreme Court's decision was contrary to the Supreme Court's decision in *Connecticut v. Barrett*, 479 U.S. 523, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987). In that case, the Supreme Court held that a suspect made a limited invocation of the right to counsel when he refused to provide a written statement but agreed to talk to police. *Id.* at 529. The Mississippi Supreme Court's decision was not contrary to *Barrett* in that it rejected Petitioner's assertion that he only intended to give a limited waiver of rights. As discussed above, that factual determination was reasonable. Therefore, this argument is meritless.

### 5. *May 23, 1996*

With respect to the statement taken on May 23, 1996, Petitioner argues that the Mississippi Supreme Court unreasonably determined that he re-initiated contact with police after previously invoking his right to counsel. Accordingly, he contends that any evidence of or derived from the second statement should have been excluded from trial.

In response, the State argues that Petitioner's claims are procedurally barred, and that his Sixth Amendment right to counsel had not attached when he provided the May 23 statement. The Court has already addressed those issues. The State also

broadly argues that Mississippi Supreme Court's determination of the facts was reasonable, and that its decision was not contrary to or an unreasonable application of federal law.

On appeal, the Mississippi Supreme Court addressed whether the trial court should "have suppressed Grayson's incriminating statements to the police." *Grayson I*, 806 So. 2d at 247. The court generally focused on the final confession statement of May 24, 1996. *Id.*[7] It held Petitioner's "claim fails because he clearly waived any right to an attorney he might theoretically have had at the time he confessed." *Id.* at 248. It also discussed the evidence from trial and held that the "record does not support Grayson's" argument that the "factors surrounding his confinement . . . render[ed] his confession involuntary." *Id.* In reaching these conclusions, the Mississippi Supreme Court found that "Grayson himself reinitiated communication with the authorities . . . ." *Id.*

In the second post-conviction proceeding, the Mississippi Supreme Court addressed Petitioner's claim that his counsel provided ineffective assistance by failing to adequately investigate and present evidence in support of his motion to suppress. *Grayson III*, 118 So. 3d at 135. The court held that there was no evidence to support Petitioner's assertion that he had not reinitiated contact with the police "sufficient to waive his invocation of the right to counsel," or that he had only provided a limited waiver of his rights. *Id.*

---

[7] In his briefing on appeal, Petitioner did not individually analyze each statement, instead addressing them as a whole and focusing on the May 24 confession. Appeal Record [153-2], at 11-17.

Sheriff Miller testified that Petitioner "wanted to talk to" Investigator Houston Dorr. Trial Record Vol. 4 [153-9], at 40. This testimony was corroborated by the MHP Investigator, Houston Dorr, who specifically testified that Petitioner "initiated [the May 23] conference." Trial Record Vol. 8 [153-13], at 98. Dorr said that he was in George County on another matter when "the Sheriff came in and said, 'Blayde Grayson said he wanted to talk to us.'" Trial Record Vol. 4 [153-9], at 88. This is the only evidence in the record regarding the initiation of communication between Petitioner and officers on May 23, 1996, and Petitioner has not directed the Court to any evidence disputing Dorr and Miller's testimony.

As explained above, an "unreasonable determination of the facts" is one "outside the bounds of reasonable debate." *Seals*, 1 F.4th at 370. "The term 'unreasonable' refers not to ordinary error or even to circumstances where the petitioner offers a strong case for relief, but rather to extreme malfunction in the state criminal justice system." *Mays*, 592 U.S. at 391. That is not the case here. Two officers testified specifically that Petitioner reinitiated communication with them on May 23, 1996, and Petitioner has not provided any evidence to dispute that testimony. Accordingly, the Court concludes that the Mississippi Supreme Court's determination on this issue was not unreasonable, and this claim is meritless.

6. *May 24, 1996*

As the Court recounted above, Petitioner took a polygraph examination on May 24, 1996, and in a subsequent interview he confessed to having murdered Minnie

Smith. Petitioner argues that all evidence of the polygraph examination and confession should have been excluded from trial because his agreement to take the examination was fruit of the May 23 statement, which he contends officers illegally obtained by questioning him after he had invoked his Fifth Amendment right to counsel. As the Court explained above, the evidence demonstrates that Petitioner initiated contact with officers on May 23, and the Mississippi Supreme Court's determination on this issue was not unreasonable.

Petitioner also argues that the Mississippi Supreme Court unreasonably determined that he voluntarily submitted to the polygraph examination and voluntarily provided the confession. He contends that officers coerced him to take the polygraph examination and to provide the confession statement.

In response, the State argues that Petitioner's claims are procedurally barred, and that his Sixth Amendment right to counsel had not attached when he confessed on May 24. The Court has already addressed those issues. The State also broadly argues that Mississippi Supreme Court's determination of the facts was reasonable, and that its decision was not contrary to or an unreasonable application of federal law.

On appeal, Petitioner argued that "his confession should have been suppressed at trial, because he was denied his right to counsel guaranteed by the Fifth and Sixth Amendments of the U.S. Constitution . . . , or in the alternative, because the confession was involuntary." *Grayson I*, 806 So. 2d at 247. He claimed that several

53

factors combined to "overcome his free will and render his confession involuntary," such as his confinement under suicide watch and prior questioning by officers. *Grayson I*, 806 So. 2d at 248.

The Mississippi Supreme Court held that the "trial record does not support Grayson's interpretation of the facts or their legal significance." *Id.* Among other things, it noted that Petitioner had not offered evidence that being under suicide watch "had any coercive effect, nor any evidence that he suffered sleep deprivation as a result of being" under observation." *Id.* at 249. It also held that he offered no evidence that officers "used coercive tactics to induce him to take the polygraph test" or induced him to confess by telling him that "it would be better for him to admit the charges." *Id.* Therefore, the Mississippi Supreme Court concluded that there was no evidence to support Petitioner's argument that the confession was coerced. *Id.*

As discussed above, the evidence indicates that Petitioner initiated contact with officers on May 23, 1996. Houston Dorr testified that he was at the jail for another matter when "the Sheriff came in and said, 'Blayde Grayson said he wanted to talk to us.'" Trial Record Vol. 4 [153-9], at 88. Dorr read Petitioner his rights and took his statement. *Id.* at 89; Exhibit 9 to Petition [8-2], at 26-35. Petitioner never asked for attorney, and he appeared to fully understand his rights. Trial Record Vol. 4 [153-9], at 106. After Dorr had taken Petitioner's statement – in which he again implicated Jason Kilpatrick as the murderer – Dorr "asked [Petitioner] would he take a lie detector test or polygraph, and [Petitioner] said 'yeah.'" *Id.* at 89.

Dorr explained why he brought up the possibility of a polygraph examination: "At that point in time I had – I didn't know what to do, because I had – when I was in Florida I had Kilpatrick saying [Petitioner] did it and over here I've got [Petitioner] over here telling me Kilpatrick did it." *Id.* at 89-90. He was trying to determine "[w]ho was telling the truth or neither one of them was telling the truth." *Id.* at 107. In his experience as an investigator, a polygraph examination is "a good investigative tool even though we don't use it in court, but it gives an idea if he's lying or not." *Id.* at 108. According to Dorr, no one made any threats or promises in relation to the polygraph. *Id.* at 109-110. No one used force or a demonstration of force to coerce him. *Id.* at 110. He said, "[N]obody even raised their voice or anything . . . ." *Id.*

Dorr testified that he did not discuss the case at all with Petitioner on the way to Jackson for the polygraph examination. *Id.* at 90. Larry Waggoner, another MHP investigator, administered the polygraph examination. *Id.* at 300. Waggoner provided a *Miranda* warning before the examination started. *Id.* at 92, 111; Trial Record Vol. 5 [153-10], at 2, 4. Waggoner specifically testified that he did not witness anyone promise anything to Petitioner, threaten him, or otherwise coerce him, and Petitioner never asked for or mentioned an attorney. Trial Record Vol. 5 [153-10], at 4. Dorr was not in the room during the polygraph, but he could see and hear what was happening from the next room. Trial Record Vol. 4 [153-9], at 91-92, 111.

Waggoner began by explaining the examination process to Petitioner and telling him the exact questions that he intended to ask. Trial Record Vol. 5 [153-10],

55

at 5-6. During this process, Petitioner told Waggoner "that he was in the house and that a friend or companion, . . . Jason had killed Ms. Minnie." *Id.* at 10. But Grayson's demeanor changed later during the polygraph examination, "when [Waggoner] asked him to be truthful and talk . . . about it. He just changed at that point." *Id.* Dorr said he got "really upset." Trial Record Vol. 4 [153-9], at 92-93. Grayson changed his story and admitted that he had murdered Minnie Smith. *Id.* at 92-93; Trial Record Vol. 5 [153-10], at 10-11. Grayson "slumped – like he was letting out a lot of anxiety. He said 'I didn't mean to do it. I didn't mean to kill her. I just went berserk,' something to those words." Trial Record Vol. 4 [153-9], at 94. At that point, Waggoner asked Petitioner if he wanted to speak with Dorr, and Petitioner answered affirmatively. *Id.*

After the polygraph examination was terminated, Investigator Dorr "got another *Miranda* sheet" and "read [Petitioner] his *Miranda* warning and explained it to him." *Id.* at 95. Dorr specifically denied that he told Petitioner "it would be better for him if he admitted" to the murder before reading him his rights. *Id.* He testified: "I tried my best not to say anything until I got through reading his *Miranda* warning. He kept on wanting to say something beforehand and I told him not to say anything until I read him his *Miranda* warning." *Id.* Dorr denied making any threats or promises to obtain Petitioner's waiver. *Id.* at 114. He also testified that he gave Petitioner an opportunity to call a lawyer before taking the confession. *Id.* at 96. Dorr said: "He was given the opportunity after he was read the *Miranda* warning. He was

told. I told him he could stop if he wanted to try to get one." *Id.* Petitioner declined and signed the waiver of rights, *id.* at 112, and during the interview, he confessed to murdering Minnie Smith. Exhibit 10 to Petition [8-2], at 37-59. During the confession, Petitioner admitted that Dorr had advised him of his rights, that he understood his rights, and that he had not been threatened in any way. *Id.* at 48-49. According to Dorr, Petitioner said that he "just wanted to get it over with." Trial Record Vol. 4 [153-9], at 97.

Later in the trial – after the prosecution had rested and, therefore, long after the suppression hearing – Petitioner's counsel raised additional issues regarding the trial court's admission of the confession, and Grayson himself took the stand outside the presence of the jury. He admitted that he was not physically abused in any fashion. Trial Court Vol. 9 [153-14], at 64. Although he initially claimed that Investigator Dorr threatened him, he later admitted that Dorr had not threatened him. *Id.* at 66-67. Rather, he said that Dorr "told [him] that they was going to throw the book at [him] . . . ." *Id.* at 67. With respect to the polygraph examination, Grayson testified that officers "said it was to [his] best interest" to take the test. *Id.* at 68. He also testified that two officers, James Earl Tanner and Porky Holloman, told him that it would be better for him to cooperate and give a statement. *Id.* at 78. Petitioner's testimony was unclear on the timeline of these events or their proximity to his agreement to take the polygraph examination or his confession. Regardless, the trial court obviously viewed the testimony – which Petitioner elected to give *after* the

prosecution had already rested – with skepticism. It noted:

> [W]e have these motions, day long motions on issues. And every time a ruling goes against this man, he comes up with some new version of something to point fingers at everybody involved in this case. Any question of coercion of a confession, he should have brought up on Friday when I had a day long motion on that question. He did not. He never said a word. . . . I think he's – he's trying to pull the wool over everybody's eyes. Trying to pull the wool over this Court's eyes, and he's not going to do it. All of this should have been brought up at the proper time, not three days after the beginning of a capital murder case, after a video confession has already been played to the jury.

*Id.* at 95.

As discussed above, a waiver of the Fifth Amendment right to counsel "must be voluntary in that it was not the product of intimidation, coercion, or deception." *Hopkins*, 325 F.3d at 583. Petitioner must show that his confession "resulted from coercive police conduct, and it is essential that there be a link between the coercive conduct of the police and the confession . . . ." *Id.* at 584. "[T]here is nothing wrong with efforts to create a favorable climate for confession. Neither mere emotionalism and confusion, nor mere trickery will alone necessarily invalidate a confession." *Self v. Collins*, 973 F.2d 1198, 1205 (5th Cir. 1992). "Trickery or deceit is only prohibited to the extent it deprives the suspect of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Alvarado-Palacio*, 951 F.3d at 341. "The voluntariness determination is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation." *Id.*

Petitioner argues that the same factors discussed above with respect to the

May 21 statement rendered his May 24 confession involuntary. However, the record contains ample evidence that officers advised Petitioner of his rights multiple times before he provided the confession. Likewise, there is ample evidence that Petitioner knew and understood those rights. Dorr specifically testified that he asked Petitioner if he wanted to get a lawyer before the confession, and Petitioner declined. The record contains no evidence that officers threatened, abused, or made any promises to Petitioner to induce the confession. Indeed, Waggoner and Dorr's testimony indicates that Petitioner was ready to come clean and unburden himself. Finally, Petitioner has not offered any evidence that the suicide watch procedures deprived him of sleep, affected his cognitive ability, or otherwise affected his ability to give a voluntary waiver.

Petitioner also notes that Waggoner told him that he had failed the polygraph examination. However, Petitioner does not dispute that he did, in fact, fail the polygraph examination – which he agreed to take. Moreover, Grayson has not directed the Court to any record evidence or cited any case law supporting the assertion that merely being provided that information deprived him of the ability to voluntarily and intelligently waive his right to counsel.

Petitioner focuses most of his argument on one comment by Dorr during a section of the recorded confession that was not included in the written transcript.[8] The following exchange occurred after Petitioner entered the room but before Dorr

---

[8] A video recording of the confession was conventionally filed with the Court.

advised him of his rights once again:

> Petitioner:   "They gonna' kill me, ain't they?"
>
> Dorr:         "You gotta' show some remorse, okay."
>
> Petitioner:   "I really didn't mean to."
>
> Dorr:         "I know you didn't, but let's – look, we'll do it together…"

Dorr then read the waiver form to Petitioner, advising him of his rights. Dorr stopped at one point and asked Petitioner, "I haven't threatened you any, have I?" Petitioner responded negatively. After Dorr finished reading the waiver form, he filled in the location of the interview, and Grayson, not responding to any question or prompt from Dorr, said, "Didn't mean to do it. We just needed some money, that's all." Petitioner then signed the waiver form and asked Dorr, "What are they gonna' do with me?" Dorr responded, "I don't know, Blayde. You didn't mean to do it. I'm gonna' turn this thing on, okay." Dorr then turned the tape recorder on and began the portion of the interview included in the written transcript.

Grayson argues that Dorr's comment – "You gotta' show some remorse, okay." – was coercive because it implicitly promised that Petitioner would not receive the death penalty if he confessed. The Court disagrees. One could reasonably conclude that 1) the comment was not a promise of leniency, and 2) Petitioner did not or should not have interpreted it as such, particularly in light of Dorr's explicit statement a couple of minutes later that he did not know what would happen. At worst, the comment could be interpreted as an attempt to build a rapport with Petitioner to

make him more comfortable opening up about the murder, and the Constitution does not forbid such practices. As noted above, "there is nothing wrong with efforts to create a favorable climate for confession." *Self*, 973 F.2d at 1205. The comment was not forbidden trickery or deceit because it did not "deprive[ ] the suspect of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Alvarado-Palacio*, 951 F.3d at 341. Therefore, the Court finds that the Mississippi Supreme Court's determination that the confession was not coerced was not unreasonable in light of the record evidence.

### B.  *Funding for an Investigator*

Petitioner also argues that the trial court violated his Sixth and Fourteenth Amendment right to a fair trial by failing to grant adequate funding for an investigator. Petitioner contends that the Mississippi Supreme Court's adjudication of this issue was based on multiple unreasonable determinations of fact. He also contends that the Mississippi Supreme Court's decision was an unreasonable application of the United States Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985). In response, the State argues that the Mississippi Supreme Court's decision was based on reasonable determinations of fact, that its decision was not an unreasonable application of clearly established federal law, and that Petitioner's claim is procedurally barred.

On appeal, Petitioner argued that the trial court erred by denying his motion for funds for a private investigator and jury consultant. The Mississippi Supreme

Court noted that Petitioner did, in fact, receive funding for one investigator, but the trial court did not address his motion for funding a second investigator. *Grayson I*, 806 So. 2d at 255. The court observed that Petitioner did not exhaust all the funds allocated for the first investigator, and that the motion seeking additional funding for a second investigator did not include enough supporting factual details. *Id.* "In light of this sparse information," the Mississippi Supreme Court held that "the trial court did not abuse its discretion in denying the motion for additional funds." *Id.*

In his successive petition for post-conviction relief, Petitioner argued that his trial counsel provided ineffective assistance by failing to timely and adequately support his motion for additional funding for a second investigator. He presented an affidavit from a prisoner who was allegedly cellmates with Jason Kilpatrick, in which the prisoner claimed that Kilpatrick had confessed to the crime. *Grayson III*, 118 So. 3d at 133. Petitioner argued that if his counsel had timely and adequately supported the motion for additional funds, the trial court would have authorized the funding, he would have developed evidence that Kilpatrick was the murderer, and the result of the trial would have been different. *Id.*

The Mississippi Supreme Court held that Petitioner was attempting to "recast his argument made on direct appeal – regarding the denial of investigative funds – under a different legal theory . . . ." *Id.* Accordingly, the claim was barred by Miss. Code § 99-39-21(2) unless Petitioner could show cause and actual prejudice. *Id.* at 134 (citing MISS. CODE ANN. §§ 99-39-21(2), (4)-(5)). It held that the cellmate's affidavit

was "not enough to prove prejudice." *Id.* First, the information in the affidavit was inconsistent with the evidence in the record. *Id.* Second, it was inconsistent with Petitioner's own confession. *Id.* Therefore, the Mississippi Supreme Court held that even if the cellmate's "hearsay testimony" had been introduced at trial, Petitioner had "failed to show a reasonable probability that the result of the proceedings would have been different." *Id.* Accordingly, the claim was procedurally barred. *Id.* Even if the claim were not barred, Petitioner did not prove that his counsel provided ineffective assistance because he had "failed to offer sufficient proof of what additional funds or . . . a proper investigation would have revealed" and, therefore, "failed to show a reasonable probability that the result of the proceedings would have been different." *Id.*

### 1. Procedural Bar

First, Respondent argues that this claim is procedurally barred. As noted above, "[f]ederal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar." *Gonzalez*, 924 F.3d at 241.

In *Grayson I*, the Mississippi Supreme Court found that the trial court did not abuse its discretion in denying Petitioner's motion to pay for a second investigator. *Grayson I*, 806 So. 2d at 255. In *Grayson III*, Petitioner argued that his counsel provided ineffective assistance by failing to timely and adequately support a motion for investigative funds. *Grayson III*, 118 So. 3d at 133. The Mississippi Supreme

63

Court found that this was an impermissible attempt to "recast his argument made on direct appeal – regarding the denial of investigative funds – under a different legal theory, ineffective assistance of counsel." *Id.* Accordingly, the claim was procedurally barred by Miss. Code Ann. § 99-39-21(2). *Id.* at 134.

As noted above, a statutory bar that "has the same effect as res judicata and prevents the re-litigation of claims" does not prevent federal review of a habeas claim, "as long as the claim was not procedurally barred for some other reason." *Jackson*, 447 F. App'x at 544 (addressing MISS. CODE ANN. § 99-39-21(2)). Applying these principles, the Fifth Circuit has found that federal review of a claim denied by a Mississippi court pursuant to Miss. Code Ann. § 99-39-21(2) is not procedurally barred. *See Foster*, 293 F.3d at 787 n. 12; *Jackson*, 447 F. App'x at 544. Therefore, the Court finds that Petitioner's claim related to the trial court's denial of his funding motions is not procedurally barred.

### 2. *Facts Relevant to this Claim*

Petitioner was indicted on August 16, 1996. Trial Record Vol. 1 [153-6], at 15. On March 5, 1997, Petitioner filed a Motion for Funds for Court Appointed Investigator, in which he asked the trial court to grant him "funding in an amount adequate to conduct the proper investigation of the alleged offense." *Id.* at 44-45. Although he suggested that he should receive "funding for his own investigative team equal in size, funding, and man power [sic] of the resources of law enforcement agencies involved in" his case, he did not request a specific amount of funds or explain

how he intended to spend them. *Id.* at 45.

On March 24, 1997, the trial court held a motions hearing, in which it heard several motions, including the initial Motion for Funds for Court Appointed Investigator. Trial Record Vol. 3 [153-8], at 3-4. Petitioner argued that he needed to hire an investigator to "organize and catalog evidence and perhaps . . . to investigate a possibility of DNA." *Id.* at 79-80. The Court instructed Petitioner's counsel to file a written motion that provided more detailed information, such as who they wanted to hire, what they would investigate, how it would help Petitioner's case, and how much it would cost. *Id.* at 80-81.

On March 27, 1997, the trial court brought up the motion for an investigator while hearing a separate motion in chambers. *Id.* at 111-12. Petitioner's counsel requested that the Court hold the motion in abeyance. *Id.* at 112.

On May 20, 1997, Petitioner filed a second Motion for Funds for Court Appointed Investigator, in which he asked the trial court to appoint Clayton Hall to assist in the preparation of his defense. Trial Record Vol. 1 [153-6], at 105-06. Petitioner did not specify what Hall would investigate, how it would help his case, or how much it was expected to cost. *Id.* The record contains no information regarding what services, if any, Hall performed on Petitioner's behalf, and the trial court never authorized a payment to him.

On June 27, 1997, the trial court held another motions hearing. Trial Record Vol. 3 [153-8], at 113. Petitioner's counsel re-urged the motion to fund an investigator.

65

Trial Record Vol. 4 [153-9], at 19-20. The trial court said that it wanted to hear more details *ex parte* before ruling on the motion. *Id.* at 22-23. It granted the motion on July 2, 1997, authorizing Petitioner to employ a private investigator at an expense of up to $750.00. Trial Record Vol. 1 [153-6], at 114.

On July 25, 1997, Petitioner filed a Motion for Continuance of the trial. *Id.* at 115-17. He alleged that on July 21, 1997, the State produced copies of reports from the Escambia County Sheriff's Department which contained "possible exculpatory evidence based on a statement taken by law enforcement officers of Richard Dale Rogers, . . . a former cell mate of Jason Kilpatrick, a former suspect" in the case. *Id.* at 116. Grayson claimed Rogers had information which contradicted Kilpatrick's claim that he was not present at the murder scene. *Id.*

On July 31, 1997, Grayson filed an Ex Parte Motion for Additional Funding for Private Investigator. *Id.* at 123-24. He asked the trial court to authorize additional funds to pay a second private investigator, James Bowman, to obtain a statement from a "possible exculpatory witness currently residing in Florida City, approximately one (1) hour south of Miami, Florida." *Id.* He also wanted funds to "properly subpoena an out-of-state criminal witness and compel his appearance" at trial. *Id.* at 124.

On the same day, James Bowman submitted a bill for his services to Petitioner's counsel. Trial Record Vol. 2 [153-7], at 52. According to the invoice, Bowman charged Petitioner's counsel $838.15 for "services furnished on Richard Dale

66

Rogers 732599." *Id.* The itemized bill indicates that Bowman met with Petitioner's counsel, located a phone and address, traveled to Pensacola, and discussed something with a travel agent. *Id.* The record does not indicate when this invoice was provided to the trial court. Long after the trial had concluded, on April 15, 1998, the trial court entered an Order to pay James Bowman $500.00 for services rendered on Petitioner's behalf. *Id.* at 51.

On August 1, 1997, Petitioner filed an Application for Subpoena for Out-of-State Witness. Trial Record Vol. 1 [153-6], at 129-31. He asked the trial court to issue the necessary paperwork to petition a local court in Florida to compel the attendance of Richard Dale Rogers at trial. *Id.* at 129-30. At that time, Rogers was an inmate in the Dade Correctional Institute in Florida City, Florida. *Id.* at 130.

On the same day, the Court heard several pretrial motions filed by Petitioner. Petitioner did not raise the Ex Parte Motion for Additional Funding, Motion for Continuance, or Motion for Out-of-State Subpoena. The Court also heard motions before trial began on August 4, 1997, and, once again, Petitioner did not raise these motions.

### 3. *Merits Analysis*

The Fourteenth Amendment's due process guarantee of fundamental fairness entitles an indigent defendant to a "fair opportunity to present his defense." *Ake*, 470 U.S. at 76. "[M]ere access to the courthouse doors does not by itself assure a proper functioning of the adversary process." *Id.* at 77. Indeed, "a criminal trial is

fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Id.* This does not mean "that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy." *Id.* Rather, "[m]ost of those raw materials come to the defendant in the form of his court-appointed lawyer – in his expert knowledge about how to negotiate the rules of court, how to mount an effective defense, and so forth. Other materials come from lay witnesses, such as evidence necessary to the defendant to establish his defense." *Moore v. Johnson*, 225 F.3d 495, 503 (5th Cir. 2000). In fact, the Fifth Circuit has specifically found that a criminal defendant is not entitled to court-funded "non-psychiatric experts," including "mitigation experts." *Id.*

To establish that a trial court's failure to fund an investigator or expert deprived him of a fair opportunity to present his defense, a criminal defendant must "establish a reasonable probability that the requested experts would have been of assistance and that their absence resulted in a fundamentally unfair trial." *United States v. Snarr*, 704 F.3d 368, 405 (5th Cir. 2013). Therefore, a trial court does not deprive a criminal defendant of due process where it rejects "undeveloped assertions that the requested assistance would be beneficial." *Caldwell v. Mississippi*, 472 U.S. 320, 324 n. 1, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985); *see also Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993). At a minimum, "an indigent defendant requesting non-psychiatric experts must demonstrate something more than a mere possibility of

assistance from a requested expert." *Moore*, 225 F.3d at 503.

### a. Factual Determinations

Petitioner argues that the Mississippi Supreme Court's adjudication of this issue was based on unreasonable determinations of fact. The Court agrees that the Mississippi Supreme Court's decision was premised on factual errors, although the Court ultimately concludes that the errors were harmless. Upon close inspection of the record, it appears that the Mississippi Supreme Court misapprehended some specific facts from the trial record. It held that Petitioner "did in fact receive funding for an investigator named Clayton M. Hall up to a maximum of $750, and the trial court in fact ordered that the county pay that investigator the sum of $500 . . . ." *Grayson I*, 806 So. 2d at 255. It also held that the trial court "never ruled on funding for the second investigator, one James Bowman, which is tantamount to a denial of Grayson's motion." *Id.*

As this Court explained above, the trial court granted Petitioner $750.00 for an investigator, but it did not specify whom Petitioner had to hire. The record contains no evidence that Hall performed any services for Petitioner, or that the court paid him anything. However, the trial court eventually paid Bowman $500.00 for investigative services, although there is no record that the court was aware that Bowman performed any services until long after the trial had concluded. Finally, there is no record of the trial court addressing Petitioner's Ex Parte Motion for Additional Funding, Motion for Continuance, or Motion for Out-of-State Subpoena.

Likewise, there is no record of Petitioner raising those motions in either of the pretrial motion hearings held after he had filed them.

Petitioner focuses on the following section of the Mississippi Supreme Court's opinion:

> The trial court had already approved $750 in funds for one investigator, not all of which was spent. The second motion stated that funds were needed to contact a 'possible exculpatory witness' without any further information, as well as to arrange to subpoena this witness and transport him or her to Grayson's trial. In light of this sparse information, the trial court did not abuse its discretion in denying the motion for additional funds.

*Id.* He argues that the Mississippi Supreme Court unreasonably determined that Petitioner had not expended all $750.00 of the initial funding granted for an investigator. Grayson contends, rather, that he requested additional funding because he needed it for Bowman to complete his work and obtain a statement from Richard Dale Rogers.

Grayson also argues that the Mississippi Supreme Court unreasonably described the purpose of the request for additional funding as the need to "pursue exculpatory evidence from an unidentified out-of-state witness." *Grayson I*, 806 So. 2d at 254. He contends that the witness was not unidentified, and that the record clearly reveals that his counsel wanted to obtain a statement from Richard Dale Rogers.

Petitioner has since obtained a statement from Rogers. He first presented it to the Mississippi Supreme Court with his successive petition for post-conviction relief.

70

Successive PCR Record [69-4], at 133-135. The document states:

> My name is Richard Dale Rogers and I am currently serving a life sentence in Florida Department of Corrections. I dictated this statement to Sonya Rudenstine and certify that it is true and correct.
>
> In 1995, I was in Escambia County Jail awaiting transfer and was put in a cell with Jason Kilpatrick. He was being pulled out of his cell several times a day and kept coming back with cigarettes, so I asked him who he was snitching on. I had seen an article in the cell about his case and asked him if that's what it was about. He told me it was and I asked him how he was going to get away with it. He told me they were making it easy for me because they had not asked him if he did it or accused him – all they wanted was a statement against Blayde Grayson.
>
> He then told me how the crime happened. He and Grayson went to the victim's house and were talking with her. Kilpatrick took her to the restroom in her wheelchair and pushed her in while Grayson was going through the house. When she tried to get out, he grabbed her chair and tipped it over and bent one of the wheels. She fell out and banged her head pretty hard. She was knocked out. She came to and started screaming. The next thing he knew he had blood all over him and everywhere and the knife was in his hand.
>
> Grayson had been carrying things out to the car while this was going on. They got a shotgun, jewelry, not much cash, and some antique things. They went back to Pensacola to sell the stuff. There was camping equipment, too. Kilpatrick also told me he put the knife in the backyard near the porch.
>
> I was questioned at the County Jail about the case as well, I assume by the same people who questioned Kilpatrick. They wanted to know if Kilpatrick had spoken to me about his case and whether Grayson had stabbed the old lady.
>
> I swear that the information in this statement is true and correct to the best of my knowledge and is in my own words.

*Id.* The statement was notarized and dated April 22, 2005. *Id.* at 135.

The Mississippi Supreme Court held that Petitioner's trial counsel's failure to

present this testimony at trial was not prejudicial because "[a]lthough Rogers's affidavit implicates Grayson, Rogers' description of the crime is not consistent with the information about the crime found in the record." *Grayson III*, 118 So. 3d at 134. Moreover, "Grayson confessed to murdering Smith and provided details which are consistent with the evidence at the crime scene. Even if Rogers's hearsay testimony had been admitted into evidence, Grayson has failed to show a reasonable probability that the result of the proceedings would have been different." *Id.*

This claim raises two issues. First, there is the question of whether the Mississippi Supreme Court's factual determinations were reasonable. *See* 28 U.S.C. § 2254(d)(2). Second, if the trial court erred, the Court must determine whether the error was harmless or "had substantial and injurious effect or influence in determining the jury's verdict." *Burgess*, 350 F.3d at 466-67; *Hood v. Cockrell*, 72 F. App'x 171, 182 (5th Cir. 2003) (alleged *Ake* errors are subject to harmless error review). The Court need only address the second issue.

Even if the trial court erred in not providing Petitioner with additional funds for an investigation into Rogers' claims, the error was harmless. As the Mississippi Supreme Court noted in Petitioner's successive post-conviction proceeding, the Rogers affidavit is not consistent with the evidence presented at Petitioner's trial. *Grayson III*, 118 So. 3d at 134.

Rogers stated that Kilpatrick told him about the murder in 1995, but the murder actually occurred in May 1996. Successive PCR Record [69-4], at 133. Rogers

claims Kilpatrick said he took Minnie Smith to the bathroom in her wheelchair, dumped her out of it, and then stabbed her to death while she was on the floor. *Id.* at 134. Rogers specifically said Kilpatrick described "blood all over . . . everywhere. . . ." *Id.* Rogers also said, "Kilpatrick also told me he put the knife in the backyard near the porch." *Id.* However, these statements do not match the physical evidence at the scene of the crime and multiple witnesses' testimony from trial.

Ray Pierce testified that he discovered Smith's body on the bed. Trial Record Vol. 7 [153-12], at 24. Also, Melissa Schoene, the State's forensic scientist, testified that she found blood on the floor of the hallway between Minnie Smith's bedroom and bathroom, but she said, "[I]t was not a smear or a pool. It was not a pool or a drop. It was more of a transfer, possibly a smear." Trial Record Vol. 7 [153-12], at 116. She specifically testified that "it was not a lot of blood." *Id.* She also collected suspected blood from a "faint stain all throughout the sink," and a "diluted stain inside the basin of the tub." *Id.* at 120. She also collected blood from the south wall of Smith's bedroom, next to where the body was found. *Id.* at 121-22. She said that there was not a large amount of blood anywhere in the house except on Smith's bed and bedding, where the body was found. *Id.* at 123.

Faith Colvin testified that Petitioner had been with her earlier on the night of the murder at Jason Kilpatrick's residence in Florida, but she said Petitioner left around ten o'clock at night and returned around six or seven in the morning. Trial Record Vol. 8 [153-13], at 3-6. She also testified that Kilpatrick did not leave with

Petitioner, but, rather, stayed there in Florida the entire night. *Id.* at 7.

Houston Dorr testified that, among other things, he retrieved a knife from the Florida law enforcement officers who arrested Petitioner. *Id.* at 31. Elaine Pierce identified the knife as having belonged to Minnie Smith, Trial Record Vol. 6 [153-11], at 145-49, and Dr. Hayne testified that the knife was consistent with Minnie Smith's stab wounds. Trial Record Vol. 8 [153-13], at 143-44.

In summary, Rogers said Kilpatrick told him about the murder in 1995, before it had even occurred. Rogers said Kilpatrick claimed to have stabbed Smith on her bathroom floor, but the physical evidence indicates that Smith was murdered in her bed. Rogers said that Kilpatrick claimed to have murdered Smith, but Faith Colvin testified that Kilpatrick never left Florida. Rogers said that Kilpatrick claimed to have left the murder weapon in Smith's backyard, but officers retrieved it in Florida. Finally, Grayson's own confession contradicts the Rogers affidavit on numerous points, including Petitioner's role in the offense.

For all these reasons, the Court concludes that even if the trial court erred by failing to allocate additional funds for an investigation into Rogers' claims, the error was harmless. "[A] federal court may grant habeas relief only if it determines that the constitutional error had substantial and injurious effect or influence in determining the jury's verdict." *Burgess*, 350 F.3d at 466-67. "Actual prejudice must be shown." *Atkins v. Hooper*, 979 F.3d 1035, 1049 (5th Cir. 2020). Even if Petitioner had investigated Rogers and presented the testimony set out in his affidavit, it is

unlikely that it would have made any difference in the result of his trial, given the weight of evidence against Petitioner, the inconsistencies between Rogers' statement and that evidence, and Petitioner's own confession to the murder. *See Kelly v. Cockrell*, 72 F. App'x 67, 76-77 (5th Cir. 2003) (where petitioner argued that insufficient funding for investigation violated his rights, appellate court found that he had not shown any prejudice because the alleged evidence to be uncovered was not credible); *cf. White v. Johnson*, 153 F.3d 197, 207 (5th Cir. 1998) (in light of evidence presented against petitioner, it was unlikely that trial court's failure to allocate funds for an expert swayed the jury); *Aranda v. Lumpkin*, 2022 WL 16837062 at *3 (5th Cir. Nov. 9, 2022) (trial court error violating *Miranda* was harmless due to "overwhelming evidence" of petitioner's guilt); *Thompson v. Davis*, 916 F.3d 444, 454 (5th Cir. 2019) (trial court violation of Sixth Amendment right to counsel was harmless because of additional evidence against petitioner).

### b. Application of Federal Law

Grayson also argues that the Mississippi Supreme Court's adjudication of this claim was an unreasonable application of the United States Supreme Court's decision in *Ake v. Oklahoma*. He contends that the trial court's failure to grant additional funds for more investigation violated the rule "that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." *Ake*, 470 U.S. at 76.

*Ake* is inapplicable here. "In *Ake*, the Supreme Court held that, upon request, a trial court must appoint a psychiatrist for an indigent defendant if a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial . . . ." *Woodward v. Epps*, 580 F.3d 318, 331 (5th Cir. 2009). "Non-psychiatric experts should be provided only if the evidence is both critical to the conviction and subject to varying expert opinion." *Snarr*, 704 F.3d at 405. Petitioner argues that the reasoning behind *Ake* is equally applicable to investigators, but he has not cited a Supreme Court decision extending the precedent in that fashion. *See Poree*, 866 F.3d at 246 ("Clearly established federal law" is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."); *Kelly*, 72 F. App'x at 76 (expressing skepticism that *Ake* applies to investigative services).

Even if the Supreme Court had extended *Ake*'s holding to investigative services, this claim fails because Petitioner has not demonstrated that the denial of additional funds prejudiced his defense. "To demonstrate reversible error on the basis that he lacked [ ]adequate funds for expert witnesses, a defendant must establish a reasonable probability that the requested experts would have been of assistance to the defense and the denial of such expert assistance resulted in a fundamentally unfair trial." *Snarr*, 704 F.3d at 405. Grayson has not made that showing, for all the reasons provided above.

## C.      *Jury Instruction on Mitigating Evidence*

Petitioner argues that his death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution because the trial court failed to instruct the jury that it could consider any and all mitigating evidence beyond that specifically enumerated in the court's instructions.[9]  He contends that the Mississippi Supreme Court's adjudication of this claim relied on an unreasonable application of federal law and an unreasonable determination of fact. In response, the State argues that the claim is procedurally barred, and that the jury was properly instructed.

As noted above, "[f]ederal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar." *Gonzalez*, 924 F.3d at 241. Petitioner first presented this argument to a state court in his successive petition for post-conviction relief. *See Grayson III*, 118 So. 3d at 129. The Mississippi Supreme Court held that this issue "was capable of determination at trial and on direct appeal," and therefore waived pursuant to Miss. Code Ann. § 99-39-21(1), unless he could show "'cause' and 'actual prejudice.'" *Id*. The court stated: "Since the legal foundation upon which the claim for relief is based was discoverable with reasonable diligence at the time of trial

---

[9] "Upon conviction . . . of capital murder or other capital offense," Mississippi courts "conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment." MISS. CODE ANN. § 99-19-101(1). "In the proceeding, evidence may be presented as to any matter that the court deems relevant to the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances" outlined in the statute. MISS. CODE ANN. § 99-19-101(1), (5), (6). "For the jury to impose a sentence of death, it must unanimously find in writing . . . [t]hat sufficient aggravating circumstances exist . . . [and t]hat there are insufficient mitigating circumstances . . . ." MISS. CODE ANN. § 99-19-101(3).

or direct appeal, Grayson cannot show cause." *Id.* at 129-30. Accordingly, the claim was procedurally barred. *Id.* at 130.

"A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza*, 738 F.3d at 675. "If the State has . . . firmly established and regularly followed the rule by the time of the relevant state court decision, then the rule is adequate." *Buntion*, 31 F.4th at 962. "If the state court decision clearly and expressly relies on the state rule to deny relief, or if the decision does not fairly appear to rest primarily on . . . or to be interwoven with federal law, then the state rule is independent." *Id.*

Grayson challenges both the adequacy and independence of the state procedural bar, arguing that the Mississippi Supreme Court's decision was "interwoven with federal law and the adequacy and independence of the state law ground is not clear from the opinion." Memorandum of Law in Support of Second Amended Petition [119], at 47.

First, the Fifth Circuit has specifically held that Miss. Code Ann. § 99-39-21(1) is adequate. *Stokes v. Anderson*, 123 F.3d 858, 860-61 (5th Cir. 1997); *cf. Gaston v. Anderson*, 214 F.3d 1349, 2000 WL 633436, at *1 (5th Cir. Apr. 25, 2000) (district court did not err in finding that claims waived under Miss. Code Ann. § 99-39-21(1) were procedurally barred). Regardless, Petitioner has "not identified specific instances when the Mississippi Supreme Court did not apply [Miss. Code Ann. § 99-

78

39-21(1)] to claims identical or similar" to his. *Rogers v. Mississippi*, 555 F. App'x 407, 408 (5th Cir. 2014). Therefore, "he has not met his burden of establishing that the procedural bars were not strictly or regularly applied to the vast majority of similar claims." *Id.*

As for independence, "the fact that the state court alternatively addressed the merits of [a petitioner's] claim does not prevent its procedural default determination from being an independent basis that bars review by the federal courts." *Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003). Here, the Mississippi Supreme Court first held that Petitioner's claim related to the trial court's mitigation instruction was procedurally barred. *Grayson III*, 118 So. 3d at 130. It then stated, "Procedural bar notwithstanding, this claim does not entitle Grayson to relief," and it proceeded to address the merits of the claim. *Id.* at 130-32. Therefore, the Mississippi Supreme Court's determination of the merits of this claim was an alternative ruling, and it does not vitiate the independent nature of the procedural bar.

Accordingly, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675, and it is barred from federal habeas review.

Notwithstanding the procedural bar, the instructions were adequate. In a death penalty case, "the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the

offense" when determining a sentence. *Penry v. Lynaugh*, 492 U.S. 302, 327-28, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989). However, "a clearly drafted catchall instruction on mitigating evidence" generally satisfies this requirement. *McCoskey v. Thaler*, 478 F. App'x 143, 150 (5th Cir. 2012). The question for the Court is whether "there is a reasonable likelihood that the special issues precluded the jury from giving full consideration and full effect to the defendant's mitigating evidence, including evidence that has mitigating relevance outside the scope of the special issues because it speaks to a defendant's moral culpability." *Id.*

Here, the trial court instructed the jury: "You are not to single out one instruction alone as stating the law, but you must consider these instructions as a whole." Trial Record Vol. 1 [153-6], at 143. It also instructed the jury:

> [T]he procedure you must follow is not a mere counting process of a certain number of aggravating circumstances versus the number of mitigating circumstances. Rather, you must apply your reasoned judgment as to whether this situation calls for life imprisonment or whether it requires the imposition of death, in light of the totality of the circumstances present.

Trial Record Vol. 2 [153-7], at 18. The Court also instructed the jury:

> You must now decide whether the Defendant will be sentenced to death or life imprisonment. In reaching your decision, you may objectively consider the detailed circumstances of the offense for which the Defendant was convicted, and the character and record of the Defendant himself. You should consider and weigh any aggravating and mitigating circumstances, as set forth later in this instruction . . . .

*Id.* at 19. The same instruction listed four of the statutory aggravating factors. *Id.* at 20; *see also* Miss. Code Ann. § 99-19-101(5). It listed two of the statutory mitigating

80

factors:

> If one or more of the above aggravating circumstances is found to exist, then you must consider whether there are mitigating circumstances which outweigh the aggravating circumstance(s). Consider the following elements of mitigation in determining whether the death penalty should not be imposed:
>
> > (1) Whether the capacity of the Defendant to appreciate the criminality of his conduct was substantially impaired.
> >
> > (2) The age of the Defendant at the time of the crime.
>
> If you find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death penalty. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence.

Trial Record Vol. 2 [153-7], at 20-21.

Therefore, the trial court instructed the jury that they should "apply [their] reasoned judgment as to whether this situation calls for life imprisonment or whether it requires the imposition of death, in light of the totality of the circumstances present," and it instructed the jury they "may objectively consider . . . the character and record of the Defendant himself," in addition to the specific listed mitigating factors. Trial Record Vol. 2 [153-7], at 18-19. "[J]urors are presumed to follow their instructions." *Sheppard v. Davis*, 967 F.3d 458, 470 (5th Cir. 2020). Accordingly, the Mississippi Supreme Court reasonably determined that the instructions, when taken as a whole, did not foreclose the jury from considering all available mitigating

evidence.

**D.**     ***Jury Instruction on Parole Ineligibility***

Petitioner argues that his sentence violated the Eighth and Fourteenth Amendments to the United States Constitution because the jury was not adequately instructed that he would be ineligible for parole if sentenced to life imprisonment. The State argues that this claim is procedurally barred, and that the Mississippi Supreme Court's adjudication of it was reasonable.

Petitioner first presented this argument to a state court in his successive petition for post-conviction relief. *See Grayson III*, 118 So. 3d at 132. The Mississippi Supreme Court held that "this claim was capable of determination at trial or on direct appeal and is procedurally barred." *Id.* (citing MISS. CODE ANN. § 99-39-21(1)). The court also found that the claim "does not meet an exception to the procedural bars and should be dismissed." *Id.* Alternatively, the court held that the claim was meritless because the "jury was informed adequately that a life sentence would be without parole." *Id.*

As with the previous claim, Petitioner challenges both the adequacy and independence of the state procedural bar, arguing that the Mississippi Supreme Court's decision was "interwoven with federal law and the adequacy and independence of the state law ground is not clear from the opinion." Memorandum of Law in Support of Second Amended Petition [119], at 47.

The Fifth Circuit has held that Miss. Code Ann. § 99-39-21(1) is adequate,

*Stokes*, 123 F.3d at 860-61, and Petitioner has "not identified specific instances when the Mississippi Supreme Court did not apply [it] to claims identical or similar" to his. *Rogers*, 555 F. App'x at 408. Therefore, "he has not met his burden of establishing that the procedural bars were not strictly or regularly applied to the vast majority of similar claims." *Id.*

As for independence, "the fact that the state court alternatively addressed the merits of [a petitioner's] claim does not prevent its procedural default determination from being an independent basis that bars review by the federal courts." *Cotton*, 343 F.3d at 754. Here, the Mississippi Supreme Court explicitly held that Petitioner's claim related to an instruction regarding ineligibility for parole was procedurally barred. *See Grayson III*, 118 So. 3d at 132 (citing MISS. CODE ANN. § 99-39-21(1)). "Procedural bar notwithstanding," it alternatively held that the claim was meritless. *Id.* Therefore, the merits ruling did not vitiate the independent nature of the procedural bar.

Regardless, the claim is meritless. Grayson cites *Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994), in support of his argument that the trial court erred by failing to give an instruction that he would be ineligible for parole if sentenced to life in prison. "In *Simmons*, the Supreme Court held that 'where a defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible.'" *Rhoades v. Davis*, 914 F.3d 357,

374 (5th Cir. 2019) (quoting *Simmons*, 512 U.S. at 156 (plurality opinion)).

Here, Petitioner has not highlighted – and the Court did not find – any overt argument by the prosecution or jury instruction putting his future dangerousness in issue. Indeed, in Mississippi, future dangerousness is not a potential aggravating circumstance to be considered by the jury in a capital murder case. *See* MISS. CODE ANN. § 99-19-101(5). However, *Simmons* can still apply in cases where the prosecution does not overtly argue that the defendant poses a future danger. *Kelly v. South Carolina*, 534 U.S. 246, 253-54, 122 S. Ct. 726, 151 L. Ed. 2d 670 (2002). "Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future." *Id.* at 254.

The Court will assume that the State introduced evidence at trial that could tend to prove that Petitioner poses a future danger. The claim is still meritless. *Simmons* does not require an instruction from the court as to parole ineligibility when the defendant's future dangerousness is at issue. Rather, it "requires that the sentencing jury be informed that the defendant is parole ineligible." *Rhoades*, 914 F.3d at 374. A plurality of the Supreme Court held: "Because truthful information of parole ineligibility allows the defendant to deny or explain the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court." *Simmons*, 512 U.S. at 169; *see also Ramdass v. Angelone*, 530 U.S. 156, 180, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000) (O'Connor, J., concurring) (where the defendant is

ineligible for parole, "*Simmons* entitles the defendant to inform the jury of that ineligibility, either by argument or instruction . . . .").

Here, the trial court specifically instructed the jury: "[Y]ou are under no obligation to impose the death penalty. That is simply one option. You may also consider a sentence of life, without parole." Trial Record Vol. 2 [153-7], at 24. Throughout closing argument, Grayson's trial counsel repeatedly emphasized that the jury was choosing between death or life imprisonment without parole. Trial Record Vol. 10 [153-15], at 76, 78-80. In fact, he made that a key point of his argument, asserting that life without parole was a harsher sentence than death. He said, "[Y]ou are not going to turn him loose today if you don't kill him. You are going to inflict a lifetime of punishment on the defendant. You will make him think about this day for the rest of his life." *Id.* at 80.

Therefore, the trial court instructed the jury that a sentence of life imprisonment would be without parole, and Petitioner's counsel emphasized that fact in closing argument. Accordingly, the jury was informed that a sentence of life imprisonment would be without parole, and that is all the Constitution requires. *Rhoades*, 914 F.3d at 374.[10]

---

[10] *Skipper v. South Carolina*, 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1, cited by Petitioner, does not address whether a jury must be instructed that a defendant would be ineligible for parole if sentenced to life imprisonment. Rather, it provides that a jury "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 4. Here, Petitioner was not precluded from offering anything regarding his parole ineligibility. As discussed above, his counsel repeatedly emphasized that a life sentence would be without parole. Therefore, *Skipper* is inapplicable here.

Accordingly, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675, and it is barred from federal habeas review. Notwithstanding the procedural bar, the claim is meritless.

## E.   *Ineffective Assistance of Counsel*

In his next enumerated ground for relief, Petitioner argues that he was deprived of effective assistance of counsel at the culpability and penalty phases of his trial, as well as on direct appeal, in violation of rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

The Fifth Circuit has summarized the law governing claims of ineffective assistance of counsel:

> To demonstrate a claim of ineffective assistance of counsel under *Strickland v. Washington*, the defendant must show both that counsel rendered deficient performance and that counsel's actions resulted in actual prejudice. To demonstrate deficient performance, the defendant must show that, in light of the circumstances as they appeared at the time of the conduct, counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Trial counsel's strategic decisions must be given a strong degree of deference. On habeas review, if there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard, the state court's denial must be upheld. . . .

> To demonstrate prejudice under *Strickland*, [the petitioner] must show that counsel's deficient performance was so serious as to deprive him of a fair trial, a trial whose result is reliable. This requires the showing of a reasonable probability that but for counsel's deficiencies, the result of

the proceeding would have been different.

*Rhoades*, 852 F.3d at 431-32 (punctuation and citations omitted); *see also Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome. Prejudice exists when the likelihood of a different result is substantial, not just conceivable." *Trottie v. Stephens*, 720 F.3d 231, 241 (5th Cir. 2013) (citations and punctuation omitted).[11]

"When an ineffective-assistance-of-counsel claim is subject to AEDPA, the pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," not whether counsel's performance fell below the *Strickland* standard. *Trottie*, 720 F.3d at 241. In the context of a habeas claim, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* at 242 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785, 178 L. Ed. 2d 624 (2011)). "Thus, while surmounting *Strickland*'s high bar is never an easy task, establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," as both standards are "highly deferential" and "doubly so" when combined. *Id.* (punctuation and citations omitted). "AEDPA review is doubly deferential because

---

[11] Petitioner argues that the Court must apply a "cumulative prejudice" analysis. That is, he contends that the Court must assess prejudice globally, rather than isolating each alleged deficiency in counsel's representation. Petitioner is mistaken. The Fifth Circuit has affirmed a district court's holding that "the Supreme Court has never affirmatively adopted a cumulative error doctrine with respect to ineffective assistance of counsel claims." *Hill v. Davis*, 781 F. App'x 277, 278 (5th Cir. 2019). *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), cited by Petitioner, applied a cumulative prejudice analysis to *Brady* claims.

counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Russell*, 68 F.4th at 272 (quotations and citations omitted). "Doubly deferential means that we afford both the state court and the defense attorney the benefit of the doubt." *Id.* (quotations and citations omitted).

### 1. *Motion for Funding Investigation in Florida*

First, Petitioner argues that his trial counsel were ineffective because they failed to timely and adequately support his motion for funding for an investigator to interview Richard Dale Rogers, and then failed to preserve the issue for appeal. In response, the State argues that the claim is procedurally barred, that Petitioner's counsel did not provide deficient representation, and that Petitioner has not demonstrated prejudice.

Petitioner presented this claim to the Mississippi Supreme Court in his successive petition for post-conviction relief. *Grayson III*, 118 So. 3d at 133. There, like here, he presented the affidavit from Richard Dale Rogers. *Id.* The Mississippi Supreme Court found that the claim was barred by *res judicata*, and in assessing cause and prejudice it found that trial counsel's failure to present the Rogers testimony was not prejudicial. *Id.* at 134. The court said:

> Although Rogers's affidavit implicates Grayson, Rogers' description of the crime is not consistent with the information about the crime found in the record. Additionally, Grayson confessed to murdering Smith and provided details which are consistent with the evidence at the crime scene. Even if Rogers's hearsay testimony had been admitted into evidence, Grayson has failed to show a reasonable probability that the

result of the proceedings would have been different.

*Id.* Notwithstanding the *res judicata* bar, Petitioner failed to demonstrate that his counsel was ineffective in this respect. *Id.* at 134. Thus, Petitioner did not receive ineffective assistance in the initial post-conviction proceeding, and the claim was time-barred and barred as a successive petition. *Id.* at 125, 134 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

### a. Procedural Bar

"Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar." *Gonzalez*, 924 F.3d at 241. Petitioner first presented this claim to a state court in his successive petition for post-conviction relief. *See Grayson III*, 118 So. 3d at 133. The Mississippi Supreme Court held that it was time-barred and barred as a successive petition. *Id.* at 125, 138 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

"A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza*, 738 F.3d at 675. "If the State has . . . firmly established and regularly followed the rule by the time of the relevant state court decision, then the rule is adequate." *Buntion*, 31 F.4th at 962. "If the state court decision clearly and expressly relies on the state rule to deny relief, or if the decision does not fairly appear to rest primarily on . . . or to be interwoven

with federal law, then the state rule is independent." *Id.*

Grayson correctly argues that federal review of a claim denied by a Mississippi court pursuant to Miss. Code Ann. § 99-39-21(2) is not procedurally barred. *See Foster*, 293 F.3d at 787 n. 12; *Jackson*, 447 F. App'x at 544. However, the Mississippi Supreme Court held that his claim was barred by *res judicata*, *Grayson III*, 118 So. 3d at 133-34 (citing MISS. CODE ANN. § 99-39-21(2)), as well as time-barred and barred as a successive petition. *Id.* at 125, 134 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

Petitioner has not challenged the adequacy and independence of the Mississippi Uniform Post-Conviction Collateral Relief Act's ("MUPCCRA's") statute of limitations and bar on successive petitions. Regardless, the Fifth Circuit has specifically held that both rules "are independent and adequate state procedural grounds" to bar federal habeas review. *Spicer v. Cain*, 2021 WL 4465828, at *3 (5th Cir. Sept. 29, 2021) (as applied to an ineffective assistance claim); *see also Bell v. Miss. Dep't of Corr.*, 290 F. App'x 649, 655 (5th Cir. 2008); *Johnson v. Puckett*, 176 F.3d 809, 815 n.3 (5th Cir. 1999). Petitioner did not argue that any exception to the doctrine of procedural default applies. Therefore, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675, and it is barred from federal habeas review. Notwithstanding the procedural bar, Petitioner has not demonstrated that the Mississippi Supreme

Court's decision was unreasonable.

### b. Merits

Two weeks before the trial, the State disclosed reports from the Escambia County Sheriff's Department which contained information about the claims made by Richard Dale Rogers. Trial Record Vol. 1 [153-6], at 116. A few days later – approximately ten days before the trial – Petitioner's counsel filed the motion for continuance to investigate the matter. *Id.* at 115-16. Less than a week before the trial, Petitioner's counsel filed the third motion for funds and a motion for an out-of-state subpoena. *Id.* at 123-24, 129-30.

On the same day Petitioner's counsel filed the third motion for funds and motion for out-of-state subpoena, an investigator submitted a bill to Petitioner's counsel for "services furnished on Richard Dale Rogers." Trial Record Vol. 2 [153-7], at 52. The itemized bill indicates that the investigator met with Petitioner's counsel, located a phone and address, traveled to Pensacola, and discussed something with a travel agent. *Id.*

Overall, Grayson's trial counsel filed three separate motions seeking funds to pay an investigator, a motion seeking a continuance of trial to conduct additional investigation, and an application for a subpoena for an out-of-state witness. Trial Record Vol. 1 [153-6], at 44-45, 105-06, 115-17, 123-24, 129-30. Counsel argued the motions in multiple hearings, as well as an *ex parte* hearing in chambers. Trial Record Vol. 3 [153-8], at 3-4, 79-80; Trial Record Vol. 4 [153-9], at 19-20.

Ultimately, the trial court granted Petitioner's initial motion for funds, Trial Record Vol. 1 [153-6], at 114, but there is no evidence that the trial court addressed the motions filed after Petitioner's counsel learned about Richard Dale Rogers. However, the record indicates that there were *ex parte* proceedings of which there is no transcript. Trial Record Vol. 4 [153-9], at 22-23; Exhibit 28 to Petition [8-2], at 117. Likewise, there is no record of how or when the trial court received the investigator's bill for payment, or why the trial court only paid $500.00 on an $838.15 bill when it had already approved up to $750.00 for an investigator.

The Rogers affidavit was executed on April 22, 2005 – almost a decade after the trial. Successive PCR Record [69-4], at 133-135. The record does not contain a copy of the Escambia County report which the State disclosed to Petitioner's counsel. However, one of Petitioner's trial counsel executed an affidavit on April 14, 2005, in which he described what he knew at the time. Exhibit 28 to Petition [8-2], at 117-20. He said:

> I ran some NCIC record checks on some of the witnesses in Florida and recall that I talked to the judge off the record about getting some assistance to do investigation. I ended up hiring Jim Bowman, a retired police officer in Pascagoula, to investigate a guy who was in jail in Florida and ended up in the penitentiary somewhere near Key West in south Florida. As I recall, he had heard something potentially exculpatory from Jason Kilpatrick, who Grayson always insisted had committed the murder.

*Id.* at 117-18.

"When evaluating an ineffective assistance of counsel claim, this court will not question a counsel's reasonable strategic decisions." *Sandoval Mendoza v. Lumpkin*,

92

81 F.4th 461, 479 (5th Cir. Aug. 31, 2023). However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 473. "If counsel opts not to explore a particular line of defense, that decision must be assessed for reasonableness in light of all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* The Court conducts "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and makes "every effort to eliminate the distorting effects of hindsight." *Aranda*, 2022 WL 16837062 at *5.

Considering the facts recited above, the Court concludes that the Mississippi Supreme Court's rejection of this ineffective-assistance claim was reasonable. Petitioner's counsel first learned about Richard Dale Rogers about two weeks before the trial. There is no evidence that counsel knew the specific content of Rogers' testimony. In fact, the affidavit that was presented to the Mississippi Supreme Court in post-conviction was dated April 22, 2005 – almost a decade after the crime. Petitioner's counsel said he knew that Rogers "had heard something potentially exculpatory from Jason Kilpatrick, who Grayson always insisted had committed the murder." Exhibit 28 to Petition [8-2], at 118. In response to this limited information and in the short time remaining before trial, counsel filed a third motion seeking additional funds for an investigator, a motion for a continuance of trial, and a motion for an out-of-state subpoena. Counsel also tasked his investigator with tracking down

information on Rogers, as evidenced by the investigator's bill. This was a reasonable response to a last-minute rumor of "potentially exculpatory" information from a jailhouse snitch hundreds of miles away.

Even if Petitioner's counsel knew the specific content of Rogers' testimony as provided in the 2005 affidavit, it was a reasonable strategic choice to not utilize the short time remaining before trial to more thoroughly follow up on it, given 1) the factual inconsistencies between Rogers' statement and the evidence, which included Petitioner's own confession; and 2) the inherent credibility problems posed by hearsay testimony from a jailhouse snitch.

Even if Petitioner's counsel provided deficient representation by failing to timely and/or more thoroughly support the motions for additional investigative funding, it was reasonable for the Mississippi Supreme Court to conclude that the result would not have been different if Rogers had testified at trial. As discussed above, his affidavit conflicts with much of the evidence, including Petitioner's own confession, and the evidence of Petitioner's guilt was overwhelming.

Petitioner also argues that his counsel provided ineffective assistance by failing to adequately present the funding claim on appeal, which he contends led to the claim later being rejected in the successive post-conviction proceeding. However, Petitioner has not demonstrated what other information his appellate counsel could have presented in support of the funding claim. The Mississippi Supreme Court's appellate decision was issued on November 8, 2001, *Grayson I*, 806 So. 2d at 241, and

the Rogers affidavit was not executed until 2005. Moreover, Petitioner's counsel claims to have only known that Rogers "had heard something potentially exculpatory from Jason Kilpatrick, who Grayson always insisted had committed the murder." Even if Petitioner could show deficient performance, he cannot show prejudice, for all the reasons previously discussed above. Accordingly, the Mississippi Supreme Court's rejection of this claim was reasonable. *See Miller v. Dretke*, 404 F.3d 908, 918-19 (5th Cir. 2005) (where evidence of petitioner's guilt was overwhelming, there was no reasonable probability that the determination of guilt would have changed).

### 2. *Miscellaneous Failures by Trial/Appellate Counsel*

Next, Grayson argues that his trial counsel provided ineffective assistance in an assortment of ways. In response, the State argues that the claim is procedurally barred, and that Petitioner failed to demonstrate that his counsel provided deficient representation. The Court will address each sub-part of this claim in turn.

### a. Funding for Other Investigation

Grayson argues that his trial counsel failed to request funding for other investigation unrelated to Richard Dale Rogers. The Mississippi Supreme Court rejected this claim in Petitioner's successive post-conviction proceeding, citing Petitioner's failure to "offer sufficient proof of what additional funds . . . would have yielded [or] . . . sufficient proof of what a proper investigation would have revealed." *Grayson III*, 118 So. 3d at 134. The court further stated that even if "counsel's performance was deficient, Grayson has failed to show a reasonable probability that

95

the result of the proceedings would have been different." *Id.* Accordingly, Petitioner failed to demonstrate that his trial counsel was ineffective in this respect. *Id.* Thus, Petitioner did not receive ineffective assistance in the initial post-conviction proceeding, and the claim was time-barred and barred as a successive writ. *Id.* at 125, 134 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

"Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar." *Gonzalez*, 924 F.3d at 241. Petitioner presented this claim to a state court in his successive petition for post-conviction relief. *See Grayson III*, 118 So. 3d at 134. The Mississippi Supreme Court held that it was time-barred and barred as a successive petition. *Id.* at 125, 134 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

"A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza*, 738 F.3d at 675. "If the State has . . . firmly established and regularly followed the rule by the time of the relevant state court decision, then the rule is adequate." *Buntion*, 31 F.4th at 962. "If the state court decision clearly and expressly relies on the state rule to deny relief, or if the decision does not fairly appear to rest primarily on . . . or to be interwoven with federal law, then the state rule is independent." *Id.*

Grayson did not challenge the independence and adequacy of the procedural bar applied by the Mississippi Supreme Court to this claim. Regardless, the Fifth

Circuit has specifically held that the MUPCCRA's statute of limitations and bar on successive petitions "are independent and adequate state procedural grounds" to bar federal habeas review. *Spicer*, 2021 WL 4465828 at *3 (as applied to an ineffective assistance claim); *see also Bell*, 290 F. App'x at 655; *Johnson*, 176 F.3d at 815 n.3.

Petitioner did not argue that any other exception to the doctrine of procedural default applies to this claim. Therefore, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675, and it is barred from federal habeas review.

Regardless of the procedural bar, the Mississippi Supreme Court's adjudication of this claim was reasonable. The claim rests on a false premise. Grayson's counsel did, in fact, seek investigative funding in two motions before he became aware of Rogers' potentially exculpatory testimony. Regardless, Petitioner has not demonstrated prejudice because he has not shown what additional funding would have uncovered, or that it would have made any difference in the outcome of his trial in light of the overwhelming evidence against him.

### b. *Ex Parte* Proceedings

Next, Grayson argues that his trial counsel provided ineffective assistance by failing to establish a record of *ex parte* discussions to preserve issues for appeal. The Mississippi Supreme Court did not specifically address this claim, despite it being presented in Petitioner's successive post-conviction proceeding.

"[A] complete verbatim transcript is not always required to ensure that a defendant's right to meaningful appellate review is satisfied." *Higginbotham v. Louisiana*, 817 F.3d 217, 222 (5th Cir. 2016) (quotation omitted). ["T]he record is adequate for full appellate review so long as it contains the portions necessary to address the alleged errors below." *Id.* (quotation omitted). Habeas "claims based on incomplete transcripts must show that the absence of such a transcript prejudiced the defendant's appeal." *Id.* (quotation omitted) (alteration in original).

Here, Petitioner has not demonstrated that the outcome of his appellate and post-conviction proceedings would have been different if his trial counsel had ensured that there was a record of *ex parte* proceedings in the trial court. Accordingly, he has not demonstrated prejudice, and this claim fails. *See Higgins v. Cain*, 720 F.3d 255, 261-62 (5th Cir. 2013) (where petitioner failed to demonstrate prejudice resulting from failure to obtain copy of a transcript, ineffective assistance claim failed); *Goodwin v. Johnson*, 132 F.3d 162, 176 (5th Cir. 1997) (where transcript would not have made a difference in appeal outcome, counsel did not provide ineffective assistance by failing to include it).

### c. Continuance

Grayson also argues that his trial counsel provided ineffective assistance by failing to seek a continuance of trial after the trial court's belated approval of funding. The Mississippi Supreme Court did not specifically address this claim, despite it being presented in Petitioner's successive post-conviction proceeding.

This claim rests on a false premise. Petitioner's counsel did, in fact, file a motion for a continuance of trial, but the trial court never addressed it. Trial Record Vol. 1 [153-6], at 115-16. Regardless, Grayson must still show that that additional evidence would have changed the outcome of the trial if counsel had obtained it. He has not done so. Accordingly, he has not shown prejudice, and this claim fails. *See Satterwhite v. Johnson*, 207 F.3d 658, 2000 WL 122440, at *8 (5th Cir. 2000) (where petitioner failed to demonstrate that additional evidence would have been favorable to his defense, he could not show prejudice from counsel's failure to seek a continuance to obtain it); *Sanchez v. Thaler*, 366 F. App'x 494, 500 (5th Cir. 2010) (where petitioner could not show additional evidence would have helped his defense, he could not show prejudice from his counsel's failure to request a continuance to obtain it).

### d. Additional Guilt Phase Investigation

Grayson argues that his trial counsel did not conduct any additional investigation with respect to the guilt phase of trial. Specifically, he argues that his counsel had not met any of the State's witnesses until he cross-examined them at trial. In support of this assertion, Petitioner cites the fact that his trial counsel introduced himself to each prosecution witness at the beginning of cross-examination.

The Mississippi Supreme Court held that, other than the Rogers affidavit, Petitioner "failed to offer sufficient proof of what a proper investigation would have revealed. Based on Rogers's affidavit alone, even if trial counsel's performance was

deficient, Grayson has failed to show a reasonable probability that the result of the proceedings would have been different." *Grayson III*, 118 So. 3d at 134. Accordingly, Petitioner failed to demonstrate that his trial counsel was ineffective in this respect. *Id.* at 134. Thus, Petitioner did not receive ineffective assistance in the initial post-conviction proceeding, and the claim was time-barred and barred as a successive petition. *Id.* at 125, 134 (citing Miss. Code Ann. §§ 99-39-27(9), 99-39-5(2)).

"Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar." *Gonzalez*, 924 F.3d at 241. Petitioner presented this claim to a state court in his successive petition for post-conviction relief. *See Grayson III*, 118 So. 3d at 134. The Mississippi Supreme Court held that it was time-barred and barred as a successive petition. *Id.* at 125, 134 (citing Miss. Code Ann. §§ 99-39-27(9), 99-39-5(2)).

"A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza*, 738 F.3d at 675. "If the State has . . . firmly established and regularly followed the rule by the time of the relevant state court decision, then the rule is adequate." *Buntion*, 31 F.4th at 962. "If the state court decision clearly and expressly relies on the state rule to deny relief, or if the decision does not fairly appear to rest primarily on . . . or to be interwoven with federal law, then the state rule is independent." *Id.*

Petitioner did not challenge the independence and adequacy of the procedural

bar applied by the Mississippi Supreme Court to this claim. Regardless, the Fifth Circuit has specifically held that the MUPCCRA's statute of limitations and bar on successive petitions "are independent and adequate state procedural grounds" to bar federal habeas review. *Spicer*, 2021 WL 4465828 at *3 (as applied to an ineffective assistance claim); *see also Bell*, 290 F. App'x at 655; *Johnson*, 176 F.3d at 815 n.3.

Petitioner did not argue that any other exception to the doctrine of procedural default applies to this claim. Therefore, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675, and it is barred from federal habeas review. Notwithstanding the procedural bar, the Mississippi Supreme Court's decision was reasonable.

"Particularly in the context of a capital case, defense counsel has the obligation to conduct a reasonably substantial, independent investigation." *Trottie*, 720 F.3d at 242. "There are no strict rules for counsel's conduct beyond the general requirement of reasonableness." *Id.* (citing *Pinholster*, 131 S. Ct. at 1406-07). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* (quoting *Strickland*, 466 U.S. at 690-91). "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Id.* (quoting *Harrington*, 562 U.S. at 108). Rather, counsel is permitted to develop a strategy that balances cost with benefit. *Id.* at 243. "[A]

defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Id.* (quoting *Drury v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011)).

After conducting a reasonable investigation, "defense counsel also has an obligation to make reasonable strategic decisions regarding which witnesses and evidence he will present." *Id.* The Court assumes that counsel's decision to not "present a particular line of argument or evidence" was a strategic choice. *Id.* (citing *Taylor v. Maggio*, 727 F.2d 341, 347 (5th Cir. 1984)). In the end, the Court "must defer to the state court's factual findings and deny relief if there is *any* reasonable argument that counsel satisfied *Strickland's* deferential standard." *Trottie*, 720 F.3d at 244 (emphasis in original). "In cases where [the Fifth Circuit has] held an attorney's investigation was deficient, it is typically because the attorney failed to interview eyewitnesses to the crime." *Armstrong v. Lumpkin*, 2022 WL 2867163, at *5 (5th Cir. July 21, 2022) (citing *Hughes v. Vannoy*, 7 F.4th 380, 389-92 (5th Cir. 2021)); *Anderson*, 338 F.3d at 391; *Soffar v. Dretke*, 368 F.3d 441, 473-74 (5th Cir. 2004)).

According to time records submitted to the trial court, Petitioner's lead trial counsel, David Ishee, spent three hours in phone calls with Petitioner's family, an hour and a half in phone calls with a psychiatric expert, thirty-two hours reviewing discovery, twenty-nine hours conducting research, and thirty-five hours in

102

unspecified "trial preparation." Exhibit 27 to Petition [8-2], at 110.

Ishee executed an affidavit in which he stated that up until the change-of-venue hearing on March 24, 1997, he relied on his co-counsel, Bill Bailey, "to do substantial portions of the investigation." *Id.* at 117. However, Ishee stated that he "learned too late . . . that much of what I had asked him to do was not done." *Id.* Accordingly, Ishee took over investigation of the case after the change-of-venue hearing. *Id.* He "obtained records pertaining to Grayson's prior offenses and a drug overdose when he was a teenager," but he does "not recall seeing any other background records." *Id.* Ishee also "ran some NCIC record checks on some of the witnesses in Florida," "talked to the judge off the record about getting some assistance to do the investigation," hired a private investigator to look into Richard Dale Rogers, met with Grayson "probably about 8-10 times at the County jail and once or twice at Mr. Bailey's office," "met with Grayson's mother . . . once every two weeks or so," "met with Grayson's grandmother during the trial," and hired a psychiatric expert to assess Petitioner's competence to stand trial. *Id.* at 117-18.

Assuming that Petitioner has demonstrated deficient performance by his trial counsel, he has not demonstrated prejudice. He has not provided any evidence that additional investigation would have altered the jury's verdict – particularly in light of the substantial evidence against him, including his own confession. The only specific task that Petitioner mentions in briefing is his counsel's failure to meet with the State's witnesses before trial. However, Petitioner has not demonstrated what

103

such meetings would have accomplished, or that they would have produced any evidence that was not already in the discovery materials produced by the State. Accordingly, Petitioner has not demonstrated that his counsel's alleged failure to conduct adequate investigation before the guilt phase of trial prejudiced his defense, and this claim fails. *See Ramey v Lumpkin*, 7 F.4th 271, 282-83 (5th Cir. 2021) (where trial counsel failed to investigate some of the prosecution's witnesses, there was no prejudice because the alleged failure would not have affected "overwhelming" evidence of the petitioner's guilt).

### e. Richard Dale Rogers

Finally, Grayson again argues that his counsel provided ineffective assistance by failing to secure the testimony of Richard Dale Rogers. As discussed above, the Mississippi Supreme Court held that "Rogers's affidavit is not enough to prove prejudice," citing its inconsistency with the evidence against Petitioner. *Grayson III*, 118 So. 3d at 134. Accordingly, it held that "[b]ased on Rogers's affidavit alone, even if trial counsel's [investigation] was deficient, Grayson has failed to show a reasonable probability that the result of the proceedings would have been different." *Id.* For the same reasons provided above, the Court finds that this claim is procedurally barred, and that the Mississippi Supreme Court's determination was reasonable.

### 3. *Failure to Support Motion to Suppress*

Grayson argues that his trial counsel was ineffective because they failed to timely and adequately investigate and present evidence and argument in support of

his motion to suppress statements made to law enforcement officers. In response, the State argues that this claim is procedurally barred, and that the Mississippi Supreme Court's adjudication of it was reasonable.

### a. Procedural Bar

Petitioner first raised this issue in his successive post-conviction proceeding. The Mississippi Supreme Court cited its rejection of his argument on appeal and in his first post-conviction proceeding that the trial court had improperly admitted his confession statement, violating his right to counsel. *Grayson III*, 118 So. 3d at 135. It held that this ineffective-assistance claim was an attempt to "recast his argument on direct appeal under a different legal theory . . . ." *Id.* Accordingly, it held that the claim was barred by *res judicata*, citing Miss. Code Ann. § 99-39-21(2). *Id.* Irrespective of *res judicata*, the Mississippi Supreme Court held that Petitioner had failed to "offer sufficient evidence in support of his assertions" that his contact with officers did not constitute a waiver of rights, and that he had "failed to show that counsel's performance was deficient or that any such deficiency prejudiced his case." *Id.*

This claim is not procedurally barred. A statutory bar that "has the same effect as res judicata and prevents the re-litigation of claims" does not prevent federal review of a habeas claim, "as long as the claim was not procedurally barred for some other reason." *Jackson*, 447 F. App'x at 544. Applying these principles, the Fifth Circuit has found that federal review of a claim denied by a state court pursuant to

Miss. Code Ann. § 99-39-21(2) is not procedurally barred. *See Foster*, 293 F.3d at 787 n. 12; *Jackson*, 447 F. App'x at 544.

### b. Merits

Petitioner argues that his trial counsel provided ineffective assistance by failing to adequately develop and present evidence and argument in support of his motion to suppress the confession. Specifically, Petitioner contends that his trial counsel should have presented the same evidence and argument in support of the motion to suppress that his habeas counsel has presented in this case.

This Court has thoroughly examined the record and addressed each specific argument Petitioner presented as to each of his three statements to law enforcement officers, including the confession. As discussed in detail above, the Mississippi Supreme Court's adjudication of these issues was reasonable. Trial counsel's "failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007). Counsel can hardly be faulted for failing to make arguments that this Court has rejected.

Regardless of the ultimate success or failure of Petitioner's motion to suppress, his trial counsel's performance was adequate. On July 31, 1997, Petitioner's counsel filed a motion to suppress the statements Petitioner provided to law enforcement officers. Trial Record Vol. 1 [153-6], at 125-28. Therein, trial counsel asserted that Petitioner invoked his right to counsel multiple times on May 17, 1996, and that the custodial statements provided on May 17, 23, and 24, 1996, were taken in violation

of Petitioner's constitutional rights. *Id.* at 126. Counsel also noted that Petitioner was held for several days without bond, denied an initial appearance, denied the opportunity to consult an attorney, and subjected to emotional distress before he confessed on May 24, 1996. *Id.* at 126-27.

On August 1, 1997, the trial court held a hearing on Petitioner's motion to suppress. Trial Record Vol. 4 [153-9], at 24-151; Trial Record Vol. 5 [153-10], at 1-66. Petitioner's counsel called 2 witnesses: Sheriff George Miller and MHP Investigator Houston Dorr. Trial Record Vol. 4 [153-9], at 24, 84. The State called three witnesses, whom Petitioner's counsel cross-examined: Sergeant James Tanner, Sheriff's Department Dispatcher Krystal Bexley, and MHP Polygraph Examiner Larry Waggoner. *Id.* at 130, 147; Trial Record Vol. 5 [153-10], at 9.

Petitioner's counsel then argued that officers violated Mississippi's Uniform Circuit and County Court Rules by failing to give Petitioner an initial appearance within forty-eight hours of his arrest. Trial Record Vol. 5 [153-10], at 12-13, 19-20. He noted that Petitioner invoked his right to an attorney as early as May 17, 1996, and that he did not intend to waive his rights by signing the waiver forms. *Id.* at 14, 25. Rather, counsel argued that Petitioner only intended to acknowledge that the officers had read him his rights. *Id.* at 25. He also argued that Petitioner confessed to the murder under duress, due to the conditions of his confinement, *id.* at 14, 24, 28, and that officers implied Petitioner would receive a benefit if he cooperated. *Id.* at 18. Finally, counsel argued that all of these circumstances combined to have a

107

coercive impact on Petitioner. *Id.* at 62. Petitioner's counsel described his trial strategy: "Our main strategy during the trial was to try to get the confession suppressed. The judge denied our suppression motion just a few days before trial and really caught us off guard." Exhibit 28 to Petition [8-2], at 118.

In this habeas case, Petitioner's counsel offered all the same arguments that Petitioner's trial counsel advanced in the suppression hearing. The only material difference is that here Petitioner argued that he only intended to provide a "limited waiver" of his rights. Likewise, the record in this habeas case is not materially different than the evidence before the trial court, insofar as this issue is concerned.

When this federal habeas Court evaluates the performance of a petitioner's trial counsel, "[t]here is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Rhoades*, 852 F.3d at 432, and the Court makes "every effort to eliminate the distorting effects of hindsight." *Aranda*, 2022 WL 16837062 at *5. Petitioner has not specified what his trial counsel could or should have done differently in litigating the motion to suppress. The trial court's denial of the motion does not, by itself, establish deficient performance. Accordingly, the Mississippi Supreme Court reasonably determined that Petitioner had failed to demonstrate a deficiency in the representation.

Even if Petitioner's trial counsel had inadequately litigated the motion to suppress in the manner Petitioner argues, there was no prejudice. As the Court discussed above, the Mississippi Supreme Court's rejection of Petitioner's Fifth and

Sixth Amendment right-to-counsel claims was reasonable. Therefore, even if Petitioner's trial counsel had presented the same arguments and evidence at trial that Petitioner has presented in this habeas case, it would not have made any difference in the outcome of the motion.

4.      *Failure to Request DNA Testing*

Grayson argues that his trial counsel was ineffective because they failed to request DNA testing on fingernail scrapings taken from the victim and blood from the crime scene. Petitioner contends that even if the DNA evidence would not have proven his innocence, it might have implicated Kilpatrick. In response, the State argues that Petitioner's trial counsel did not provide deficient representation in this respect, and that Petitioner has not demonstrated prejudice.

The Mississippi Supreme Court addressed this argument in Petitioner's first post-conviction proceeding. It held that he had "not shown that counsels' failure to conduct DNA testing was deficient performance," or that there was a "reasonable probability that the results of the guilt or sentencing phase of trial would have been different had DNA testing been done." *Grayson II*, 879 So. 2d at 1017. The Court noted that Petitioner admitted "to being at the victim's home with Kilpatrick at the time of the crime," and that conducting DNA testing might have eliminated Kilpatrick as a suspect, thus removing Petitioner's primary defense. *Id.*

Petitioner raised the issue again in his successive post-conviction proceeding, and the Mississippi Supreme Court held that the claim was procedurally barred.

*Grayson III*, 118 So. 3d at 136. It also recited its findings from *Grayson II* and held the claim was meritless. *Id.*

Petitioner's trial counsel filed a Motion to Preserve Evidence Samples on March 5, 1997. Trial Record Vol. 1 [153-6], at 42. He specifically asked the trial court to order preservation of "any type of hair or body fluid samples" for "later testing by defense experts." *Id.* at 43. When counsel argued the motion in a hearing, he stated:

> I believe the State plans on calling DNA experts in this matter. If they do, we would like at this point in time for the Court to order a preservation of any evidence samples, including hair, blood or other bodily fluids that may be examined by any DNA experts and that we – enough of that be preserved in order to have our own expert, if in fact they do deem it necessary to call a DNA expert on behalf of the State.

Trial Record Vol. 3 [163-8], at 85. The State responded, "[R]ight now there are no plans for DNA . . . I don't think there's a necessity for DNA in this case." *Id.* at 85-86. The trial court told the State that if it used DNA evidence, the trial would likely be continued so that Petitioner could hire an expert. *Id.* at 86-87. The State reiterated, "I don't see where DNA is going to be relevant in this case at all," and the Court directly asked Petitioner's counsel, "If they don't do DNA, are you asking the Court for a DNA specialist for anything?" *Id.* at 87. Petitioner's counsel responded: "Not at this point." *Id.*

In an affidavit executed years after trial, Petitioner's trial counsel explained: "I did not request DNA testing in this case because I did not think the judge would approve the necessary funding. I also doubted that the evidence had been preserved for testing anyway." Exhibit 28 to Petition [8-2], at 118.

The transcript demonstrates that Petitioner's counsel only intended to use DNA evidence if the State did so. This was a sound trial strategy, in that Petitioner's counsel did not know what the results of the DNA testing would be, and it could have harmed Petitioner's defense as easily as helped it. As the Fifth Circuit has observed, when DNA testing "prove[s] reliable, it [is] virtually conclusive of the guilty party's identity." *Wooten v. Thaler*, 598 F.3d 215, 221 (5th Cir. 2010). Accordingly, it "cuts both ways for those accused of crimes." *Id.*; *see also Skinner v. Quarterman*, 528 F.3d 336, 341 (5th Cir. 2008). DNA evidence can exonerate, but it can also convict. Considering Petitioner's confession and the other evidence against him, it was reasonable for the Mississippi Supreme Court to conclude that trial counsel's failure to obtain DNA testing was not deficient representation.

Regardless, to show prejudice resulting from his trial counsel's failure to obtain DNA testing, Petitioner must demonstrate what the DNA testing would yield. *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002). Moreover, he must demonstrate what the expert witness interpreting the test results would testify. *Id.*; *see also Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (providing requirements to prove ineffective assistance claims premised on failure to call witnesses). He has not done so. Therefore, he has not demonstrated that this alleged deficiency in his trial counsel's representation prejudiced his defense. For all these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was reasonable.

5.    *"Distancing Themselves" from Petitioner*

Petitioner argues that counsel was ineffective because they "distanced themselves" from Petitioner throughout the trial, repeatedly telling the jury that they were appointed by the Court. Petitioner contends that his trial counsel violated their duty of loyalty by effectively conveying that they did not want to represent him. In response, the State argues that the claim is procedurally barred, that trial counsel did not perform deficiently, and that Petitioner has not demonstrated any prejudice.

The Mississippi Supreme Court addressed this claim in Petitioner's successive post-conviction proceeding. It held that Petitioner "has taken each of these instances completely out of context. The mere mention that counsel is appointed does not indicate that counsel was not loyal to his client." *Grayson III*, 118 So. 3d at 137. Accordingly, it held that Petitioner had "failed to show that trial counsel's performance was deficient, and . . . failed to show that any such deficiency prejudiced his case." *Id.* Since the claim was meritless, post-conviction counsel's failure to raise it in the initial post-conviction proceeding did not prejudice Petitioner. *Id.* Therefore, Petitioner did not receive ineffective assistance in the initial post-conviction proceeding, and the claim was time-barred and barred as a successive petition. *Id.* at 125, 137 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

"Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar." *Gonzalez*, 924 F.3d at 241. Petitioner first presented this claim to a

state court in his successive petition for post-conviction relief. *See Grayson III*, 118 So. 3d at 136-37. The Mississippi Supreme Court held that it was time-barred and barred as a successive petition. *Id.* at 125, 137 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

"A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza*, 738 F.3d at 675. "If the State has . . . firmly established and regularly followed the rule by the time of the relevant state court decision, then the rule is adequate." *Buntion*, 31 F.4th at 962. "If the state court decision clearly and expressly relies on the state rule to deny relief, or if the decision does not fairly appear to rest primarily on . . . or to be interwoven with federal law, then the state rule is independent." *Id.*

Petitioner has neither challenged the adequacy nor the independence of the state procedural bars at issue. Regardless, the Fifth Circuit has specifically held that the MUPCCRA's statute of limitations and bar on successive petitions "are independent and adequate state procedural grounds" to bar federal habeas review. *Spicer*, 2021 WL 4465828 at *3 (as applied to an ineffective assistance claim); *see also Bell*, 290 F. App'x at 655; *Johnson*, 176 F.3d at 815 n.3.

Petitioner argues that Mississippi law allows death-sentenced prisoners to overcome procedural bars in a successive post-conviction proceeding by establishing the ineffective assistance of initial post-conviction counsel. The Court assumes that

Petitioner is arguing that the ineffective assistance provided by his initial post-conviction counsel should excuse his procedural default. "[I]f state law requires an ineffective assistance of counsel claim to be brought for the first time in a collateral proceeding, then state postconviction counsel's ineffective assistance in failing to raise a substantial ineffective assistance of trial counsel claim excuses that claim's default." *Ramirez v. Davis*, 780 F. App'x 110, 118 (5th Cir. 2019) (citing *Martinez v. Ryan*, 566 U.S. 1, 17, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012)).

Under Mississippi law, "[g]enerally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Spiers v. State*, 361 So. 3d 643, 660 (Miss. 2023). However, the Mississippi Supreme Court "will address such claims on direct appeal when (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of the witnesses, etc., are not needed." *Id.* Therefore, Mississippi law does not require an ineffective assistance of trial counsel claim to be brought for the first time in a collateral proceeding, and the *Martinez* exception to procedural default is inapplicable here.

Petitioner did not argue that any other exception to the doctrine of procedural default applies. Therefore, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675,

and it is barred from federal habeas review.

Regardless of the procedural bars, Petitioner merely stated, in conclusory fashion, that the comments prejudiced his defense. He did not direct the Court to any evidence demonstrating that there is a reasonable probability that the outcome of his case would have been different if the jury had not known that his trial counsel was appointed by the court. "Because conclusory assertions of prejudice are insufficient to satisfy the second prong of *Strickland*," the Mississippi Supreme Court's adjudication of this claim was reasonable. *Green v. Johnson*, 160 F.3d 1029, 1041 (5th Cir. 1998).

### 6.   *Objection to Statements*

Next, Petitioner argues that his trial counsel was ineffective because they failed to adequately review and object to the admission of the full transcripts of his recorded statements and the video of his May 24 statement. Petitioner contends that trial counsel should have objected to portions of the transcripts and video which disclosed that he had purchased cocaine after returning to Florida, and that he had been arrested on a warrant issued in Mississippi related to his leaving the restitution center in Pascagoula. In response, the State argues that this claim is procedurally barred, that trial counsel's performance was not deficient because the disputed portions of the statements were admissible, and that Petitioner has not demonstrated prejudice.

In Petitioner's successive post-conviction proceeding, the Mississippi Supreme Court held that the information regarding Grayson's purchase of cocaine after

returning to Florida after the murder "was admissible as proof of motive," *Grayson III*, 118 So. 3d at 137-38 (citing MISS. R. EVID. 404(b)), as he had admitted in his confession that he broke into Smith's house to steal the shotgun because he needed money to buy drugs. Therefore, the court held that any objection to such evidence "would have been properly overruled," and Grayson could not show that the failure to object prejudiced his defense. *Id.* at 138. The Mississippi Supreme Court likewise ruled that "evidence that Grayson had escaped from the Restitution Center" was admissible "to show that Grayson had the opportunity to commit the crime." *Id.* (citing MISS. R. EVID. 404(b)). Therefore, even if his counsel's failure to object to such evidence was deficient, there was no prejudice. *Id.*

The Mississippi Supreme Court also observed that even if the disputed portions of the statements had been redacted, the "jury still would have heard the rest of the confession, including Grayson's detailed description of the murder." *Id.* Therefore, he failed to demonstrate that the outcome of the trial would have been different if the mentions of drugs and the Restitution Center had been redacted from the statements. *Id.* Since the claim was meritless, post-conviction counsel's failure to raise it in the initial post-conviction proceeding did not prejudice Petitioner. *Id.* Therefore, Petitioner did not receive ineffective assistance in the initial post-conviction proceeding, and the claim was time-barred and barred as a successive petition. *Id.* at 125, 138 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

116

### a. Procedural Bar

"Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar." *Gonzalez*, 924 F.3d at 241. Petitioner first presented this claim to a state court in his successive petition for post-conviction relief. *See Grayson III*, 118 So. 3d at 137-38. The Mississippi Supreme Court held that it was time-barred and barred as a successive petition. *Id.* at 125, 138 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

"A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza*, 738 F.3d at 675. "If the State has . . . firmly established and regularly followed the rule by the time of the relevant state court decision, then the rule is adequate." *Buntion*, 31 F.4th at 962. "If the state court decision clearly and expressly relies on the state rule to deny relief, or if the decision does not fairly appear to rest primarily on . . . or to be interwoven with federal law, then the state rule is independent." *Id.*

Petitioner did not address the State's argument that the claim was procedurally barred. Therefore, he has not challenged the adequacy and independence of the state procedural bars at issue. Regardless, the Fifth Circuit has specifically held that the MUPCCRA's statute of limitations and bar on successive petitions "are independent and adequate state procedural grounds" to bar federal

habeas review. *Spicer*, 2021 WL 4465828 at *3; *see also Bell*, 290 F. App'x at 655; *Johnson*, 176 F.3d at 815 n.3. Petitioner did not argue that any exception to the doctrine of procedural default applies. Therefore, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675, and it is barred from federal habeas review.

### b.  Statement from May 21, 1996

Even if the claim were not procedurally barred, the May 21, 1996, statement does not include any mention of drugs, a warrant issued for Petitioner's arrest, or the restitution center in Pascagoula. Exhibit 7 to Petition [8-2], at 22. Therefore, its admission could not have prejudiced Petitioner's defense in the manner he argues, and the claim is meritless.

### c.  Statement from May 23, 1996

In the May 23 statement, Investigator Dorr asked Petitioner if he was on anything the night of the murder, and Petitioner answered, "Yes, sir . . . . We were doing a little bit of everything to tell you the truth, cocaine." Exhibit 9 to Petition [8-2], at 29-30. Petitioner also admitted that he had drunk "a whole bunch" of beer and snorted cocaine. *Id.* at 34. A few lines of the statement appear to have been redacted. *Id.* at 26. There is no mention of the Restitution Center and Petitioner's warrant. *Id.* at 26-35.

When the May 23 statement was offered into evidence, the trial court had a

conference with the attorneys in chambers. Trial Record Vol. 8 [153-13], at 77. There is no transcript of the conference, but Petitioner's counsel later described what happened. *Id.* He said that he had "objected to the mention of the use of illegal drugs in that statement of the 23rd," but the trial court overruled his objection. *Id.* The trial court agreed with this description of events. It said: "There were still some areas in here that you did object to me in chambers about. One was about statements concerning – specific statements concerning drug use and how they related to this crime, as far as motive or they were so interrelated to the actual committing of the crime." *Id.* at 78-79. The trial court held, with respect to the May 23 statement, "those references to drugs I felt like were admissible." *Id.* at 79.

Therefore, with respect to the May 23 statement, Petitioner's claim rests on a false premise. Petitioner's trial counsel did, in fact, object to the comments about drugs in the May 23 statement. Accordingly, the Mississippi Supreme Court's conclusion that he did not perform deficiently was reasonable. Moreover, Petitioner has not demonstrated that the admission of the comments about drugs in the May 23 statement prejudiced his defense, particularly in light of the other evidence against him, including his own confession. "[C]onclusory assertions of prejudice are insufficient to satisfy the second prong of *Strickland*," *Green*, 160 F.3d at 1041, and the Mississippi Supreme Court's adjudication of this claim was reasonable.

### d.  Statement from May 24, 1996

In the May 24 confession statement, Dorr asked Petitioner, "You needed some

money and what was your money for?" Exhibit 10 to Petition [8-2], at 37. Petitioner answered: "I needed some more drugs." *Id.* Petitioner later reiterated this motivation for the burglary. *Id.* at 40, 51. He said that when he and Kilpatrick got back to Florida after the murder, they bought an eight ball of cocaine. *Id.* at 57. He also said that he knew officers from Mississippi would be looking for him because of the "Restitution Center in Pascagoula," although he did not specifically say he had escaped from there. *Id.* at 58-59.

During the trial, Petitioner's counsel objected to the admission of the May 24 confession on the same grounds he had objected to the May 23 statement. Trial Record Vol. 8 [153-13], at 76-77. He said he did not make the objection earlier when they were discussion the May 23 statement in chambers because he "was under the impression that Your Honor's ruling about the substance abuse discussed in the video would be the same as Your Honor's ruling about the substance abuse on the 23rd." *Id.* at 80. The trial court affirmed that counsel was correct; the "ruling would have been the same." *Id.* Petitioner's trial counsel then objected to "the mention of drugs in the videotape, the use of drugs by the defendant and Kilpatrick prior to and subsequent to the crime." *Id.* The Court overruled the objection. *Id.* at 81.

The State then asked for a clarification of the Court's ruling – whether Petitioner's counsel had only objected to the information about drug use contained in the statement. *Id.* at 81-82. Petitioner's counsel explained that although Petitioner had mentioned a "warrant outstanding in Mississippi," he understood it as Petitioner

assuming that there was an arrest warrant in the murder case. *Id.* at 82-83. Accordingly, he had not asserted an objection to that portion of the statement. *Id.* at 83. As discussion of the issue continued, Petitioner's counsel said:

> [T]he only thing on the restitution center, I don't feel at this point in time, I don't think the Court would grant a mistrial, and I certainly think a curative instruction would only enhance that to the jury. It had been so long since I had listened to this videotape – I had read the transcript several times, but I did not recall the mention of the restitution center. There's no mention of the Mississippi Department of Corrections. There's no mention of an escape. There's no mention that he was incarcerated there. And I don't think that, at this point in time, that any juror would realize that it was simply a place in Pascagoula. And . . . asking for a curative instruction would only enhance that and bring it to the jury's attention. And that's why I'm not asking for a curative instruction on that.

*Id.* at 85-86.

With respect to the references to drugs in the May 24 confession, Petitioner's claim relies on a false premise. Petitioner's trial counsel did, in fact, object to the comments about drugs. Accordingly, the Mississippi Supreme Court's conclusion that he did not perform deficiently in this respect was reasonable.

As for the comment about the Restitution Center, Petitioner's counsel stated on the record that he would not object to that portion of the statement because "asking for a curative instruction would only enhance that and bring it to the jury's attention." *Id.* at 85-86. Therefore, Petitioner's failure to object to the portion of the statement mentioning the Restitution Center was a strategic choice and, as such, "virtually unchallengeable." *Neal*, 78 F.4th at 790. To rebut the "strong presumption" that this choice by his trial counsel was an "exercise of reasonable professional judgment,"

121

Petitioner must "prove that his attorney's representation was unreasonable under prevailing professional norms and the challenged action was not sound strategy." *Id.*

"The decision to raise an objection is driven largely by trial strategy, and we have no reason to second-guess it." *Hernandez v. Thaler*, 398 F. App'x 81, 87 (5th Cir. 2010). As Petitioner's counsel observed during the trial, sometimes making an objection draws more attention to unfavorable evidence or argument. *Id.* Petitioner has not carried his burden of demonstrating that counsel's judgment on this issue was unreasonable under prevailing professional norms. Accordingly, the Mississippi Supreme Court's conclusion that he did not perform deficiently in this respect was reasonable.

Moreover, Petitioner has not demonstrated that the admission of the comments about the drugs and restitution center in the May 24 confession prejudiced his defense, particularly in light of the other evidence against him, including his own confession. "[C]onclusory assertions of prejudice are insufficient to satisfy the second prong of *Strickland*," *Green*, 160 F.3d at 1041, and the Mississippi Supreme Court's adjudication of this claim was reasonable.

### 7.  *Closing Argument*

Petitioner argues that his trial counsel were ineffective because they failed to object to certain comments in the State's closing argument. Specifically, Petitioner contends that the prosecutor improperly vouched for Jason Kilpatrick, and that he asserted facts that were not in the record – namely, that the investigators had

investigated Kilpatrick, and that the fingerprint evidence from the crime scene had not yet been processed when Petitioner initially implicated Kilpatrick as the murderer. In response, the State argues that the claim is procedurally barred, that Petitioner's trial counsel did not perform deficiently, and that Petitioner has not demonstrated prejudice.

The Mississippi Supreme Court addressed this claim in Petitioner's successive post-conviction proceeding. *Grayson III*, 118 So. 3d 139-40. It held that Petitioner's argument took the prosecutor's comments out of context. *Id.* at 139. The court observed that the prosecutor was rebutting Petitioner's counsel's argument that Kilpatrick was the actual murderer, as evidenced by the fact that Petitioner's fingerprints were not found at the crime scene. *Id.* Therefore, any objection would have been overruled. *Id.* The Mississippi Supreme Court also found that Petitioner had not demonstrated that the prosecutor's comments prejudiced him, given Petitioner's confession to the crime. *Id.* Accordingly, the claim was meritless, and post-conviction counsel's failure to raise it in the initial post-conviction proceeding did not prejudice Petitioner. *Id.* Therefore, Petitioner did not receive ineffective assistance in the initial post-conviction proceeding, and the claim was time-barred and barred as a successive petition. *Id.* at 125, 139-40 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

### a. Procedural Bar

"Federal review of a habeas claim is procedurally barred if the last state court

to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar." *Gonzalez*, 924 F.3d at 241. Petitioner presented this claim to a state court in his successive petition for post-conviction relief. *See Grayson III*, 118 So. 3d at 138-40. The Mississippi Supreme Court held that it was time-barred and barred as a successive petition. *Id.* at 125, 139-40 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

"A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza*, 738 F.3d at 675. "If the State has . . . firmly established and regularly followed the rule by the time of the relevant state court decision, then the rule is adequate." *Buntion*, 31 F.4th at 962. "If the state court decision clearly and expressly relies on the state rule to deny relief, or if the decision does not fairly appear to rest primarily on . . . or to be interwoven with federal law, then the state rule is independent." *Id.*

In rebuttal, Petitioner challenges the adequacy of the procedural bar applied by the Mississippi Supreme Court to this claim. The Fifth Circuit has specifically held that the MUPCCRA's statute of limitations and bar on successive petitions "are independent and adequate state procedural grounds" to bar federal habeas review. *Spicer*, 2021 WL 4465828 at *3 (as applied to an ineffective assistance claim); *see also Bell*, 290 F. App'x at 655; *Johnson*, 176 F.3d at 815 n.3.

Petitioner also argues that the ineffective assistance provided by his initial

post-conviction counsel should excuse his procedural default. As discussed above, "if state law requires an ineffective assistance of counsel claim to be brought for the first time in a collateral proceeding, then state postconviction counsel's ineffective assistance in failing to raise a substantial ineffective assistance of trial counsel claim excuses that claim's default." *Ramirez*, 780 F. App'x at 118 (citing *Martinez*, 566 U.S. at 17). However, Mississippi law does not require an ineffective assistance of trial counsel claim to be brought for the first time in a collateral proceeding, *Spiers*, 361 So. 3d at 660, and the *Martinez* exception to procedural default is inapplicable here.

Petitioner did not argue that any other exception to the doctrine of procedural default applies. Therefore, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675, and it is barred from federal habeas review.

### b. Merits – The First Disputed Argument

Regardless of the procedural bar, the Mississippi Supreme Court's adjudication of this claim was reasonable. During closing argument, Petitioner's counsel argued that Jason Kilpatrick was the actual murderer. Trial Record Vol. 9 [153-14], at 131-32. He argued that several of the State's witnesses had not provided any evidence implicating Grayson, *id.* at 132-35, 138-39, and he attempted to discredit others. *Id.* at 136. He emphasized that Grayson's fingerprints were not found at the crime scene, and that the State had not matched the fingerprints to

anyone. *Id.* at 137. Thus, Petitioner's counsel argued that the only evidence the State had against Petitioner was the videotaped confession, *id.* at 139, and he argued that it was a false confession, coerced by the investigators. *Id.* at 141-42.

In rebuttal, the prosecutor argued that Petitioner's counsel had not adduced any evidence of coercion. *Id.* at 149. He then discussed the history of the investigation. *Id.* at 150-51; Trial Record Vol. 10 [153-15], at 2-4. Petitioner's counsel made two objections, which were overruled. Trial Record Vol. 9 [153-14], at 150. The prosecutor asked the jury to decide which party had more motive to kill a witness to the burglary – Kilpatrick, who was unknown to Smith, or Petitioner, whom she had known for a long time. Trial Record Vol. 10 [13-15], at 3-4. Then, he said:

> And this is what the police looked for that morning. . . . They are doing the same thing at this time for Jason Kilpatrick in Florida. We can't even put him in Mississippi. If we could, he would be sitting over there. I'm telling you that. They're doing it down there. Law enforcement from two states are involved in this. And that's why he's not here. But he's going to kill somebody he ain't got no reason to? He can just – he goes into the window, grabs the gun, jumps out and runs down the road to the car. And that the end of that. He's back in Florida. That's what he's saying. This doesn't make sense. But we do have a guy who will then tell you, well, let's go to Jackson, and let's check out some things. Let's do some more checking on this. Will you do that? Where is the testimony they put another gunny sack on him, threw him in the truck and beat him on the way up there?

*Id.* at 4. Petitioner's counsel then made an unspecified objection, which the trial court overruled. *Id.*

The Mississippi Supreme Court's adjudication of Petitioner's claim as to this portion of the State's closing argument was reasonable, for a few reasons. First, "[a]

126

decision not to object to a closing argument is a matter of trial strategy," *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992), and, as such, is "virtually unchallengeable." *Neal*, 78 F.4th at 790. To rebut the "strong presumption" that this choice by his trial counsel was an "exercise of reasonable professional judgment," Petitioner must "prove that his attorney's representation was unreasonable under prevailing professional norms and the challenged action was not sound strategy." *Id*. He has not carried this steep burden.

Regardless, Petitioner's counsel did, in fact, make an objection to this line of argument, which the trial court overruled. Trial Record Vol. 10 [13-15], at 4. It is not clear from the transcript whether counsel intended the objection for the overall argument or the last line delivered by the prosecutor. One could reasonably conclude that Petitioner's counsel intended to object to the entire line of argument, or, at the very least, that he did not want to prejudice the jury against him and, by proxy, his client by repeatedly asserting objections which the trial court overruled.

Moreover, Petitioner's counsel directly argued that Kilpatrick was the actual murderer. Trial Record Vol. 9 [153-14], at 131-32. This opened the door for the State to argue in rebuttal that Kilpatrick had an alibi for the date of the murder, and this argument was supported by testimony from two of the State's witnesses. Trial Record Vol. 7 [153-12], at 108; Trial Record Vol. 8 [153-13], at 7. Therefore, it did not constitute facts outside the record.

Finally, Petitioner has not demonstrated that his counsel's failure to object to

this argument prejudiced his defense, particularly in light of the evidence against him, including his own confession. "[C]onclusory assertions of prejudice are insufficient to satisfy the second prong of *Strickland*." *Green*, 160 F.3d at 1041. For all these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was reasonable.

### c. Merits – The Second Disputed Argument

In rebuttal, the prosecutor also addressed Petitioner's argument that his fingerprints were not found at the crime scene, and that the State had failed to match the fingerprints to anyone. He said, in relevant part:

> Lack of fingerprints. Lack of fingerprints. Jason Kilpatrick's prints weren't found there. Neither were Blayde Grayson's. Neither one of them were. Well, let me ask you something. . . . Gloves. In the videotaped statement, Blayde says that Jason is wearing gloves. He said he had on gloves. It was either then or in the statement on the 24th. Now, bear in mind, all of this stuff was being collected and trying to be kept up with and it hadn't gotten to the crime lab yet, probably. If it had, it certainly hadn't been worked. And, you know, within a week's span here. So, all this evidence is being collected. . . . So we don't have the results of all this yet. . . . He says he didn't have gloves on and Jason did. Everything was over. The window was up. He admits being in the house because his prints may be found there. He don't know yet. We don't have prints. But he thinks they may be found there. And if his are found there, what about Jason's? That's the guy he's trying to blame. So, he puts a pair of gloves on Jason, doesn't he? He says Jason is wearing a pair of gloves. If he's wearing a pair of gloves, there's not going to be any prints there. So, if they don't find any prints of his but they find mine, his story will fit. Boom. If that's true, and I think that's the way it went, when in the world . . . Now, why would you take the screen? Well, it was all over by the time Blayde got back there. . . . He never touched a screen. He didn't mention about the screen in the 23rd, the statement of the 23rd. He does in the 24th, though. That screen isn't to be found. Never will be found. Why? Because the guy who took it off the window might have left prints on it. And if Jason Kilpatrick was wearing gloves, he wouldn't have had

any prints on it. And so who threw the screen away?

Trial Record Vol. 10 [153-15], at 6-8.

Petitioner contends that this argument was improper because there was no evidence in the record that the fingerprint evidence had not yet been processed when he gave the confession. He notes that Melissa Schoen, the forensic scientist who collected the fingerprints, testified that she collected the fingerprints on May 5, 1996. Trial Record Vol. 7 [153-12], at 113. According to the evidence submission form, she submitted her findings to the lab on May 6, 1996. Exhibit 31 to Petition [8-2], at 126. The lab returned a Latent Print Analysis on May 22, 1996, which indicates that one fingerprint of value and two palm prints of value were found in the latent lifts. Exhibit 32 to Petition [8-2], at 129. The technician advised that "known inked prints" including the "palms and the tips of the fingers" be submitted for comparison, indicating that the prints had not yet been compared to any known prints. *Id.*

The Court finds that the Mississippi Supreme Court's adjudication of this issue was reasonable. Even if there were no facts in evidence that the latent lifts had not yet been fully processed, that point is irrelevant to the prosecutor's argument. Petitioner's counsel argued that Kilpatrick was the actual murderer, emphasizing that Petitioner's fingerprints were not found at the crime scene, and that the State had not matched the latent fingerprints to anyone. Trial Record Vol. 9 [153-14], at 131-32, 137. In rebuttal, the prosecutor argued that Kilpatrick had an alibi, Trial Record Vol. 10 [13-15], at 4, and that Petitioner, knowing that there was a chance his

fingerprints might be found at the scene, said that Kilpatrick was there but wore gloves. *Id.* at 6-8. Petitioner has not demonstrated how the prosecutor's assertion that the latent lifts had not yet been processed was prejudicial – particularly in light of the evidence against him, including his own confession. "[C]onclusory assertions of prejudice are insufficient to satisfy the second prong of *Strickland*." *Green*, 160 F.3d at 1041. For all these reasons, the Court finds that the Mississippi Supreme Court's adjudication of this claim was reasonable.

8.    *Jury Instructions*

Next, Petitioner argues that his trial counsel provided ineffective assistance by failing to object to Instruction S-3A. Petitioner contends that Instruction S-3A impermissibly decreased the State's burden of proof by permitting the jury to find him guilty of capital murder without a finding that he committed every element of the crime. In response, the State argues that this claim is procedurally barred, and that the instructions, when read as a whole, properly instructed the jury that they must find Petitioner guilty of each element of capital murder to render a guilty verdict.

Instruction S-3A stated:

The Court instructs the Jury that each person present at the time and consenting to or encouraging the commission of a crime, and knowingly, willfully and feloniously doing any act which is an element of the crime or immediately connected with it, or leading to its commission, is as much a principal as if he had with his own hands committed the whole offense; and if you believe from the evidence, beyond a reasonable doubt, that the Defendant, BLAYDE N. GRAYSON, did willfully, unlawfully, knowingly and feloniously do any act which is an element of the crime

with which he is charged, namely Capital Murder, or immediately connected with it, or leading to its commission, then and in that event, you should find the Defendant, BLAYDE N. GRAYSON, Guilty of Capital Murder.

Trial Record Vol. 2 [153-7], at 4.

The trial court also instructed the jury, in Instruction C-1(A): "You are not to single out one instruction alone as stating the law, but you must consider these instructions as a whole." Trial Record Vol. 1 [153-6], at 143. It also instructed them: "The State must prove each and every essential element of the crime charged beyond a reasonable doubt." *Id.* at 144. Likewise, in Instruction D-8, the trial court told the jury that the State had the "burden of proving the Defendant guilty of every material element of the crime which he is charged." Trial Record Vol. 2 [153-7], at 9.

In Instruction S-4A, the trial court set forth the elements of capital murder and required the jury to find each of them beyond a reasonable doubt before returning a guilty verdict:

> The Court instructs the Jury that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant, Blayde N. Grayson, on or about May 4, 1996, in George County, Mississippi, did willfully, unlawfully, feloniously, with or without deliberate design, then and there, kill Minnie Smith, a human being, without authority of law, when engaged in the commission of the crime of Burglary, then, if you so believe from all the evidence in this case beyond a reasonable doubt, the defendant is guilty of Capital Murder, and it is your sworn duty to say so by your verdict.

*Id.* at 5. Instruction S-5A provided the elements of burglary:

> The Court further instructs the Jury that if you believe from the evidence in this case beyond a reasonable doubt that the Defendant, Blayde N. Grayson, alone or in conjunction with another, in George

131

County, Mississippi, on or about May 4, 1996, did willfully, unlawfully, feloniously and burglariously break and enter the dwelling house of Minnie Smith, with the intent, then and there to take, steal and carry away the personal property of Minnie Smith, then same would constitute the crime of Burglary as used in other instructions of the Court.

*Id.* at 6. Instruction D-2A likewise provided the elements of burglary, and it required the jury to find each element of burglary beyond a reasonable doubt before returning a guilty verdict. *Id.* at 8.

Petitioner first presented this claim to the Mississippi Supreme Court in his successive post-conviction proceeding. *Grayson III*, 118 So. 3d at 140-41. The court noted that it had "found similar instructions to be erroneous, though harmless" because other instructions had required the State to prove all elements of the offense before the jury could return a guilty verdict. *Id.* at 140. The court observed that Instructions C-1(A) and D-8 required the jury to prove each element of the crime beyond a reasonable doubt, that Instruction S-4A provided the elements of capital murder, and that Instructions S-5A and D-2A provided the elements of burglary. *Id.* Therefore, while trial counsel "should have known that a similar instruction had been found to be erroneous," the "error was harmless." *Id.* Accordingly, post-conviction counsel's failure to raise this claim in the initial post-conviction proceeding did not prejudice Petitioner. *Id.* at 140-41. Thus, Petitioner did not receive ineffective assistance in the initial post-conviction proceeding, and the claim was time-barred and barred as a successive petition. *Id.* at 125, 141 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

### a. Procedural Bar

"Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar." *Gonzalez*, 924 F.3d at 241. Petitioner presented this claim to a state court in his successive petition for post-conviction relief. *See Grayson III*, 118 So. 3d at 140-41. The Mississippi Supreme Court held that it was time-barred and barred as a successive petition. *Id.* at 125, 140-41 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

"A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza*, 738 F.3d at 675. "If the State has . . . firmly established and regularly followed the rule by the time of the relevant state court decision, then the rule is adequate." *Buntion*, 31 F.4th at 962. "If the state court decision clearly and expressly relies on the state rule to deny relief, or if the decision does not fairly appear to rest primarily on . . . or to be interwoven with federal law, then the state rule is independent." *Id.*

Petitioner challenges the independence and adequacy of the procedural bar applied by the Mississippi Supreme Court to this claim. The Fifth Circuit has specifically held that the MUPCCRA's statute of limitations and bar on successive petitions "are independent and adequate state procedural grounds" to bar federal habeas review. *Spicer*, 2021 WL 4465828 at *3 (as applied to an ineffective assistance

133

claim); *see also Bell*, 290 F. App'x at 655; *Johnson*, 176 F.3d at 815 n.3.

Petitioner also argues that the ineffective assistance provided by his initial post-conviction counsel should excuse his procedural default. As discussed above, "if state law requires an ineffective assistance of counsel claim to be brought for the first time in a collateral proceeding, then state postconviction counsel's ineffective assistance in failing to raise a substantial ineffective assistance of trial counsel claim excuses that claim's default." *Ramirez*, 780 F. App'x at 118 (citing *Martinez*, 566 U.S. at 17). However, Mississippi law does not require an ineffective assistance of trial counsel claim to be brought for the first time in a collateral proceeding, *Spiers*, 361 So. 3d at 660, and the *Martinez* exception to procedural default is inapplicable here.

Petitioner did not argue that any other exception to the doctrine of procedural default applies. Therefore, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675, and it is barred from federal habeas review.

### b. Merits

Regardless of the procedural bar, Petitioner has not demonstrated that the Mississippi Supreme Court's adjudication of this issue was unreasonable. As discussed above, the trial court specifically instructed the jury that they were "not to single out one instruction alone as stating the law, but you must consider these instructions as a whole." Trial Record Vol. 1 [153-6], at 143. It also instructed them,

"The State must prove each and every essential element of the crime charged beyond a reasonable doubt," *id.* at 144, and it instructed them as to each element of capital murder and the underlying felony of burglary. Trial Record Vol. 2 [153-7], at 5-6, 8.

"A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000). Moreover, when assessing the impact of an instruction on a jury's deliberations, the Court does not view the erroneous instruction "in artificial isolation, but . . . in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146-47, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973). Given those principles, it was reasonable for the Mississippi Supreme Court to conclude that the erroneous instruction was harmless, as the instructions as a whole did not permit the jury to return a guilty verdict unless they found that the State had proven each element of capital murder and the underlying felony of burglary beyond a reasonable doubt. *Cf. Galvan v. Cockrell*, 293 F.3d 760, 766 (5th Cir. 2002) (where trial court erroneously instructed jury that the defendant may earn time off his prison term, other instructions mitigated the error by forbidding jury from considering the manner in which such time would be applied to defendant); *Grillette v. Warden Winn Corr. Ctr.*, 348 F. App'x 41, 44-45 (5th Cir. 2009) (trial court's provision of erroneous instruction which mitigated the state's burden to prove intent was harmless error).

### 9. *Mitigation Investigation*

Petitioner argues that his trial counsel was ineffective because they failed to adequately consult with him and conduct a proper mitigation investigation prior to

trial. He contends that counsel's failure to adequately consult with him caused him to represent that he did not wish to oppose a death sentence if convicted, until his family intervened and advised him of his options. He also contends that counsel's failure to conduct an adequate mitigation investigation prejudiced his defense in that he was unable to present substantial mitigation evidence at sentencing.[12]

In response, the State argues that Petitioner's claims related to his trial counsel's failure to adequately investigate and present mitigating evidence are procedurally barred. Alternatively, it argues that Petitioner's trial counsel did not provide deficient representation because 1) Petitioner instructed him to not present mitigation evidence if the jury returned a guilty verdict, and 2) counsel prepared an adequate mitigation case in spite of Petitioner's wishes to the contrary. The State also argues that Petitioner was not prejudiced by counsel's failure to conduct a more extensive mitigation investigation.

In Petitioner's first post-conviction proceeding, he argued that his trial counsel had failed to conduct an adequate mitigation investigation, which resulted in a failure to present substantial mitigation evidence to the jury during sentencing. *Grayson II*, 879 So. 2d at 1014. The Mississippi Supreme Court observed that Petitioner "instructed his counsel not to oppose the death penalty, in the event of a guilty

---

[12] In the Second Amended Petition [104], Petitioner expressed these three complaints – trial counsel's alleged failure to consult with him prior to trial, failure to conduct an adequate mitigation investigation, and failure to adequately present mitigation evidence – in two ineffective-assistance claims. Second Amended Petition [104], at 44-65. In briefing, both Petitioner and the State argued them as a single claim. Accordingly, the Court will treat them as a single claim.

verdict." *Id*. Petitioner only allowed trial counsel to put on a mitigation case after being convinced to do so by his family and a court-appointed independent counsel. *Id*. at 1015. But even then, Petitioner "allow[ed] his counsel to call only [his] mother and grandmother and make a closing argument in mitigation." *Id*.

Accordingly, the Mississippi Supreme Court held that Petitioner's ineffective-assistance claim related to mitigation "rings hollow." *Id*. at 1016. The court held that Petitioner "was thoroughly advised by his two defense counsel, the trial court, and independent counsel . . . of the consequences of his decision," but he "blocked his counsel's efforts and cannot claim deficient performance." *Id*. The Mississippi Supreme Court also held that Petitioner "failed to present any information regarding the extent of the investigation actually conducted by counsel, or what, if anything, an 'adequate' investigation would have revealed." *Id*. Therefore, the court concluded that Petitioner had failed to demonstrate deficient performance by his trial counsel in this respect. *Id*. at 1017.

In his successive post-conviction proceeding, Petitioner presented the same claims asserted here: that his trial counsel provided ineffective assistance by failing to adequately consult with him before trial, failed to conduct an adequate mitigation investigation, and failed to adequately present mitigation evidence at sentencing. *Grayson III*, 118 So. 3d at 141. The Mississippi Supreme Court recounted its earlier decision and held that the claim was barred by *res judicata*. *Id*.

Alternatively, the court held that Petitioner's allegation that his counsel failed

to consult with him before trial was "contrary to the record." *Id.* at 142. The court noted that "[b]oth counsel's affidavit and Grayson's affidavit note that Grayson stated from the beginning that he did not want to oppose the death penalty." *Id.* The court further noted that after being convinced at trial to allow counsel to put on a mitigation case, Petitioner limited counsel to calling his mother and grandmother and making a closing argument. *Id.* Accordingly, Petitioner's "blanket statement in his latest PCR proceedings that he 'would have changed his mind much earlier' [was] unconvincing." *Id.*

The Mississippi Supreme Court also held that Petitioner's allegation that he had not limited his counsel's ability to present evidence in mitigation was "contrary to the record," which demonstrated that Petitioner only permitted his trial counsel to call his mother and grandmother as witnesses and present a closing argument. *Id.* at 42-43. Accordingly, the court held that Petitioner "was thoroughly advised by his two defense counsel, the trial court and independent counsel . . . of the consequences of his decision" to limit trial counsel's ability to present a mitigation case. *Id.* at 143. Accordingly, the Mississippi Supreme Court found that even if Petitioner's trial counsel had conducted a more extensive mitigation investigation, "it could not have been presented during the sentencing phase of the trial." *Id.* The court also found that much of the evidence Petitioner claimed his counsel should have presented in mitigation was "cumulative of the testimony presented during the sentencing proceeding." *Id.*

Therefore, Petitioner failed to demonstrate that his counsel's performance was deficient, and he failed to demonstrate that the result of the sentencing would have been different if counsel had performed differently. *Id.* Accordingly, post-conviction counsel's failure to raise this claim in the initial post-conviction proceeding did not prejudice Petitioner. *Id.* at 143. Thus, Petitioner did not receive ineffective assistance in the initial post-conviction proceeding, and the claim was time-barred and barred as a successive petition. *Id.* at 125, 143 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

### a. Exhaustion

Petitioner apparently argues that this claim has not been exhausted. *See* Memorandum in Support of Second Amended Petition [119], at 99. He argues that because he has new evidence which has not been considered by the Mississippi Supreme Court – namely, expert reports that he obtained after the conclusion of his successive post-conviction proceeding – the claim is "in a significantly different posture" than that presented to the state court. The State disagrees, arguing that Petitioner presented the same claim to the Mississippi Supreme Court.

AEDPA's "exhaustion requirement is satisfied when the substance of the federal claim is fairly presented to the highest state court on direct appeal or in post-conviction proceedings, even if the state court fails to address the federal claim." *Johnson*, 712 F.3d at 231. A federal claim "is fairly presented when the petitioner asserts the claim in terms so particular as to call to mind a specific right protected by

the Constitution or alleges a pattern of facts that is well within the mainstream of constitutional litigation." *Id.* "[T]he state court system must have been presented with the same facts and legal theory upon which the petitioner bases his current assertions." *Ruiz*, 460 F.3d at 643. However, new facts which "supplement," rather than "fundamentally alter," a claim presented to the state courts are not sufficient to render a habeas claim a new, unexhausted claim. *Anderson*, 338 F.3d at 386-87. Likewise, "merely putting a claim in a stronger evidentiary posture is not enough" to make it a new, unexhausted claim. *Nelson*, 952 F.3d at 671; *see also Morris*, 413 F.3d at 491.

Petitioner's new evidence does not fundamentally alter the nature of the claim that his counsel failed to adequately investigate and present evidence in mitigation during sentencing. The only difference is that in this federal habeas case, he bolstered the claim with some additional expert reports obtained after the Mississippi Supreme Court rejected his successive petition. Therefore, this claim was exhausted. *See Nelson v. Lumpkin*, 72 F.4th 649, 659 (5th Cir. 2023) (asserting more specific instances of trial counsel's ineffective assistance regarding mitigation evidence and argument was not enough to fundamentally alter the claim asserted in state court); *Ward v. Stephens*, 777 F.3d 250, 258-59 (5th Cir. 2015) (additional evidence of mental illness and family history, including expert and lay witness affidavits, was not sufficient to fundamentally alter the nature of ineffective assistance claim premised upon failure to adequately investigate and litigate mitigation case by, among other

things, failing to obtain additional expert opinions), *abrogated on other grounds by Ayestas v. Davis*, 584 U.S. ---, 138 S. Ct. 1080, 1092-93, 200 L. Ed. 2d 376 (2018); *Morris*, 413 F.3d at 495-96 (new affidavits from experts were not enough to fundamentally alter *Atkins* claim that had been previously asserted in state court); *Dowthitt v. Johnson*, 230 F.3d 733, 746 (5th Cir. 2000) (new expert affidavits regarding mental illness only strengthened ineffective assistance claim premised on failure to investigate and present a mitigation defense).

### b. Procedural Bar

The State argues that Petitioner's ineffective-assistance claims related to mitigation are procedurally barred. "Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar." *Gonzalez*, 924 F.3d at 241. The last state court to address this claim was the Mississippi Supreme Court, addressing Petitioner's successive petition for post-conviction relief. *See Grayson III*, 118 So. 3d at 141-43. The Mississippi Supreme Court held that the claim was barred by *res judicata*. *Id.* It also held that the claim was time-barred and barred as a successive petition. *Id.* at 125, 143 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

"A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza*, 738 F.3d at 675. "If the State has . . . firmly established and regularly followed the rule by the time of

the relevant state court decision, then the rule is adequate." *Buntion*, 31 F.4th at 962. "If the state court decision clearly and expressly relies on the state rule to deny relief, or if the decision does not fairly appear to rest primarily on . . . or to be interwoven with federal law, then the state rule is independent." *Id.*

Federal review of a claim denied by a Mississippi court pursuant to Miss. Code Ann. § 99-39-21(2) is not procedurally barred. *See Foster*, 293 F.3d at 787 n. 12; *Jackson*, 447 F. App'x at 544. However, the Mississippi Supreme Court held that his claim was barred by *res judicata*, *Grayson III*, 118 So. 3d at 133-34 (citing MISS. CODE ANN. § 99-39-21(2)), as well as time-barred and barred as a successive writ. *Id.* at 125, 134 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

Petitioner has not challenged the adequacy and independence of the MUPCCRA's statute of limitations and bar on successive petitions. Regardless, the Fifth Circuit has specifically held that both the MUPCCRA's statute of limitations and bar on successive petitions "are independent and adequate state procedural grounds" to bar federal habeas review. *Spicer*, 2021 WL 4465828 at *3; *see also Bell*, 290 F. App'x at 655; *Johnson*, 176 F.3d at 815 n.3. Petitioner did not argue that any exception to the doctrine of procedural default applies. Therefore, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675, and it is barred from federal habeas review.

142

### c. Relevant Facts

Notwithstanding the procedural bar, the Court will address the merits of this claim. First, the Court must recount the relevant evidence from the record. Ten months before trial, Petitioner's counsel filed a Motion for Authority to Employ Court Reporter, in which he asked for leave to "employ a Court Reporter for the purpose of conducting an adequate investigation of the social and medical history in regard to the Defendant." Exhibit 34 to Petition [8-2], at 134. The record contains no indication that the trial court ever addressed the motion.

Several months later, Petitioner's counsel filed an Ex Parte Motion for Psychological Evaluation. Trial Record Vol. 1 [153-6], at 34-35. The trial court initially granted the motion but set the order aside a few days later on the State's motion. Trial Record Vol. 1 [153-6], at 49-51. In the motions hearing of March 24, 1997, Petitioner stated that they were seeking a psychological evaluation "to determine a defense of whether or not our client is competent to stand trial," and to determine whether he had "another type of emotional or mental disorder that would not prohibit him from standing trial, but we would need to take into consideration in our discussions with him." Trial Court Vol. 3 [153-8], at 100. The trial court told Petitioner's counsel to provide "evidence that there is a need, what the need is, what it will cost, who you want," and she would evaluate it. *Id.* at 104.

In an ex parte hearing on March 27, 1997, Petitioner's counsel stated: "[M]y client . . . informed me that he has had psychological problems in the past and he has

143

undergone treatment for psychiatric problems. He's been unable to furnish me the name of the treating physician or times or dates." *Id.* at 110. He requested "an appointment of a psychiatrist for an evaluation to determine if he is competent enough to assist in his own defense and whether or not we need to assert mental incompetence as a defense at trial." *Id.* The court granted the motion and authorized a psychological evaluation by Dr. Roy Deal. *Id.* at 111.

Deal examined Petitioner on July 22, 1997. Exhibit 51 to Petition [8-2], at 189. According to Deal, Petitioner said "that he does not trust [his trial counsel] because 'the state hired him.' He says that he 'don't trust none of them . . . the penitentiary is full of innocent people.'" *Id.* Petitioner apparently believed "'they' [were] trying to 'get him' and that they [had] been watching him for a while." *Id.* Petitioner claimed to have "loved Aunt Minnie," and he told Deal that "he 'wouldn't let anyone hurt her.'" *Id.* "He became almost tearful, though not in a dramatic way." *Id.* Deal stated:

> Mr. Grayson reports a long history of multiple substance abuse. He used IV heroin, cocaine, acid, alcohol, "crank" and marijuana at different times beginning at the age of thirteen or fourteen. He says that he has experienced frequent blackouts, has overdosed on at least one occasion and that he gets "wound up" on drugs, though he does not have a history of random violence.

*Id.* at 190. Deal concluded:

> With regard to Mr. Grayson's competency, I would question his ability to make a confession or to understand his rights due to the substances in his body at the time he was taken into custody. At the time of this examination he understands the nature of the charges and that the potential consequences of the judicial proceedings involve the death penalty.

*Id.* Although Deal timely informed Petitioner's counsel that Petitioner was competent to stand trial, he did not provide the written report until the third day of Petitioner's trial. Trial Record Vol. 9 [153-14], at 20-21.

On August 5, 1997, before opening statements at trial, Petitioner's counsel told the trial court:

> During the course of our representation, Mr. Grayson had told me on several occasions . . . that if, in fact, he is convicted, he does not want to fight the death penalty. Up until yesterday, I had not given this much consideration. I did not think it was a serious statement, or perhaps one that he had not thought through. Yesterday, . . . at the close of the day, we talked extensively. He informed me again he does not want me to fight the death penalty in any way if in fact he is convicted. It is his desire, since the only two options at this point are life without parole or the death penalty, he wishes to be executed. My co-counsel, Mr. Bailey, and I have talked with him at length about this yesterday. In fact, we brought his mother and grandmother into the room with us. The four of us had counseled with him probably for twenty minutes to a half hour and, at that point in time, he was very adamant about this. I feel that it is not in his best interest. At this point in time, we are at odds about what we think is best for Mr. Grayson.
>
> At this point in time, I think that I will necessarily have to fight the death penalty, even though he does not want me to. I think I would be – we would be derelict in our duty. But, at the same time, to go against the wishes of our client puts us in a direct conflict. We wanted to make the record clear on this. Mr. Grayson is here. He has had an opportunity to respond to anything that I have said. And the Court may even want to consider, prior to this, to at least given him an hour or so to counsel with a third attorney, if the Court thinks that's necessary.
>
>                           \*\*\*
>
> [H]e has put this forward to me since, probably since the first time I talked to him, which I believe was September of last year. But, until yesterday, when we actually started the trial, I thought it was something . . . that he would reconsider. But he's been adamant about it all along, and very adamant about it yesterday, even on voir dire, as far

145

as our questions about feelings on the death penalty. It's my understanding that he did not feel that those were really relevant, since that was not an issue he wished to contest if he was convicted.

Trial Record Vol. 6 [153-11], at 104-07. Petitioner confirmed to the trial court that he did not wish to contest the death penalty if convicted: "I have nothing to say. . . . [I]f I get convicted, . . . I ain't fixing to do the rest of my days up there, you know. I'd just rather go ahead and be executed." *Id.* at 105-06. The trial court deferred addressing the issue until the guilt phase had concluded. *Id.* at 106.

After the State rested its case, Petitioner's counsel brought the issue up again. He said:

[W]e had discussed this matter in chambers earlier. In fact, we've discussed it several times during the week. Mr. Grayson has informed me that if in fact . . . he is convicted during the sentencing phase tomorrow, he has instructed me that I am not to fight the death penalty during the sentence phase. Given the choice between death or life without possibility of parole, it is his option to choose the death penalty. And he does not want me to interfere in any way in that. Mr. Grayson has told me that several months ago and he has continued that position throughout my representation of him. Quite frankly, I thought prior to trial that he would change his mind. Once the trial began, he still maintained this position. I spoke with Your Honor about this. We had a conference in chambers about it. And the matter has still continued on. As of the break a little while ago, Mr. Bailey and I took Mr. Grayson and his mother into this room just off the courtroom, we discussed this matter at length. We explained all of his options for appeal. We explained all the options and all the possibilities for the outcome of a jury verdict. He has still informed us that it's his wish that if he is convicted in the sentencing phase that we are to do nothing . . . in the way of defending the death penalty. And he wishes to request the jury to impose the death penalty.

Due to that, Your Honor, I would request, on behalf of myself and Mr. Bailey, that the Court appoint a third attorney simply to discuss this matter with him, so that it is clear that Mr. Bailey and I have not been

146

> derelict in our duties to our client and have made all of his options clear
> to him and make sure that he understands the implications and the
> ramifications of what he plans to do tomorrow.

Trial Record Vol. 9 [153-14], at 6-8. The trial court asked Petitioner if he agreed with

what his counsel had said, and Grayson answered, "I ain't got no problem with what

he said." *Id.* at 11.

Petitioner's counsel also expressed concern that Grayson would damage his

own credibility and/or inflame the jury if he took the stand:

> I have explained that if in fact Mr. Grayson wishes to fight the death
> penalty, I would not put him on during the guilt phase, because I think
> that that would damage his credibility with the jury. It would affect
> their opinion of him in the sentencing phase. So he would either have to
> make a decision, based on my trial tactics, to testify in one or the other.
> If he chose to testify in the guilt phase and then changed his mind and
> wished to fight the death penalty, it probably would affect the jury's
> perception of him.

*Id.* at 11-12.

The court asked Grayson's mother if she had spoken with him on this topic,

and she said, "Yes, I have." *Id.* at 12. The court asked, "Have you done anything to

persuade him one way or the other?" *Id.* She answered, "No, ma'am. . . . Why should

I? If he has life in prison without parole? No, ma'am. . . . I don't want him to spend

the rest of his life in prison without parole." *Id.* at 12-13. Petitioner's mother affirmed

that she would prefer he receive the death penalty, and Petitioner's grandmother

agreed. *Id.* at 13. They both felt that he understood the ramifications of his decision.

*Id.* at 14. Petitioner's grandmother said, "[H]e's a grown man. He's got a right to make

a decision about his life," and his mother said, "Would you want your son . . . to spend

147

the rest of their lives in prison, without parole, being abused from other people?" *Id.*

The Court appointed an independent attorney, Robert Shepard, to speak with Petitioner alone "concerning this question of waiving a defense on the death penalty issue, if it gets that far." *Id.* at 25-26, 95-97. The next day, the Court asked Petitioner how long he had met with Shepard, and Petitioner said "[c]lose to an hour." *Id.* at 99. Petitioner confirmed that he had changed his mind, and that he wanted to "fight the death penalty" if convicted. *Id.* Petitioner's trial counsel also confirmed that Petitioner had "decided to go forward and fight the death penalty." *Id.* at 100. He stated: "Mr. Grayson has allowed me to put forth a defense on this. He's allowed me to call his mother and grandmother; however, he has opted not to take the stand in his own defense, but he will not object to me putting forth a defense and will not demand me not to do so." Trial Record Vol. 10 [153-15], at 38.

During the sentencing phase of trial, Petitioner's counsel called his mother, Annie O'Bryan, and his grandmother, Mrs. Vermelle Williams. *Id.* at 50-66. O'Bryan testified that Petitioner's father died when Petitioner was only three months old, while working on an offshore oil rig. *Id.* at 51-52. She said that she later remarried, and Petitioner's stepfather was "very strict on him. He would never let him participate in any ball games or any sports activities with the other children which he grew up with. He never allowed anyone to come home with Blayde to have a good time with or for Blayde to go home with anyone to have a good time." *Id.* at 52. They frequently had verbal conflicts, and Petitioner's stepfather, a large man, "would

148

either whip [Petitioner] with a belt and he would leave marks on him or he'd pick up a root or a stick outside in the yard and hit [Petitioner] with it." *Id.* at 53, 57. On one occasion, he beat Petitioner with a water hose. *Id.* at 53. O'Bryan also testified that Petitioner's stepfather verbally abused him: "He would call him a low down, no good for nothing, worthless bum. And then there was quite a few choice words that I will not repeat." *Id.* She said Petitioner endured this verbal and physical abuse for seven years – from the age of ten until he moved out when he was seventeen. *Id.* at 53-54.

O'Bryan said that Petitioner had been rebellious, and that he had problems with drug abuse. *Id.* at 54. She said: "[W]hen he didn't have drugs in him, he was . . . the best person you ever wanted to be with. But when he had drugs with him, in him, he was a totally different person. He didn't want to be around the family when he had drugs in him, because he knew it wasn't right." *Id.* at 54. According to O'Bryan, Petitioner overdosed on "LSD and cocaine" in 1993, and he was hospitalized. *Id.* He spent sixteen days in a rehab facility, until "[t]he insurance money ran out." *Id.* at 54-55. The family was never able to afford additional treatment. *Id.* at 55. She said Petitioner never made any other effort to get help for his drug problem. *Id.* at 59.

Mrs. O'Bryan testified that she could not "believe that he killed Mrs. Minnie under the fact that, the sight of the blood, he would have blacked out completely. Because when he . . . had cut his finger really bad and he blacked out." *Id.* at 56. Although he was "a different person" while "under the influence of drugs," she had "never seen him to be a violent person." *Id.* at 60-61. In the end, she affirmed that she

149

"would rather that [he] not have the death penalty." *Id.* at 56.

Petitioner's grandmother, Vermelle Williams, testified that Petitioner's stepfather did not permit him to come visit her, although she lived just "up the path" from them. *Id.* at 62. She said: "So we'd see each other out in the yard and we'd just wave and tell each other we loved them." *Id.* She also testified that Petitioner's stepfather "was all the time shouting at him. He would hit him occasionally, and he left marks on him." *Id.* at 63. She said Petitioner started using drugs around eighth or ninth grade, and he became "more moody. We couldn't control him as much." *Id.* However, she said he "was never mean," and "he didn't never strike out at us." *Id.* Like O'Bryan, Williams testified that Petitioner overdosed on "LSD and cocaine," and they put him in a rehab facility until insurance stopped paying. *Id.* at 63-64. She said that there were never any problems with Petitioner when he lived with her after he moved out of his mother's house. *Id.* at 64.

In post-conviction, Petitioner supplemented the contemporaneous trial record with numerous affidavits. In an affidavit executed on April 14, 2005, Petitioner's trial counsel described his mitigation efforts:

> I recall that Mr. Bailey and I had obtained records pertaining to Grayson's prior offenses and a drug overdose when he was a teenager. I do not recall seeing any other background records.
>
> ***
>
> Prior to trial, I met with Grayson probably about 8-10 times at the County jail and once or twice at Mr. Bailey's office. I believe that I had a good working relationship with Grayson, but he told me from the beginning that he did not want to fight against the death penalty if he

150

was convicted. He was, however, very cooperative in talking with me about his life, giving me a list of his family members, and answering any other questions I had concerning the trial or potential mitigation in sentencing.

***

I met with Grayson's mother, Annie O'Brien, a number of times. She would meet with me at my office every two weeks or so. She wanted Grayson to fight the death penalty.

I also met with Grayson's grandmother during the trial. I recall that Grayson's grandmother wanted him to get the death penalty. I also recall that she came up to me after the sentencing and asked how soon he would be executed because she hoped to get his heart for a grandson who needed a heart transplant. . . .

I did not talk to any of Grayson's family members outside of his mother and grandmother. As I recall, I did not talk with his siblings, although I knew he had at least one or two siblings, because Mr. Bailey informed me that they were very young when the murder occurred. I did not talk to any other family members because Mr. Bailey informed me that they were not capable of assisting us because they were very simple, uneducated people. They were used to being told what to do and living with it.

***

Although Grayson had told me from the beginning that he did not want to present mitigation and argue for life, I never believed that he was serious and did not allow that to affect our planning. Our strategy during sentencing was just to present all the available mitigation evidence and to try to elicit sympathy.

I selected Dr. Deal as the defense psychiatric expert because he was the only psychiatrist that I knew of in Mississippi who had found a defendant to meet the McNaughton standard for insanity. I believed that he was the best chance we had for a finding of incompetence.

I do not recall talking with Dr. Deal about potential mitigation issues and also do not recall him saying anything helpful on that front. I do not recall whether I gave Dr. Deal any background records or if he talked to

151

any of Grayson's family. The best I can recall, Grayson may have had a prior evaluation done and that would have been given to Dr. Deal.

I did not call Dr. Deal as a witness during the trial or sentencing because he did not find that Grayson was incompetent or insane at the time of the offenses and because Dr. Deal is not a very good witness. He likes to play games and joust around with the prosecutors too much and I feared that he would cause more harm than good in testimony. I was also concerned that the state would seek to call a rebuttal witness who would be very harmful.

Just before sentencing, at my request, the judge appointed Robert Shepard to consult with Grayson concerning his decision not to fight the death penalty. I may have been present for the first part of his meeting with Grayson, but was not there for most of it so they could talk privately. I do not know if Shepard talked to any of Grayson's family members.

After Shepard convinced Grayson to allow us to present mitigation evidence and to argue against the death penalty, I do not recall Grayson refusing to allow us to call anyone other than his mother and grandmother to testify. We did not present any additional evidence or ask for a continuance because that was the only mitigation evidence we had to present and I did not believe that a continuance would be helpful.

Exhibit 28 to Petition [8-2], at 117-20. The time sheets submitted by Petitioner's counsel provide that before trial he spent 7.5 hours in meetings with Petitioner, 3 hours in phone calls with Petitioner's family, 1.5 hours in phone calls with Dr. Deal, and 35 hours in "other trial preparation." Exhibit 27 to Petition [8-2], at 110.

In an affidavit executed on April 15, 2005, Petitioner stated he met with his attorneys only six to eight times before trial, and "[e]ach of these meetings lasted for no more than 30 minutes each time." Exhibit 33 to Petition [8-2], at 131. Concerning mitigation, he said:

My attorneys never explained to me that the sentencing proceeding was

a separate proceeding following conviction. They did not explain to me the types of aggravating and mitigating circumstances that the jury would be allowed to consider in sentencing. They also did not explain the numerous appeals and proceedings available even after a person is sentenced to death.

Although I told Ishee from the beginning that I did not want to oppose the death penalty if convicted, I did not refuse to discuss any possible mitigation with my attorneys and answered any questions they asked about my family and my background. I did not tell my attorneys not to talk to my family and did not tell my family not to talk to them. My family did not know of my desires until shortly before trial.

Bailey knew my mother and grandmother personally because he had represented me on a prior charge. Bailey also knew my aunt, Dulcie, because she had worked in the courthouse as a bailiff prior to my trial. I am not aware of either of my attorneys contacting my family or anyone else to investigate my background or the circumstances of my life prior to my trial starting. As far as I know they had talked with my mother on a few occasions but that was only because she contacted them to ask questions about my case.

During the trial, Ishee finally took me seriously when I said that I did not want to oppose the death penalty. He then asked that my mother and grandmother discuss the issue with me. He also asked that another attorney, Robert Shepard, meet with me. After discussing the issue with my family and with Shepard, I understood the proceedings much better and agreed to allow Ishee to argue against the death penalty.

Once I agreed to present mitigation and to argue against the death penalty, I did not place any restrictions on my attorneys. The decision to call only my mother and grandmother in mitigation was their decision, not mine. I think that was done because they simply had not talked to anyone else or investigated my background.

Exhibit 33 to Petition [8-2], at 131-32.

Robert Shepard also provided an affidavit, in which he described his brief consultation with Petitioner. He stated:

I met with Grayson for a half hour to an hour. . . . Although I had never

153

met Grayson before, I was able to persuade him to allow his attorneys to present mitigation and to argue against the death penalty. In the beginning of the meeting, Grayson was adamant that he preferred the death penalty to life in prison. All I really said to him to get him to change his mind was that there would be appeals and that you never know what might happen. I also told him that he could do good in prison and that he was too young to make the decision to die.

It was my impression that Grayson's insistence, before my involvement, that no mitigation or argument be presented in his behalf was not an informed decision. It was an impulsive action made by a 21-year-old kid who had not been provided with adequate information to make such a momentous decision.

Exhibit 52 to Petition [8-2], at 192.

Annie O'Bryan, Petitioner's mother, also executed an affidavit. She described Grayson's childhood in detail, describing how his stepfather mistreated him. Exhibit 35 to Petition [8-2], at 136. The affidavit largely mirrors her testimony at trial, but with greater detail. She described physical abuse: "Lomax would hit Blayde . . . with a root, hammer, water hose, wrench, or whatever was available." *Id.* She also described Petitioner's drug use: "I think Blayde started using drugs around the 9th grade, but it became really noticeable when he was in the 11th grade. When Blayde was on drugs he was like a different person." *Id.* at 137. She recounted his overdose and brief stay in a treatment facility. *Id.* She noted that Petitioner dropped out of school in the 12th grade. *Id.* Finally, she described her contact with Petitioner's attorneys throughout the case:

I . . . went and talked to his lawyers, although they never contacted me. Me and my mom visited Mr. Bailey once for about one hour just to find out what was happening. Mr. Bailey was in poor health at the time. I also met Mr. Ishee one time before trial for about 30 minutes. Neither

one of them ever asked about Blayde's background other than during my testimony in sentencing. We had never discussed it before and they did not prepare with me in any way for my testimony.

During the trial, I did talk with Blayde at the courthouse because he said he did not want to fight the death penalty. I did not disagree with him because it is his life and he was looking at life without parole as an alternative. I do not know why he changed his mind and allowed Mr. Ishee to argue for a life sentence.

*Id.*

Petitioner's grandmother, Vermelle Williams, also provided an affidavit, and it largely mirrors her testimony at trial in all relevant respects, but with greater detail. She said Petitioner had a "mostly healthy childhood, but he had high fevers at night pretty often all the way until he started school." Exhibit 36 to Petition [8-2], at 141. She described the verbal and physical abuse Grayson's stepfather inflicted on him: "He constantly told them that they were stupid and dumb. He also beat them and would leave bruises and marks on them." *Id.* She said Petitioner "was a good student and no trouble at all until he started high school and started using drugs." *Id.* at 142. "After he started using drugs, he was a totally different person. He even stole from me in order to support his drug habit. He was out of control with drugs and was even found at one time passed out by the side of the road." *Id.* She described Petitioner's overdose and brief stay in a treatment facility. *Id.* Finally, she described her contact with Petitioner's attorneys:

After Blayde's arrest in this case, I saw him within a day or two. I also met with Mr. Bailey, who I knew because he had represented Blayde before. I had no real discussion with him though. He just said that he would do the best he could with what he had. I also met with Mr. Ishee

and others just before trial when we were all in a room talking to Blayde. These were the only discussions I had with Blayde's lawyers or anyone working with them prior to his arrest. I testified in his sentencing trial, but they had not otherwise met with me or prepared me for my testimony.

*Id.* at 143.

Petitioner also presented affidavits from several other friends and family members: his aunt, Dulcie Williams;[13] his grandfather, Robert Williams;[14] his aunt, Melody Riley;[15] his aunt, Daphne Lee;[16] his uncle, Claude Williams;[17] his brother, Kristopher Grayson;[18] his sister, Margaret Campbell;[19] his aunt, Teresa Goff;[20] his cousin, Tim Amodeo;[21] his high school guidance counselor, Rodney Byrd;[22] and the mother of his daughter, Charnelle Prescott.[23] He also presented the unexecuted draft of an affidavit from Carlton King, the former Constable in George County, Mississippi.[24] In general, these affidavits described the verbal and physical abuse inflicted on Petitioner by his stepfather, and Petitioner's resulting physical and emotional wounds. They described how he began using drugs and alcohol by the time he was twelve or thirteen years old, and a couple of family members said that Grayson had stolen from them to feed his drug habit. Multiple family members noted that

---

[13] Exhibit 37 to Petition [8-2], at 145-48.
[14] Exhibit 38 to Petition [8-2], at 150-51.
[15] Exhibit 39 to Petition [8-2], at 153-56.
[16] Exhibit 40 to Petition [8-2], at 158-61.
[17] Exhibit 41 to Petition [8-2], at 163-64.
[18] Exhibit 42 to Petition [8-2], at 166-67.
[19] Exhibit 43 to Petition [8-2], at 169.
[20] Exhibit 44 to Petition [8-2], at 171-72.
[21] Exhibit 45 to Petition [8-2], at 174.
[22] Exhibit 53 to Petition [8-2], at 194-95.
[23] Exhibit 55 to Petition [8-2], at 201-03.
[24] Exhibit 54 to Petition [8-2], at 198-99.

Petitioner would get sick and/or faint at the sight of blood. Overall, Petitioner's friends and family described him as good-natured and kind, but they lamented that he could not control his drug problem or avoid the bad crowd that came with it. Each affiant stated that Petitioner's trial counsel did not interview them, but that they would have testified at sentencing if they had been asked.

### d. Evidence Not Presented to State Court

Neither Petitioner nor the State squarely addressed whether all Petitioner's exhibits in this federal habeas case had been presented to the Mississippi Supreme Court for consideration. The State generally asserted that Petitioner had attached exhibits that were not part of the state-court record without specifying which exhibits, and Petitioner generally replied that most of his exhibits had, in fact, been presented in state court. After comparing the state-court record to Petitioner's exhibits in this habeas case, the Court concludes that the expert reports and curricula vitae of Dr. Donna Maddox and Dr. Tora Brawley have never been presented to a state court. *See* Exhibits to Motion for Leave to Amend [97-1, 97-2, 97-3, 97-4].

When a federal habeas court addresses a claim that was adjudicated on the merits in state court, it may not consider any evidence outside the state-court record. *Broadnax*, 987 F.3d at 406 (citing *Pinholster*, 563 U.S. at 180). If the petitioner can "demonstrate that habeas relief is warranted under § 2254(d) *on the state court record alone*, . . . then a federal habeas court may entertain new evidence pursuant to the limitations of § 2254(e)(2)." *Id.* at 406-07. However, when a federal habeas court

addresses a claim that was *not* adjudicated on the merits in state court, it applies §

2254(e)(2) to determine whether to permit evidentiary development. *Id.* at 406 n. 3

(emphasis added).

Here, the Mississippi Supreme Court held that Petitioner's mitigation-related

ineffective-assistance claims were barred by *res judicata*, time-barred, and barred as

a successive petition. *Grayson III*, 118 So. 3d at 125, 141-43 (citing MISS. CODE ANN.

§§ 99-39-21(2), 99-39-27(9), 99-39-5(2)). However, it also addressed the claims' merits.

*Id.* at 141-43. A state court has adjudicated a claim on the merits when it decides a

case on procedural grounds but alternatively addresses the claim's merits. *Lucio*, 987

F.3d at 466-67. Therefore, the Court may not consider any evidence outside the state-

court record, including the Maddox and Brawley affidavits. *See Broadnax*, 987 F.3d

at 406-07.

Even if the Mississippi Supreme Court had not adjudicated the merits of

Petitioner's mitigation-related ineffective-assistance claims, the Court still could not

consider the Maddox and Brawley affidavits. AEDPA provides:

> If the applicant has failed to develop the factual basis of a claim in State
> court proceedings, the court shall not hold an evidentiary hearing on the
> claim unless the applicant shows that –
>
> (A)  The claim relies on –
>
> > (i)      a new rule of constitutional law, made retroactive to cases
> > on collateral review by the Supreme Court, that was
> > previously unavailable; or
> >
> > (ii)     a factual predicate that could not have been previously
> > discovered through the exercise of due diligence; and

(B)     the facts underlying the claim would be sufficient to establish by
clear and convincing evidence that but for constitutional error, no
reasonable factfinder would have found the applicant guilty of the
underlying offense.

28 U.S.C. § 2254(e)(2). Petitioner cannot meet this standard because even if the Court

were to consider the Maddox and Brawley affidavits, they are only relevant to

sentencing, and not his conviction on the underlying offense. *See* 28 U.S.C. §

2254(e)(2)(B); *Ford v. Johnson*, 263 F.3d 162, 2001 WL 803555, at *4 (5th Cir. June

11, 2001) (§ 2254(e)(2)(B) requires showing of actual innocence); *Nobles v. Johnson*,

127 F.3d 409, 424 n. 33 (5th Cir. 1997) (describing § 2254(e)(2)(B) as requiring "actual

innocence" showing).

### e.  Merits Analysis

As stated above, Petitioner claims that his trial counsel was ineffective because

they failed to adequately consult with him and conduct an adequate mitigation

investigation prior to trial, and that the failure to conduct an adequate mitigation

investigation prejudiced his defense in that he was unable to present substantial

mitigation evidence at sentencing.

"The Supreme Court has interpreted the Sixth Amendment to require defense

counsel 'to make reasonable investigations [into potential mitigating evidence] or to

make a reasonable decision that makes particular investigations unnecessary.'"

*Brewer v. Lumpkin*, 66 F.4th 558, 565 (5th Cir. 2023) (alteration original) (quoting

*Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)). "[T]o

succeed on a claim for failure to investigate, a defendant must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Bernard*, 762 F.3d 467, 477 (5th Cir. 2014).

"Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy[,] and speculation about what witnesses would have said on the stand is too uncertain." *Woodfox*, 609 F.3d at 808; *see also Robinson v. Whitley*, 2 F.3d 562, 571 (5th Cir. 1993) ("general allegations and speculation" insufficient to support ineffective assistance claim). Accordingly, "petitioners making claims of ineffective assistance based on counsel's failure to call a witness [must] demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense." *Woodfox*, 609 F.3d at 808.

However, trial counsel's "failure to present a particular line of argument or evidence is presumed to have been the result of strategic choice." *Devoe v. Davis*, 717 F. App'x 419, 430 (5th Cir. 2018) (quoting *Taylor v. Maggio*, 727 F.2d 341, 347 (5th Cir. 1984)) (punctuation omitted). "[A] tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance." *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997). Indeed, "an attorney need not

pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Bernard*, 762 F.3d at 477. Likewise, an attorney's failure to present mitigating evidence that is cumulative of that which was presented does not prejudice the defendant. *Brewer*, 66 F.4th at 566.

It is undisputed that Petitioner instructed his trial counsel that he did not wish to fight the death penalty if convicted. Petitioner admitted in his affidavit: "I told Ishee from the beginning that I did not want to oppose the death penalty if convicted . . . ." Exhibit 33 to Petition [8-2], at 131. He directly told the trial court: "I ain't fixing to do the rest of my days up there, you know. I'd just rather go ahead and be executed." Trial Record Vol. 6 [153-11], at 105-06. Petitioner's own mother and grandmother agreed with this course of action. Exhibit 35 to Petition [8-2], at 137; Trial Record Vol. 9 [153-14], at 13-14. Petitioner's counsel stated at the beginning of trial that Petitioner had been "adamant . . . all along" that he did not wish to fight the death penalty if convicted. Trial Record Vol. 6 [153-11], at 107. Robert Shepard, the attorney who convinced Petitioner to allow his attorneys to put on a mitigation case, said that Petitioner "was adamant that he preferred the death penalty to life in prison." Exhibit 52 to Petition [8-2], at 192. Indeed, Petitioner admits in briefing that he instructed his trial counsel throughout the course of the entire case, up to shortly before the guilt phase of trial, that he did not wish to fight the death penalty.

This case is similar to *Autry v. McKaskle*, 727 F.2d 358 (5th Cir. 1984). There, the petitioner claimed that his attorney provided ineffective assistance by failing "to

conduct an independent investigation into possible witnesses at the sentencing phase," including "witnesses who might have testified to Autry's family background." *Id.* at 360. However, the record demonstrated that the petitioner "did not want his lawyer to fight the death penalty" because he "preferred death to life imprisonment." *Id.* The petitioner told his counsel "prior to ever going to trial . . . , that if he was found guilty, he wanted to take the stand and tell the jury he wanted the death sentence as opposed to a life sentence." *Id.* at 361. The attorney thought Autry would change his mind, but although he interviewed a few of Autry's family members, he did not conduct any other independent investigation. *Id.* The Fifth Circuit held, "By no measure can [a defendant] block his lawyer's efforts and later claim the resulting performance was constitutionally deficient," and Autry's ineffective-assistance claim failed. *Id.*

Additionally, in *Dowthitt v. Johnson*, the petitioner claimed "that trial counsel committed constitutional error by not presenting mitigation evidence via family members during the punishment phase of the trial" which would have demonstrated his "abusive upbringing, his mental difficulties, and his loving relationship with some of his children . . . ." 230 F.3d at 748. The Fifth Circuit held: "Counsel will not be deemed ineffective for following their client's wishes, so long as the client made an informed decision." *Id.* Dowthitt claimed that "he did not understand the import of mitigating evidence," and that his "counsel did not even discuss it with him," but the Fifth Circuit found that these assertions did not constitute "clear and convincing

evidence to rebut the state court's finding" that he "did not want any of his family testifying on his behalf." *Id.* Accordingly, Dowthitt failed to demonstrate that his trial counsel provided deficient representation. *Id.* at 749.

Here, the record contains undisputed evidence that Petitioner specifically instructed his trial counsel that he did not wish to present a mitigation case if convicted. The record also contains evidence that Petitioner's attorneys discussed the issue with him well before and during trial.[25] Accordingly, the Court finds that the Mississippi Supreme Court reasonably determined that Petitioner made an informed decision to forego presentation of a mitigation case if convicted. Moreover, the Mississippi Supreme Court's finding that Petitioner's trial counsel did not provide deficient representation in this respect was not unreasonable, in light of the Fifth Circuit's decisions in *Autry* and *Dowthitt*.

The Court also notes that most of the affidavits collected by Petitioner are from his family members. Petitioner's trial counsel stated in his affidavit that he "did not talk to any of Grayson's family members outside of his mother and grandmother" because "Mr. Bailey informed me that they were not capable of assisting us because they were very simple, uneducated people. They were used to being told what to do and living with it." Exhibit 28 to Petition [8-2], at 118. He also noted that Petitioner's

---

[25] Regardless, the Supreme Court has "never imposed an 'informed and knowing' requiring upon a defendant's decision not to introduce evidence." *Schriro v. Landrigan*, 550 U.S. 465, 479, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007). Even if there were such a requirement, Petitioner's counsel represented to the trial court, in Petitioner's presence, that he had "made all of [Petitioner's] options clear to him and ma[de] sure that he understands the implications and the ramifications" of the issue. Trial Record Vol. 9 [153-14], at 6-8.

siblings "were very young when the murder occurred." *Id.* Petitioner's trial counsel elected to not call Dr. Deal "during the trial or sentencing because he . . . is not a very good witness. He likes to play games and joust around with the prosecutors too much and I feared that he would cause more harm than good in testimony." *Id.* at 119. Counsel also did not wish to give the State a chance to call a rebuttal expert. *Id.* Accordingly, counsel's decision to not call these witnesses – including Petitioner's family – was a strategic decision entitled to a strong degree of deference. *Rhoades*, 852 F.3d at 431-32.

Petitioner argues that his counsel had a duty to perform more investigation and present more mitigation evidence despite his explicit instruction that he did not wish to present a mitigation case. Most of the cases he cites in support of this argument are inapposite. In *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), the habeas petitioner did not explicitly instruct his trial counsel that he did not want to present any defense against the death penalty. Instead, he was simply unhelpful. *Id.* at 381. His "contributions to any mitigation case were minimal," and he was "uninterested in helping." *Id.* He expressed boredom during counsel's visits, and he obstructed counsel's investigation "by sending counsel off on false leads." *Id.*

Similarly, in *Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009), the habeas petitioner did not explicitly instruct his trial counsel that he did not wish to fight the death penalty. Rather, he was "fatalistic and uncooperative,"

and although he instructed trial counsel "not to speak to [his] ex-wife or son," he "did not give him any other instruction limiting the witnesses he could interview." *Id.* at 40.[26]

Even if Petitioner's counsel had provided deficient representation, the Mississippi Supreme Court reasonably determined that it did not prejudice Petitioner's case. First, the record contains evidence supporting the Mississippi Supreme Court's factual determination that Petitioner only allowed his trial counsel to call his mother and grandmother to testify before presenting a mitigation argument. *See* Trial Record Vol. 10 [153-15], at 25, 38. Petitioner has not rebutted this factual determination with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). If Petitioner did not allow his trial counsel to present mitigation testimony from anyone other than his mother and grandmother, counsel's failure to investigate and prepare such evidence could not have prejudiced Petitioner's defense.

The Court also notes that much of the information provided in the affidavits, described above, is generally cumulative of the evidence already presented at trial, albeit with more details. Moreover, all the affidavits from Petitioner's friends and family mention his drug problems, which could have harmed his defense by

---

[26] *Sonnier v. Quarterman*, 476 F.3d 349 (5th Cir. 2007), also cited by Petitioner, is a different story. There, the habeas petitioner had "refused to cooperate" with his attorneys during their investigation, and specifically forbade them from offering any evidence in mitigation at his trial. *Id.* at 357. Despite the applicable precedents of *Autry* and *Dowthitt*, the panel in *Sonnier* found that Sonnier's attorneys had provided deficient representation. *Id.* at 358. However, they ultimately found that there was no prejudice because of the weight of the evidence against him. *Id.* at 360-61. Under the Fifth Circuit's rule of orderliness, "a later panel . . . cannot overrule an earlier panel decision." *United States v. Berry*, 951 F.3d 632, 636 (5th Cir. 2020). Accordingly, the Court will adhere to the earlier decisions in *Autry* and *Dowthitt*.

supporting the State's theory of a burglary motive. In fact, a couple of the affiants specifically mentioned that Petitioner had previously stolen from them to feed his drug habit, and a couple stated that he "became another person" when he was on drugs. This testimony could just as easily have been harmful as helpful, particularly in light of the weight of evidence against Petitioner, including the brutality of the murder and his own confession. *Cf. Nelson*, 72 F.4th at 662 (where counsel had "little hope" of showing petitioner did not pose a continuing threat to society due to the nature of the offense and other evidence, there was no prejudice from counsel's failure to investigate and present mitigation evidence); *Brewer*, 66 F.4th at 566-67 (counsel's failure to present mitigating evidence was not prejudicial because it likely would not have influenced the jury given the nature of the crime and the state's evidence).

Ultimately, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Chamberlin*, 885 F.3d at 837. This Court must determine "whether fairminded jurists could disagree as to how the Supreme Court's caselaw applies to the circumstances that the state court confronted; if so, then [this Court] cannot set aside the state court's conclusion." *Engle*, 33 F.4th at 790. For the reasons provided above, the Court concludes that the Mississippi Supreme Court's adjudication of Petitioner's claims related to mitigation was not unreasonable in light of the record.

*11.    Mitigation Argument*

Petitioner also argues that his trial counsel provided ineffective assistance by only making general social and religious arguments against the death penalty, rather than highlight specific mitigation evidence in his argument. Petitioner contends that his trial counsel should have discussed the mitigation testimony of his mother and grandmother, rather than appealing to the jury's moral and religious sensibilities. In response, the State argues that this claim is procedurally barred, and that Petitioner has not demonstrated that his trial counsel provided ineffective assistance.

The Mississippi Supreme Court addressed this claim in Petitioner's successive post-conviction proceeding. *Grayson III*, 118 So. 3d at 143-44. It noted that closing argument typically "falls under the ambit of defense counsel's trial strategy." *Id.* at 144. Regardless, Petitioner "failed to show that there is a reasonable probability that the result of the proceedings would have been different" if his trial counsel had altered his strategy in closing argument. *Id.* Accordingly, this ineffective-assistance claim failed, and post-conviction counsel's failure to raise it in the initial post-conviction proceeding did not prejudice Petitioner. *Id.* at 144. Thus, Petitioner did not receive ineffective assistance in the initial post-conviction proceeding, and the claim was time-barred and barred as a successive petition. *Id.* at 125, 144 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

**a.  Procedural Bar**

The State argues that this claim is procedurally barred. As noted above, the

Mississippi Supreme Court held that the claim was time-barred and barred as a successive petition, despite providing an alternative ruling on the claim's merits. *Id.* "A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza*, 738 F.3d at 675.

Petitioner argues that the Mississippi Supreme Court addressed the merits of the claim and did not reject it pursuant to a procedural rule. Petitioner is mistaken. The Mississippi Supreme Court addressed the merits of the claim as part of its post-conviction ineffective-assistance analysis, to determine if post-conviction counsel's deficient performance prejudiced Petitioner. *Id.* at 125, 144 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)). Because there was no prejudice, Petitioner was not excused from complying with Mississippi's procedural rules governing post-conviction petitions, and the successive petition was procedurally barred. *Id.* Regardless, the Mississippi Supreme Court clearly invoked procedural bars in its dismissal of this claim, *id.*, and "the fact that the state court alternatively addressed the merits of [a petitioner's] claim does not prevent its procedural default determination from being an independent basis that bars review by the federal courts." *Cotton*, 343 F.3d at 754.

The Fifth Circuit has specifically held that both the MUPCCRA's statute of limitations and bar on successive petitions "are independent and adequate state procedural grounds" to bar federal habeas review. *Spicer*, 2021 WL 4465828 at *3 (as applied to an ineffective assistance claim); *see also Bell*, 290 F. App'x at 655; *Johnson*,

176 F.3d at 815 n.3. Petitioner did not otherwise argue that any exception to the doctrine of procedural default applies. Therefore, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675, and it is barred from federal habeas review.

### b. Merits

Notwithstanding the procedural bar, the Mississippi Supreme Court's adjudication of this claim was reasonable. The Court has already thoroughly discussed the mitigation evidence presented by Petitioner's trial counsel. In his sentencing-phase closing argument, Petitioner's trial counsel argued that life imprisonment would be a fitting sentence for the crime of which Petitioner was convicted, and that it would be harsher than a death sentence. Trial Record Vol. [10] [153-15], at 76-79. In fact, he emphasized throughout the argument that life without parole was "not a lenient sentence. Not something that anyone in this courtroom would even want to entertain in their own minds for their own life or their own future. A punishment that is so great that the rest of civilized society hasn't even imposed it." *Id.* at 81. He also argued that killing Petitioner would not benefit anyone or bring Minnie Smith back from death, and that it would only serve the purpose of revenge. *Id.* at 77, 80. He cited the Biblical story about Jesus stopping a group of people from stoning an adulterous woman to death. *Id.* at 80.[27] He closed with an impassioned

---

[27] *See* John 8:1-11.

plea for the jury to "stop the killing" and to "acknowledge the fact that we are all human beings and that we're all God's children and that we are above that." *Id.* at 81-82.

Petitioner's trial counsel later explained via affidavit that "there were a lot of fundamentalist people on the jury and they handed down a death verdict. There were, however, three or four people . . . who were crying after the death sentence had been handed down and they apologized to me on their way out." Exhibit 28 to Petition [8-2], at 119.

"[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 6, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003). Although, "[c]losing arguments should sharpen and clarify the issues for resolution by the trier of fact, . . . which issues to sharpen and how best to clarify them are questions with many reasonable answers." *Id.* "[G]iven the wide range of available strategies, pleading for mercy or presenting mitigating factors in a closing argument is not required." *Clark v. Thaler*, 673 F.3d 410, 427 (5th Cir. 2012). In fact, "it might sometimes make sense to forego closing argument altogether," *Yarborough*, 540 U.S. at 6, or to "establish credibility with the jury" by "acknowledge[ing] the defendant's culpability and . . . conced[ing] that the jury would be justified in imposing the death penalty." *Riley v. Cockrell*, 339 F.3d 308, 317 (5th Cir. 2003). Therefore, the Court's

review of ineffective assistance claims premised upon counsel's performance in closing argument is "highly deferential – and doubly deferential when it is conducted through the lens of federal habeas." *Yarborough*, 540 U.S. at 6. A habeas petitioner's "desire to have a specific defense theory presented does not amount to ineffective assistance on federal habeas review." *Ries v. Quarterman*, 522 F.3d 517, 529 (5th Cir. 2008).

Considering trial counsel's observation that the jury had "a lot of fundamentalist people," his choice to use Biblical illustrations and argue that life imprisonment was, in fact, harsher than death was reasonable. Regardless, Petitioner has not provided any evidence demonstrating that a different strategy would have resulted in a sentence of life imprisonment without parole. Accordingly, the Mississippi Supreme Court's adjudication of this claim was not unreasonable in light of the record.

### 12. *Jury Instruction – Mitigation Evidence*

Petitioner argues that his trial counsel provided ineffective assistance by failing to object to the trial court's failure to instruct the jury to consider all mitigation evidence, rather than just the statutory mitigating factors. In response, the State argues that this claim is procedurally barred, and that the Mississippi Supreme Court's alternative ruling on the merits was reasonable.

Petitioner first presented this issue to the Mississippi Supreme Court in his successive post-conviction proceeding. *Grayson III*, 118 So. 3d at 144. The Mississippi

Supreme Court held that the jury was not foreclosed from considering all mitigating circumstances, and, therefore, the claim was meritless. *Id.* Therefore, post-conviction counsel's failure to raise it claim in the initial post-conviction proceeding did not prejudice Petitioner. *Id.* at 144. Thus, Petitioner did not receive ineffective assistance in the initial post-conviction proceeding, and the claim was time-barred and barred as a successive petition. *Id.* at 125, 144 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

### a. Procedural Bar

The State argues that this claim is procedurally barred. As noted above, the Mississippi Supreme Court held that the claim was time-barred and barred as a successive petition, despite addressing the claim's merits in the process of determining whether it was procedurally barred. *Id.* "A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza*, 738 F.3d at 675.

Petitioner did not address the procedural bars with respect to this claim. Regardless, the Mississippi Supreme Court clearly invoked procedural bars in its dismissal of the claim, *Grayson III*, 125, 144, and "the fact that the state court alternatively addressed the merits of [a petitioner's] claim does not prevent its procedural default determination from being an independent basis that bars review by the federal courts." *Cotton*, 343 F.3d at 754. Moreover, the Fifth Circuit has

172

specifically held that both the MUPCCRA's statute of limitations and bar on successive petitions "are independent and adequate state procedural grounds" to bar federal habeas review. *Spicer*, 2021 WL 4465828 at *3; *see also Bell*, 290 F. App'x at 655; *Johnson*, 176 F.3d at 815 n.3. Petitioner did not otherwise argue that any exception to the doctrine of procedural default applies. Therefore, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675, and it is barred from federal habeas review.

### b. Merits

Notwithstanding the procedural bar, the Mississippi Supreme Court's adjudication of this claim was reasonable. As discussed above, the trial court instructed the jury that they should "apply [their] reasoned judgment as to whether this situation calls for life imprisonment or whether it requires the imposition of death, in light of the totality of the circumstances present," and it instructed the jury they "may objectively consider . . . the character and record of the Defendant himself," in addition to the listed statutory mitigating factors. Trial Record Vol. 2 [153-7], at 18-19. "[J]urors are presumed to follow their instructions." *Sheppard*, 967 F.3d at 470. Accordingly, the instructions, when taken as a whole, did not foreclose the jury from considering all available mitigating evidence. *Grayson III*, 118 So. 3d at 131-32. Failure to make a meritless objection is not ineffective assistance, *Wood*, 503 F.3d at 413, and the Mississippi Supreme Court's adjudication of this claim was reasonable.

13.     *Jury Instruction – Parole Eligibility*

Petitioner argues that his trial counsel provided ineffective assistance by failing to object to the trial court's omission of an instruction that, if sentenced to life imprisonment, he would be ineligible for parole. The State argues that this claim is procedurally barred, and that the Mississippi Supreme Court's adjudication of the claim was reasonable.

Petitioner first presented this claim to the Mississippi Supreme Court in his successive post-conviction proceeding. *Id.* at 144-45. The Mississippi Supreme Court held that the "jury was adequately informed that a life sentence would be without parole," and the claim was meritless. *Id.* at 144. Therefore, post-conviction counsel's failure to raise it claim in the initial post-conviction proceeding did not prejudice Petitioner. *Id.* at 145. Thus, Petitioner did not receive ineffective assistance in the initial post-conviction proceeding, and the claim was time-barred and barred as a successive petition. *Id.* at 125, 145 (citing MISS. CODE ANN. §§ 99-39-27(9), 99-39-5(2)).

### a.  Procedural Bar

The State argues that this claim is procedurally barred. As noted above, the Mississippi Supreme Court held that the claim was time-barred and barred as a successive petition, despite addressing the claim's merits in the process of addressing the procedural bars. *Id.* "A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim."

174

*Garza*, 738 F.3d at 675.

Petitioner did not address the procedural bars with respect to this claim. Regardless, the Mississippi Supreme Court clearly invoked procedural bars in its dismissal of the claim, *Grayson III*, 125, 145, and "the fact that the state court alternatively addressed the merits of [a petitioner's] claim does not prevent its procedural default determination from being an independent basis that bars review by the federal courts." *Cotton*, 343 F.3d at 754. Moreover, the Fifth Circuit has specifically held that both the MUPCCRA's statute of limitations and bar on successive petitions "are independent and adequate state procedural grounds" to bar federal habeas review. *Spicer*, 2021 WL 4465828 at *3; *see also Bell*, 290 F. App'x at 655; *Johnson*, 176 F.3d at 815 n.3. Petitioner did not otherwise argue that any exception to the doctrine of procedural default applies. Therefore, the Court finds that the Mississippi Supreme Court rejected this claim "pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim," *Garza*, 738 F.3d at 675, and it is barred from federal habeas review.

### b. Merits

Notwithstanding the procedural bar, the Court finds that the claim is meritless. As discussed above, the trial court instructed the jury that its options were death or life imprisonment without parole. Trial Record Vol. 2 [153-7], at 24. Also, throughout closing argument, Petitioner's trial counsel repeatedly emphasized that the jury was choosing between death or life imprisonment without parole. Trial

Record Vol. 10 [153-15], at 76, 78-80. Therefore, the jury was adequately informed that a sentence of life imprisonment would be without parole, and any objection would have been meritless. Failure to make such an objection, therefore, was not deficient performance. *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) (failure to raise meritless objection is not ineffective assistance).

14.    *Cumulative Prejudice*

Finally, Petitioner argues that his trial counsel provided ineffective assistance Petitioner argues that all his trial counsel's deficient conduct cumulatively prejudiced his defense. In response, the State argues that the Mississippi Supreme Court correctly determined that this claim is meritless. Petitioner raised this claim in his successive post-conviction proceeding, and the Mississippi Supreme Court held: "In order for there to be a cumulative effect of errors, there must first be errors." *Grayson III*, 118 So. 3d at 145. Because Petitioner "failed to prove that he is entitled to any relief on each of his claims individually," the Mississippi Supreme Court concluded that he had "failed to prove that he is entitled to any relief on such claims cumulatively." *Id.*

"The Supreme Court has never squarely held that the cumulative error doctrine governs ineffective assistance of counsel claims." *Hill*, 781 F. App'x at 280. The Fifth Circuit has observed:

> We have reservations with respect to the applicability of cumulative error in the context of ineffective assistance after the enactment of AEDPA. This is because in order for there to be constitutional error in the form of ineffective assistance of counsel, the petitioner must fulfill

> both prongs of *Strickland*. If either prong is not satisfied, then the petitioner has not shown constitutional error, much less unreasonable constitutional error. On the other hand, if a petitioner demonstrates both prongs of *Strickland* and an objectively unreasonable determination in state court, relief is available. There is no need to cumulate.

*Zimmerman v. Cockrell*, 69 F. App'x 658, 2003 WL 21356018, at *12 (5th Cir. May 28, 2003). In other words, if a habeas petitioner demonstrates *any* ineffective assistance, he can get relief, and there's no need to cumulate prejudice. However, if he cannot prove any ineffective assistance, then there is nothing to cumulate. Therefore, the Court declines to extend the cumulative error doctrine in this manner.

Even if the cumulative error doctrine applied in this context, there is nothing to cumulate in that each of Petitioner's ineffective-assistance claims is meritless. *See Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008) (agreeing with district court ruling that meritless claims cannot be cumulated); *Dodson v. Stephens*, 611 F. App'x 168, 179 (5th Cir. 2015) (where there were not "multiple instances of deficient conduct," cumulative prejudice argument was meritless). The Mississippi Supreme Court's dismissal of this claim was reasonable.

## F.   *Evidentiary Hearing*

Petitioner argues that this Court should hold an evidentiary hearing on his habeas claims. Respondents argue that AEDPA and applicable case law specifically forbid the Court from holding an evidentiary hearing.

When a federal habeas court addresses a claim that was adjudicated on the merits in state court, it may not consider any evidence outside the state-court record.

177

*Broadnax*, 987 F.3d at 406 (citing *Pinholster*, 563 U.S. at 180). If the petitioner can "demonstrate that habeas relief is warranted under § 2254(d) *on the state court record alone*," then "a federal habeas court may entertain new evidence pursuant to the limitations of § 2254(e)(2)." *Id.* at 406-07. However, when a federal habeas court addresses a claim that was *not* adjudicated on the merits in state court, it applies § 2254(e)(2) to determine whether to permit evidentiary development. *Id.* at 406 n. 3 (emphasis added). A state court has adjudicated a claim on the merits when it decides a case on procedural grounds but alternatively addresses the claim's merits. *Lucio*, 987 F.3d at 466-67.

Even if the Mississippi Supreme Court had not adjudicated the merits of Petitioner's claims, the Court still could not permit evidentiary development. AEDPA provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (C)  The claim relies on –
>
>> (iii)   a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (iv)   a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (D)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). Petitioner cannot meet this standard because the only new evidence he seeks to develop is related to the testimony of two experts, Dr. Donna Maddox and Dr. Tora Brawley,[28] which is only relevant to sentencing, and not his conviction on the underlying offense. *See* Exhibits to Motion for Leave to Amend [97-1, 97-2, 97-3, 97-4]. Therefore, further evidentiary development is unavailable. *See* 28 U.S.C. § 2254(e)(2)(B); *Ford*, 2001 WL 803555 at *4 (§ 2254(e)(2)(B) requires showing of actual innocence); *Nobles*, 127 F.3d at 424 n. 33 (describing § 2254(e)(2)(B) as requiring "actual innocence" showing).

## III. CONCLUSION

For all the reasons provided above, the Court denies the Second Amended Petition [104] and dismisses this case with prejudice.

The Rules Governing § 2254 Proceedings require the Court to issue or deny a certificate of appealability ("COA") upon the entry of a final order adverse to the petitioner, and a petitioner must obtain a COA before appealing this Court's decision denying habeas relief. 18 U.S.C. § 2253(c)(1). To obtain a COA, Petitioner must show "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000). The Court denies a certificate of appealability.

---

[28] *See* Memorandum of Law in Support of Second Amended Petition [119], at 100-01; Reply Memorandum [136], at 2-3.

SO ORDERED AND ADJUDGED this 21st day of March, 2024.

                                    <u>  /s/     Carlton W. Reeves  </u>
                                        CARLTON W. REEVES
                                    UNITED STATES DISTRICT JUDGE